[No. S007779. Dec. 1, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ARNALDO RODRIGUES, Defendant and Appellant.

1074

1078

**Counsel**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Irene Kiebert and Joel Kirshenbaum, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Mathias, Gerald A. Engler and Joan Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**BAXTER, J.**—Defendant Jose Arnaldo Rodrigues was convicted by a jury of one count of murder (Pen. Code, § 187),[1] two counts of attempted robbery (§§ 664, 211), and one count of burglary (§ 459). The jury found true the special circumstances that defendant committed the murder while engaged in the crime of robbery or attempted robbery (§§ 190.2, subd. (a)(17)(vii), 211), and while engaged in the crime of burglary (§§ 190.2, subd. (a)(17)(vii), 460). It also found true allegations that defendant personally used a knife in the commission of each offense (§ 12022, subd. (b)), and that defendant had previously served prison terms (§ 667.5, subd. (b)) for accessory to murder (§ 32) and auto theft (Veh. Code, § 10851). After the jury returned a penalty

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

verdict of death, the trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)). Appeal to this court is automatic. (§ 1239, subd. (b).)

We find no prejudicial error at the guilt or penalty phase of defendant's trial. The judgment is affirmed in its entirety.

## I. FACTS

### A. *Guilt Phase Evidence*

#### 1. *The Prosecution Case*

Epifanio Zavala testified that in May 1987, he was living with his older brother Juan Barragan in an apartment on the second floor of a two-story building at 1100 Sevier in Menlo Park.[2] Zavala was then 19 years old and Barragan was 21.

Although Zavala and Barragan previously worked in restaurants, they did not have jobs the first week of May 1987. Barragan sold small amounts of cocaine and heroin to help make a living. Zavala sometimes helped out by giving drugs to customers. One of those customers was Cynthia Ontiveros,[3] a heroin addict who had bought heroin from the brothers on several occasions.

Ontiveros testified to the following. Although she lived in Hayward with her boyfriend, Richard Lopez, she was in love with Juan Garcia. At approximately noon on May 4, 1987, Ontiveros left Hayward to buy some heroin from Zavala at his apartment. Zavala sold her approximately one gram of heroin for $100.[4] After telling Zavala she might come back, Ontiveros returned to Hayward. During the course of the day, Ontiveros injected about half of the heroin and sold the rest.

At approximately 5 p.m. that evening, Ontiveros was selling heroin in front of the El Tanampa bar on B Street in Hayward. Garcia drove up in defendant's car, with defendant in the passenger seat.[5] Garcia asked Ontiveros how he could make some money. Ontiveros told him not to worry about it, that she would find a way. She told Garcia to meet her at the bar later in the evening.

---

[2] Although this opinion refers to the brothers as Zavala and Barragan, the reporter's transcript reflects that witnesses sometimes referred to Zavala as "Moro" or "Zavala Barragan," and to Barragan as "Andre."

[3] Zavala knew Ontiveros as "Cyndia."

[4] Zavala testified the sale was for $80.

[5] Ontiveros knew defendant as "Baloney" or "Bologna."

Garcia and defendant met Ontiveros at the bar after dark. Ontiveros told Garcia she had a connection from whom they could get drugs, and identified Zavala and Barragan because they were young and naive drug dealers who "weren't rough." Ontiveros had never seen the brothers with weapons and had never seen them use or threaten violence in their drug dealing. She thought Garcia and defendant could get drugs from them without a big fight.

Ontiveros, Garcia and defendant then planned how to get the drugs from Zavala and Barragan. They agreed that Ontiveros would go to the apartment first because the brothers knew her and would open the door for her. Once the door was open, Garcia and defendant would rush in and scare the brothers into giving up their drugs. Garcia asked Ontiveros if Zavala and Barragan had any weapons, and she responded that she had never seen any and did not think they had any. Ontiveros apparently thought that the brothers might be beaten or roughed up a little bit, but did not expect any further violence. Ontiveros, Garcia and defendant agreed to use defendant's car, a beige Lincoln, to drive to the brothers' apartment.

Sometime around 11 p.m., Ontiveros, Garcia and defendant arrived at the apartment. Garcia was dressed in black pants, black shoes and a black jacket. Defendant wore a beige long-sleeved jacket. Garcia, who was driving, stopped the car on Sevier Street, some seven or eight houses down from the apartment. Ontiveros went to find out who was in the apartment. It was agreed that Ontiveros would let Garcia and defendant know if the brothers were alone.

Ontiveros went upstairs to the apartment and knocked on the door. Zavala let her in. Once inside, Ontiveros saw Barragan asleep on the couch but did not see anyone else. Zavala told Ontiveros that he had not expected her to return, and that he had no more drugs. After some discussion, Zavala indicated he would give her some money for a "date" if she would stay. After agreeing to this, Ontiveros said she was going to tell her friend who was waiting for her in a car. Zavala walked downstairs with Ontiveros, then went to his own car and locked it while she kept walking. Zavala returned to the apartment and waited for Ontiveros.

After Zavala went upstairs, Ontiveros walked to defendant's car. She told Garcia and defendant that the brothers did not have any drugs, but that they did have money. When Garcia asked how much money, Ontiveros replied she did not know, but said they must probably have "a good amount" because Zavala had not yet bought more drugs. Ontiveros, Garcia and defendant agreed to proceed with the plan to rob the brothers, but to get money instead of drugs.

Garcia moved defendant's car to Madera, the next street over, and parked it approximately 20 to 30 feet from Pierce Road. Ontiveros walked to Madera and met Garcia and defendant there. She saw Garcia obtain an object that looked like a crowbar from the trunk of the car,[6] and noticed defendant had a large knife. The three walked together back to the apartment building.

As planned, Garcia and defendant went up the back stairs. Ontiveros walked up the front stairs, and knocked on the door. As Zavala let her in, she saw that Barragan was still sleeping on the couch. At that point, Garcia and defendant rushed into the apartment. Garcia hit Zavala with his tire iron and knocked him back onto Ontiveros. Ontiveros became scared and ran back to defendant's car. She waited in the front seat for several minutes until Garcia and defendant returned.

Zavala testified that once inside the apartment, Garcia struck at Zavala's head repeatedly with a tire iron, forcing him back into the apartment through the living room. Zavala yelled at Barragan to wake up. As Barragan stood up, Zavala saw the second attacker, who was wielding a knife in his left hand, hold his brother up against a wall. Zavala, who at this time was being held to the ground and beaten by Garcia, saw the second attacker trying to stab his brother in the face or throat.[7] After the attacker and Barragan fell to the floor during the struggle, the attacker reached over and stabbed Zavala in the left leg and right foot.

During the course of the attack, Garcia said to Zavala: "Calmate cabron, [¿]donde la tienes?" According to Zavala, this translated in English to: "Calm down, damn it, where do you have it?"[8] Zavala answered with a lie, saying "it" was in the closet. He was hoping to have a chance to help his brother if the attacker went to look in the closet. After Zavala responded, however, the man with the knife told Garcia in English to "finish him too." Garcia stabbed Zavala in the back with the pointed end of the tire iron, penetrating to the bones. At that point, the telephone started ringing and the man with the knife said: "Well let's get out of here the police might going to come [sic]." As the two assailants fled from the apartment, Zavala could see that the one with the knife had an injured arm.

After the assailants left, Zavala answered the phone, which had continued to ring. The caller was Maria Vargas, a friend and neighbor from an apartment downstairs. Zavala told Vargas his brother was dead and to call the police.

---

[6]Although Ontiveros referred to a crowbar, she was shown a photograph of a tire iron and recognized it as the item Garcia obtained from the car trunk.

[7]Zavala testified he could not see the actual stabbing.

[8]The court interpreter translated "Calmate cabron" as "Calm down you son of a bitch."

Vargas testified that she immediately dialed 911 from a telephone located next to her bedroom window. As Vargas was reporting the murder, she saw two men come down the apartment stairway and pass by the window. Since a light had been shining on the stairway landing that night, Vargas saw the two men clearly enough to provide the following details. The first was a "dark man" who wore dark clothes, had blood on his left hand, and held his left arm down by his side with his right arm across his chest. After reaching the bottom of the stairs, the man stopped and looked through the window at Vargas and her daughter; he then hurried off toward Pierce Street. The second man was an Hispanic with light skin and straight hair. He was about four steps behind the first man as they came down the stairs. The second man also looked through the window at Vargas as he rushed by.

Vanessa Sturns lived in an apartment building next to 1100 Sevier. She testified that shortly after midnight on the morning of May 5, 1987, she got into her car and was beginning to drive to a liquor store when she saw two men in dark clothes climb over a fence into the backyard of her apartment building and walk to Madera. Sturns noticed the men because she had never seen anyone jump that fence before. Because the area was "nicely lit," she could tell that the two men were Hispanic, and that they were not "Black." Sturns was approximately one and a half car lengths from the men as she observed them. As Sturns drove off, she saw a car parked on Madera, about five houses up the street.

Ontiveros testified that when Garcia and defendant returned to the car, Garcia took the driver's seat and defendant sat in the passenger side. Defendant had a deep cut on his left forearm. Garcia had blood on his face and hands, but he was not injured. Defendant told Ontiveros to clean the blood off Garcia.

As they drove back to Hayward, defendant climbed into the backseat and lay down. He told Ontiveros to look straight and act normal. There was some discussion between Garcia and defendant about the knife, and as they approached a bridge, Ontiveros felt a rush of air as if the rear window had been rolled down. Although she did not see defendant throw the knife out, she did not see the knife in the car again. Ontiveros told defendant not to worry, she would not say anything about what had happened.

The three stopped for about half an hour in Hayward while Garcia changed his shirt and defendant changed his pants. Defendant also took his jacket off to wrap his arm, which was bleeding badly. Garcia stayed at that location, and Ontiveros dropped defendant off at his sister's house in Hayward. Ontiveros then drove to her place. The next day, pursuant to

Garcia's instructions, Ontiveros washed the blood out of the interior of the car. Later on, defendant's brother, Raymond Rodriguez[9] (hereafter Raymond), came by and retrieved the car.

Defendant's sister Norma testified that at approximately 4:10 in the morning on May 5, 1987, defendant came to her house and told her he had been working on his car. He asked for a bandage and requested to be taken to Raymond's house in Oakland.

Raymond testified that defendant told him a transmission had fallen on his arm. He acknowledged, however, having testified at the preliminary hearing that although defendant told him to say that the transmission had fallen while the two of them were working on defendant's car, the two had not actually worked together on the transmission for a week or two before defendant's arm was injured.[10] When Raymond drove the car back from Ontiveros's place in Hayward, he had no trouble with the transmission. Raymond took defendant to Highland Hospital at 5:50 in the morning on May 5 to get his arm treated.

Dr. William Billings from Highland Hospital testified that although defendant stated that a transmission fell on his left arm, no dirt or grease was found in the wound. Also, the wound appeared to have been caused by a sharp instrument, rather than a blunt one, and was sufficiently clean that the surgery team was able to sew the tissue together fairly precisely and match a tattoo that had been split apart. Hospital records reflected that defendant was left-handed.

Officers arriving at the scene of the crime found Barragan lying dead on the floor with a massive pool of blood around his head and neck area. Barragan's chest was split wide open, and part of his face was hanging off. The officers saw Zavala rolling around on the floor in pain. Zavala had been severely beaten and his face was completely covered with blood. He was also missing several teeth. Zavala lapsed in and out of consciousness, sometimes screaming or moaning about his pain.

Zavala was taken to Stanford Hospital, where Detective James Simpson interviewed him at approximately 1:30 or 1:45 a.m. Zavala told him that two male Hispanic assailants and a female named Cyndia were involved. On or about May 17, 1987, Zavala picked Ontiveros out of a photo lineup.

[9] Defendant's last name is Rodrigues. The last name of his brother, Raymond, is spelled Rodriguez; and the last name of his sister, Norma, is spelled Rodriquez.

[10] Raymond, who had been in prison before, stated on cross- and redirect examination that he felt "pressured" to testify the way he did at the preliminary hearing for fear of being arrested and charged.

Detective Ronald Williams testified that on May 6, 1987, Zavala described the knife wielder as being an Hispanic male adult, 23 to 24 years of age, 5 feet, 9 to 10 inches tall, 160 pounds, straight dark brown hair to his collar, and a very dark complexion. When Williams subsequently showed Zavala a photograph taken of defendant at the time of his arrest on May 28, 1987, Zavala said that the man in the photo looked Black to him, and that the skin tone and hair length in the photo closely resembled the knife wielder as he appeared the night of the murder. A citation issued to defendant on May 2, 1987, gave his weight as 170 pounds, and height as 5 feet, 8 inches tall.

On July 19, 1987, a search team found a survival-type knife alongside the freeway in the area where Ontiveros thought defendant had rolled down the rear car window as they drove from the crime scene. The knife had bloodstains both on its blade and hilt and on a capsule contained inside the handle. The knife blade was just short of nine inches, with a maximum width of one and one-half inches. Ontiveros, upon being shown the knife, immediately identified it as the one carried by defendant.

The forensic pathologist's autopsy of Barragan disclosed 21 stab and incise wounds consistent with infliction by a large knife-type instrument. Six of the wounds were to the face and head, one of which was a large, irregular, jagged wound in the lip that went through to the anterior part of the neck. There was a six-inch-deep wound in the right leg above the knee. One four-inch-deep stab wound in the chest had cut the rib cartilage in half and sliced the right lung, while another one five inches deep had also damaged the right lung. There was also a large, gaping, complex, eight-inch-deep wound, possibly caused by several thrusts through the same skin hole, that cut the right jugular vein in half and perforated the right lung. The location of the wounds to the torso and upper body was consistent with overhand-type thrusts. Of the 21 wounds, 17 were located on the right side of the body, while 4 were on the left; this was consistent with face-to-face stabbing by a left-handed assailant. The cause of death was loss of blood with air embolism.

Three bloody fingerprints, apparently made by the same finger, were found at the crime scene. They had an arch pattern found only in 5 percent of the population, and did not match the prints of the victims, the suspects or those persons whose presence at the scene was logged.[11] A smeared set of comparison prints for James Williams, a tenant in a nearby unit, showed an arch pattern, but Williams could not be located to make a further comparison.

---

[11]Officer Allen Talton testified that he kept a log of the people who came to the scene, but that it was incomplete and did not include, for example, the firefighters who had arrived initially to assist the victims.

An examination of defendant's car disclosed one of Garcia's fingerprints, but none of defendant's. However, on the back of the front seat backrest, police found a partial shoe print that had the same class characteristics as a pair of shoes belonging to defendant. Those shoes indicated the presence of blood in two spots.

Prosecution criminalist Elizabeth Skinner performed a blood-typing analysis, and determined that Zavala and Barragan both had type A blood, differing only in the EAP genetic marker system. Defendant and Garcia both had type O blood. In the TF (or transferrin) genetic marker system, defendant's type was CD, a type shared by less than 3 percent of the population. Neither Garcia nor the two victims had CD transferrin.

Although various bloodstains were found in defendant's car and a few blood drops were discovered outside the apartment, many were of insufficient quantity to perform blood-typing analysis. However, type O blood, with the CD type in the TF system, was discovered on the floormat in defendant's car. Blood on a paper tissue in the trunk of the car was found to be consistent with the blood of either Zavala or Barragan, but not with the blood of defendant or Garcia. Of three spots of blood found outside the brothers' apartment on the pavement leading to Pierce Road, one may have been type A or a mix of type A and type O; the other two were insufficient to produce test results.

Inside Zavala's apartment, there were copious bloodstains on the living room carpet and walls. Blood was found on the front door, the couch, the television, the stereo, a telephone book, a mattress in the bedroom, and on the walls, sink and window in the bathroom. Skinner tested the blood samples and was able to determine that all of the blood surrounding Barragan was consistent with his type. Although Skinner could not say that blood belonging to defendant was found in the apartment, she opined, in response to hypotheticals, that if an attacker had been bleeding from a forearm wound, the attacker's blood might not be found if the length of the attack was a matter of minutes and the wound was enclosed in the long sleeve of a jacket so that the clothing would absorb the blood. She also indicated that because Barragan had bled so profusely, small amounts of an attacker's blood might go undetected.

Skinner also tested the blood on the knife found by the freeway. Skinner testified that the hilt of the knife had human blood on it, but that a lot of the blood on the blade, being very dry and crusty, had flaked off by the time she examined it. As for the bloodstains found on the plastic capsule inside the knife handle, Skinner found a strong reaction for type O blood, and a weak reaction for type A blood, suggesting the possible presence of both types.

## 2. *The Defense Case*

Defendant did not take the stand. His defense was that he was not present and had nothing to do with the crime. There was no physical evidence placing defendant at the scene, and the surviving victim could not positively identify him.

Maria Vargas had initially described the first man to come down the stairs on the night of the murder as a "Black" man when speaking to the 911 dispatcher and the police. Vargas failed to identify defendant when shown a photo lineup on May 27, 1987, and identified him for the first time at the preliminary hearing. At that hearing, defendant was wearing an orange jumpsuit and was seated at the defense table behind a nameplate that said "defendant."

Nathan Howard, testifying for the defense, disclosed that he had known Juan Garcia since 1967, and in the past had even identified himself as Garcia's "partner." Although he had met defendant a couple of times, he was unaware of any friendship between defendant and Garcia, and had never seen them socialize together. Howard also testified that he knew defendant's brother, Raymond, and that he had run into Raymond at Highland Hospital one morning in May 1987. Raymond told Howard that a transmission had fallen on defendant's arm.

Defendant's sister, Norma, testified that when defendant arrived at her home at 4:10 a.m. on or about May 5, 1987, he was covered with dirt and grime, and had car grease on his face and hands. Although defendant asked for a bandage and wanted to be taken to Raymond's house, Norma did not notice that he was injured, or that he needed to go to the hospital. Defendant said he had been working on his car. He was bald at the time, and looked normal but dirty.

## B. PENALTY PHASE EVIDENCE

### 1. *The Prosecution Case*

#### a. *Nishimoto Incident (May 1987)*

On or about May 25, 1987, Hayward Police Officer Darrin Nishimoto saw a Lincoln Continental run a stop sign at 45 to 50 miles per hour. He pursued the car, which went over 70 miles per hour through 2 red lights before finally pulling over. Defendant, who was drunk, immediately got out of the car and started walking away. When Nishimoto ordered defendant back in

the car, defendant responded "Fuck you. What are you going to do?" As Nishimoto placed his hand on defendant's jacket collar, defendant turned and started swinging at him. Officer Robert Palermini, responding to Nishimoto's call for backup, saw defendant and Nishimoto wrestle to the ground. As Palermini attempted to assist in handcuffing defendant, defendant grabbed Palermini's baton, which had fallen to the ground. Nishimoto shot defendant with his stun gun. A third officer eventually arrived and defendant was finally subdued and handcuffed. Nishimoto suffered a broken hand in the struggle.

b. *Nieves Incident (May 1987)*

Gladys Nieves had lived with defendant off and on for about four years. On May 19, 1987, shortly after they had separated, defendant came to Nieves's apartment to talk about getting back together. When Nieves said she did not want to get back together, defendant became angry, and they began arguing. During the course of the argument, defendant struck Nieves in the face, arm and ribs, and called her a bitch. Nieves managed to push defendant away and call the police. Defendant, who appeared intoxicated, was arrested when the police arrived. Nieves's face was swollen and she was red around her eye.

c. *Gallia Incident (April 1987)*

On April 2, 1987, Hayward Police Officer Richard Gallia of the canine unit and Officer Brent Morris stopped a car for a stop sign violation. Defendant, the front seat passenger, was staring out the window and swearing in a slurred manner. When asked to step from the car, defendant emerged fighting and swinging at Gallia. As Gallia struggled with defendant, defendant broke out of a carotid restraint and hit Gallia in the chest, denting the steel chest plate of his bulletproof vest. Morris attempted to assist Gallia in handcuffing defendant, but the two officers were unable to restrain him. Defendant was ultimately subdued with the aid of the canine unit's dog and a third police officer. At one point during the struggle, the dog bit defendant in the chest but defendant managed to pry the dog's mouth open to release its bite hold. Gallia had never previously seen anyone able to do this. Defendant's behavior was consistent with phencyclidine (PCP) intoxication.

d. *Rodriguez Incident (November 1984)*

On November 2, 1984, Correctional Officer Leo Rodriguez was supervising the serving of breakfast at Deuel Vocational Institute in Susanville when he observed that defendant and two other Hispanic inmates were serving

double portions of breakfast to all Hispanic inmates. Rodriguez advised the three inmates to give equal portions to all inmates, but they ignored his directive. After Rodriguez advised them a second time and again was ignored, he had the inmates removed from the serving assignment. At that point, defendant became hostile and verbally abusive toward Rodriguez, cursing and threatening to "kick [his] ass." According to Rodriguez, defendant was laughing and appeared to be under the influence of alcohol or some other substance.

### e. *Johnson Incident (June 1984)*

On June 3, 1984, Lamont Johnson and his brother, Paul Tadlock, went to a 7-Eleven store in Union City to buy some beer. Johnson did not have his identification with him, so he asked defendant, who happened to be in the store, to buy some beer for him. Defendant refused, and Johnson returned to his car. Defendant came up to Johnson's car and started saying or yelling something, which Johnson could not hear because the window was rolled up. When Johnson started to get out of the car, defendant struck him in the head and knocked him unconscious. Tadlock got out of the car and started wrestling with defendant until Steve May, a store security guard, drew his baton and told them to break it up. Defendant got a four-arm lug wrench from his car and swung at May with great force. Defendant then gave the wrench to a female companion, who also swung at May. Defendant retrieved a long steel bar from his car, which he also began swinging at May. Eventually, defendant and his female companion got back in the car and drove away.

Johnson was taken to a hospital by ambulance and received stitches to his lip. Tadlock suffered a bloody nose. Although Tadlock and May identified defendant for police shortly after the incident, only Tadlock made an identification at trial. Johnson, Tadlock and May all testified they had done nothing to provoke defendant's attack.

### f. *Calles Incident (January 1981)*

On January 21, 1981, defendant approached fellow inmate Rick Calles in the yard at the medium security prison in Susanville. Defendant asked Calles why he had missed a meeting of Mexican/Puerto Rican inmates earlier that day.[12] They went into a dorm, and defendant sat on a bed facing Calles, while another inmate sat on the same bed as Calles to his right. Defendant, who was wearing weightlifting gloves, got up and moved behind Calles on his right side. About 10 seconds later, Calles saw a gloved hand come

---

[12]Calles testified he was half White and half Puerto Rican.

toward him. He felt a blow on the side of his face, and was knocked unconscious. Calles suffered a broken nose and a cracked rib, and was hospitalized for seven days.

### g. *Correctional Facility Fire (January 1981)*

At approximately 1 a.m. on January 1, 1981, prisoners on three tiers at the correctional facility in Susanville started setting fires, breaking windows and throwing jars of water at the guards. Correctional Officer Frank Shipman was standing by a wall when he saw someone throw burning material through a broken window onto a fire just outside the dormitory where the inmates were housed. Shipman, who was 18 to 20 inches away, shined his flashlight through the window and saw defendant moving away from the window. Defendant was the only inmate in the area of the window at the time. Other inmates were standing about 18 to 24 inches beyond defendant when Shipman first saw him.

### h. *Espinoza Homicide (June 1980)*

In the afternoon and early evening of June 6, 1980, Ernest Espinoza and Eric Mitchell were sitting on Mitchell's porch, when a car with about seven passengers drove repeatedly by. When the passengers yelled angrily in Spanish, Espinoza gave them "the finger." Later that evening, Espinoza left the Mitchell house just before 9 p.m. to call his girlfriend from a pay phone at a gas station across the street. While Espinoza was at the pay phone, a group of approximately 10 men approached him. Espinoza was shot a number of times and stabbed. He died from his wounds.

Six men, including defendant and his brother Raymond, were charged with the murder of Ernest Espinoza. Only Raymond was alleged to have personally used a firearm, and only defendant Toby Jaramillo was alleged to have personally used a deadly weapon. Raymond and Jaramillo were also the only ones alleged to have personally inflicted great bodily harm. Defendant was alleged to have been armed with a firearm, and to have suffered a previous conviction. On August 29, 1980, pursuant to a plea bargain, Raymond pleaded guilty to manslaughter with personal use of a firearm, and Jaramillo pleaded guilty to manslaughter with personal use of a knife. Defendant pleaded guilty to violation of section 32 (accessory). The murder charges against all charged defendants were dismissed.

At the penalty phase, Rejon Mitchell, who was Eric Mitchell's brother, came forward and testified that he saw defendant shoot Espinoza.

### i. *Roach Shooting (April 1977)*

On the night of April 1, 1977, Frank Roach drove with two friends in his pickup truck to a park in Hayward for the purpose of fighting with another group of people. As Roach and his friends waited for the other group to arrive, a car carrying three or four people pulled up. Someone rolled down the rear window of the car and pointed a pump-action, sawed-off shotgun at them. Roach and his friends scrambled out of the truck and tried to run away as a first shot was fired. When Roach was 10 to 15 feet from the truck, a second shot was fired. Roach was hit from head to toe in the back with shotgun pellets. His friend, Chris Garner, was shot in the arm or shoulder.

Roach identified defendant as the shooter from a photo shown to him four or five days after the incident. He also identified defendant at the preliminary hearing. Defendant ultimately pleaded guilty to assault with a deadly weapon.

### j. *Jill M. Incident (October 1976)*

At approximately midnight on October 16, 1976, Jill M. was standing with her girlfriend Laurie at a bus stop in Hayward when five men in a car pulled up. The two women accepted their offer of a ride, but instead of taking them home, the men drove to a house in San Leandro. While the men dragged Jill screaming into the house, Laurie was able to walk away. Inside the house, Jill was subjected to a series of sexual assaults by at least three men, including defendant. Defendant, acting alone, committed forcible rape, sodomy and oral copulation on Jill, and, acting in concert with another man, committed forcible oral copulation and sodomy on her.

Although sexual assault charges were filed against defendant, the charges were subsequently dismissed. Jill testified that after the preliminary hearing she had asked the prosecution not to require her to participate in the case any further because she was pregnant and feared for her life. She admitted, however, that defendant had never threatened her.

### k. *Prior Felony Convictions*

In addition to presenting documentation of defendant's felony accessory conviction in the Espinoza matter, the prosecutor offered evidence showing that defendant had been convicted for auto theft in Solano County and burglary in Alameda County.

### 2. *The Defense Case*

The defense attempted, in cross-examining the prosecutor's witnesses and in calling its own witnesses, to cast doubt on the prosecutor's theories of the

above events. In particular, the defense attempted to show: (1) that defendant's brother Raymond was the only person to shoot Ernest Espinoza, and that Rejon Mitchell's testimony and identification of defendant at trial contradicted statements he had made shortly after the incident; (2) that Oscar Payne and Billy Grejeda, not defendant, had shot at Frank Roach during the confrontation at the park; and (3) that Jill M. consented to have sex with multiple partners at defendant's house on the night in question.

## II. DISCUSSION

### A. *Failure to Hold Competency Hearing*

■ Defendant contends that the lower courts erred by not ordering, sua sponte, a hearing on his competence to stand trial. (See *Pate* v. *Robinson* (1966) 383 U.S. 375, 385 [15 L.Ed.2d 815, 822, 86 S.Ct. 836]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1162 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) ■ Defendant also contends that his counsel was ineffective in failing to request a competency hearing at any stage of the proceedings in question, and in failing to move to set aside the information based upon defendant's asserted incompetence at the preliminary hearing.[13] ■ ■ He asserts that his conviction must be reversed because these omissions denied him statutory and constitutional protections, including his rights to due process and effective assistance of counsel under the state and federal Constitutions.

Defendant's claims arise out of events that transpired at three court hearings held on June 22, 1987, September 11, 1987, and September 15, 1987.[14] On June 22, 1987, defendant appeared in municipal court for his preliminary hearing. At defense counsel's request, the court held an in camera hearing during which counsel informed the court of a "fundamental dispute" between counsel and defendant. According to counsel, defendant refused to agree to a time waiver for the preliminary hearing even though counsel had repeatedly explained to him that a waiver was essential in order to adequately prepare for the hearing. Counsel asserted that defendant's decision was not rational, that defendant refused to communicate with counsel intelligently, and that defendant did not give an articulate reason for not waiving time. Although counsel had not had an opportunity to obtain a psychiatric evaluation, counsel expressed the opinion that defendant was "not competent to proceed to preliminary hearing today because he has been

---

[13]Defendant was represented at trial by Edward Thirkell and Geoffrey Carr. This opinion does not distinguish between the two counsel unless relevant to an issue on appeal.

[14]These hearings were conducted in camera. The transcripts have been ordered unsealed.

unable to assist me in making a decision as to whether to waive time and prepare for the preliminary hearing." Counsel clarified, however, that apart from defendant's refusal to waive time, defendant had not talked in an irrational manner, and counsel had "not seen any evidence of mental defect."

The court then questioned defendant regarding his understanding of the situation and explained to him what a time waiver would and would not entail. During the discussions, defendant stated that he did not want to waive time because he had been "sitting in here too long," even though he apparently knew he had a parole hold in any event, and that he just wanted "to get this over with." Defendant also complained that counsel was not telling him anything, and that counsel kept challenging him and treating him like a child. At one point, the court stated its belief that "what [defendant] values is a little more TLC." During the hearing, defendant had several changes of mind about waiving time. Ultimately, however, he agreed in open court to waive time until July 20, 1987.

On September 11, 1987, the superior court held an in camera hearing during which defense counsel addressed issues regarding defendant's competency to proceed to trial on September 21, 1987, and counsel's desire to waive defendant's right to be tried within 60 days of the filing of the information. After explaining to the court that more time was needed to prepare for trial, counsel summarized the events occurring at the hearing on June 22. Counsel then reported that defendant refused to waive time for trial, that he refused to sign release forms for police reports, medical information and other documents despite counsel's detailed explanations for their need, and that he was being uncooperative and unreasonable.

A defense investigator then told the court that he had obtained information from defendant's mother that when defendant was two or three years old he had "some sort of seizure, she believes epileptic type seizure where he actually turned blue and was taken to Children's Hospital in Oakland." The investigator also said family members stated that defendant had suffered from migraine headaches throughout his life.

Additionally, counsel informed the court that he had spoken with Dr. Missett and Dr. McKinsey, two defense psychiatrists, and that both believed the records concerning defendant's seizure were "crucial to a psychiatric defense." Although Dr. Missett was not present at the hearing, counsel related that Dr. Missett had met with defendant for one to two hours, and that Dr. Missett felt that defendant had brain damage due to the "two major

seizures" he had heard about.[15] According to counsel, however, Dr. Missett had "not done a competency evaluation and wanted to get a psychological evaluation on competence before he arrived at an opinion."

Dr. McKinsey was present at the hearing. Although defendant had refused to meet with him, Dr. McKinsey offered the following opinion based on reports given to him and discussions with Dr. Missett. "I suspect that there is a drug dementia; that Mr. Rodrigues has difficulties that have been outlined earlier which are secondary to that drug dementia. That one of the reasons he wouldn't sign anything, as he just said, was he doesn't understand. It is going to be difficult for him to understand anything if his brain isn't working well. [¶] I have etiological events in the record, which is to say a considerable amount of poly substance abuse dating way back, dating as far back as 4/2/87 for example, and as late as May 25th, '87. [¶] It seems to me that a person of this level of drug use is at very high risk for a neurological impairment that would make it very difficult for him to cooperate with his defense."

During discussions on the matter, defense counsel expressed the opinion that it was in defendant's best interest to waive his right to trial within 60 days so that counsel could investigate his competence to proceed to trial. The court then explained to defendant that his attorneys thought it was in his best interest to waive time and to let the doctors talk to him so that a decision could be made how best to defend him. Although defendant stated he did not wish to waive time, he did agree, in response to the court's inquiry, that he would speak to the defense doctors. He also indicated that he would decide, after meeting with the doctors, whether to agree to a time waiver and to a release of medical records. Since defendant was unwilling to waive time but was agreeable to reconsidering the matter after a meeting with defense psychiatrists, the court declined to give counsel time over defendant's objection. The court continued the hearing to September 15, 1987, and suggested that at that time they could ascertain whether Dr. Missett would be prepared to testify as to incompetence.

At the continued in camera hearing on September 15, 1987, defense counsel reported that defendant had given written releases of information for parole records, probation records, police reports and school records. Although defendant had not consented to releases for medical records, he nonetheless was willing to waive his right to be tried within 60 days. In response to court questioning, counsel agreed that the request for a trial continuance over defendant's objection was no longer an issue but indicated

---

[15]Defense counsel did not explain the reference to "two major seizures." The defense investigator had earlier indicated that defendant's mother mentioned only one seizure.

that the defense had not completed its competency investigation. Counsel then reported that defendant had met with the defense psychiatrist as previously agreed, and that there was some rapport between defendant and the psychiatrist. Counsel added that defendant's rapport with counsel had increased in the past three days. Defendant agreed that he and counsel were getting along better. Subsequently, in open court, a continuance on the trial date was ordered. Thereafter the competency issue was never raised again.

The relevant principles may be summarized as follows. ■■ "A trial court is required to conduct a competence hearing, sua sponte if necessary, whenever there is substantial evidence of mental incompetence. [Citations.] Substantial evidence for these purposes is evidence that raises a reasonable doubt on the issue. [Citation.]" (*People* v. *Howard, supra,* 1 Cal.4th at p. 1163.) " 'The court's duty to conduct a competency hearing arises when such evidence is presented at any time "prior to judgment." [Citations.]' " (*People* v. *Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

■■■ Defendant contends that substantial evidence of incompetence appears in the record, citing to the evidence of his childhood seizure and lifelong episodes of migraine headaches, as well as to the statements of the two defense psychiatrists. Defendant also emphasizes the point that his counsel repeatedly expressed concerns regarding his competence to understand and assist in his defense, and counsel's conclusion that his refusal or reluctance to cooperate appeared connected to a physical-mental condition, rather than merely to obduracy. We are not convinced.

A defendant is mentally incompetent "if, *as a result of mental disorder or developmental disability,* the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a), italics added.) Here, the statements provided by defendant's family that defendant suffered from migraine headaches and that he had a possible epileptic seizure when he was two or three years old did not, standing alone, suggest a mental disorder or developmental disability. Although the court was informed by the defense at the September 11 hearing that it was in the process of obtaining defendant's medical records by subpoena, nothing in the record after that time indicated that any medical records ever obtained substantiated the claim of such a disorder or disability.

Moreover, the statements of the two defense doctors did not furnish substantial evidence of mental incompetence. ■■ We have held that the standard for determining when a psychiatrist's opinion will constitute substantial evidence of incompetence to stand trial is as follows: " 'If a psychiatrist . . . who has had sufficient opportunity to examine the accused, states

under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied.'" (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476], citing *People* v. *Pennington*, *supra*, 66 Cal.2d at p. 519.) For the reasons below we find that the conclusions of Dr. McKinsey and Dr. Missett did not meet this test.

First, although Dr. McKinsey attended the court hearing and offered his opinion, he had not had any opportunity to examine defendant. Moreover, the basis for his opinion was rather brief (13 lines of transcript) and virtually devoid of particulars. Dr. McKinsey merely told the court that, based on reports he had read, he suspected that defendant suffered from "drug dementia" and that defendant's record of "a considerable amount of poly substance abuse" suggested a very high risk of neurological impairment that would make it very difficult for him to cooperate with his defense. But no elaboration or details were provided regarding the type or quantity of drugs involved, the frequency of the claimed abuse, or the extent of impairment threatened. This falls far short of the showing made in *People* v. *Stankewitz*, *supra*, 32 Cal.3d at page 92, and in *People* v. *Pennington*, *supra*, 66 Cal.2d at page 519.

Second, the purported opinion of Dr. Missett, who had actually met with defendant but was not present at the hearing, was simply inconclusive. Although defense counsel claimed that Dr. Missett "feels that the defendant has brain damage because of the two major seizures he has heard about through [the defense investigator]," counsel also stated that Dr. Missett was "not sure about his opinion since he's not done a competency evaluation and wanted to get a psychological evaluation on competence before he arrived at an opinion." Thus, even if we assume that Dr. Missett had offered his tentative opinion directly and under oath, it did not furnish substantial evidence of defendant's incompetence. Moreover, it is significant to note that after Dr. Missett apparently met with defendant a second time after the second hearing for two or three hours, defense counsel offered no further opinion from the doctor that defendant was incompetent.

 Finally, the lower court judges were not compelled to order a competency hearing based on defense counsel's opinion that defendant might be incompetent. We rejected a similar argument in *People* v. *Howard*, *supra*, 1 Cal.4th at pages 1163-1164: "Under section 1368, if a 'doubt arises in the mind of the judge' as to the defendant's mental competence, the judge must 'state that doubt in the record' and solicit defense counsel's opinion on

the matter. (§ 1368, subd. (a).) In such a case, '[i]f counsel informs the court that he believes the defendant is or may be mentally incompetent,' the court must order a hearing. (§ 1368, subd. (b).) Because the court in this case did not declare a doubt, section 1368 did not require the court to conduct a hearing based solely on counsel's opinion." Here, as in *People* v. *Howard*, the lower court judges expressed no doubt as to defendant's competence. Accordingly, they were under no duty to hold a competency hearing based solely on counsel's opinion that defendant might be incompetent.

It must also be remembered that counsel's concerns regarding defendant's competency were based primarily on defendant's refusal to assist counsel in his defense. The record establishes, however, that even though there was a definite lack of rapport and cooperation between counsel and defendant initially, the situation improved markedly by the third hearing. Not only did defendant agree to a one-month continuance of the preliminary hearing and a sixty-day continuance of the trial, but he eventually provided the requested releases for parole and probation records, police reports and school records. Defendant also met with the defense psychiatrist as agreed at the second hearing, with no apparent resistance or problems. Significantly, defense counsel did not further pursue the competency issue once defendant became cooperative.

On this record, we cannot say as a matter of law that the evidence raised a substantial doubt as to defendant's mental competence. Accordingly, the lower courts were under no duty to order a competency hearing.[16]

▆▆▆ Because the record does not demonstrate a substantial doubt as to defendant's competency, we reject defendant's related claims that his counsel was ineffective in failing to request a competency hearing at any stage of the proceedings or in failing to move to set aside the information based upon defendant's asserted incompetence at the preliminary hearing.

## B. *Guilt Phase Issues*

### 1. *Videotape Evidence*

The day after the murder, the police made a videotape with the help of Maria Vargas, the victims' downstairs neighbor. The videotape showed the

---

[16]Defendant recasts his claim as one based on the failure of the lower courts to appoint an expert under Evidence Code section 730 to examine him. (See *People* v. *Campbell* (1987) 193 Cal.App.3d 1653, 1662 [293 Cal.Rptr. 214].) We rejected an identical claim in *People* v. *Howard*, *supra*, 1 Cal.4th at page 1164, footnote 12: "Absent a reasonable doubt as to defendant's mental competence, the trial court had no obligation to pursue the matter further. [Citations.]"

outside of Vargas's apartment, the stairway that was located by her bedroom window, and a view from her bedroom toward the stairway landing and out toward the street. It also contained scenes in which a White man in a white shirt came down the stairs in broad daylight, stopped and turned to look directly toward Vargas's apartment, and then ran off in the direction the assailants had run. At trial, the court admitted the videotape without its soundtrack. Defendant contends the court erred in admitting the videotape as a reenactment, and in admitting it to refresh Vargas's recollection.

 Preliminarily, we address the Attorney General's argument that these claims have been waived. The record demonstrates that defense counsel had initially moved *in limine* to exclude the videotape on the grounds now asserted on appeal, but was unsuccessful.[17] When the prosecutor requested to have the videotape admitted into evidence during Vargas's examination, the trial court asked defense counsel, "Your objection to it being admitted?" Defense counsel responded: "I believe it's the one that we've been over before. No objection." Although the Attorney General is correct that counsel's remarks may be construed as indicating an abandonment of the earlier objections, we conclude that they are more properly understood as indicating counsel's intent to preserve such objections but to raise no additional ones. Nonetheless, for the reasons below we find defendant's claims to be without merit.

### a. *Admissibility*

 Defendant contends that the videotape should have been excluded because the prosecution failed to lay a foundation showing the accuracy of certain scenes in the tape as reenactments of what Vargas witnessed the night of the murder. (*People* v. *Boyd* (1990) 222 Cal.App.3d 541, 565-566 [271 Cal.Rptr. 738]; *People* v. *Vaiza* (1966) 244 Cal.App.2d 121, 127 [52 Cal.Rptr. 733].) Specifically, defendant claims that three scenes featured in the videotape were inaccurate in the following particulars. First, the scenes were each shot in broad daylight, whereas the actual events occurred in the middle of the night and were illuminated only by an artificial light located

---

[17]The motion *in limine* asserted that the videotape did not accurately represent what it purported to show, and that its probative value was outweighed by its potential prejudicial effect. Additionally, defense counsel requested that the videotape not be shown to Vargas for purposes of refreshing her recollection because its inaccuracies would color her testimony. The prosecutor opposed the motion, arguing that the videotape would aid the jury as demonstrative evidence showing the relative locations of the victims' and Vargas's apartments, the stairway, and Vargas's vantage point in witnessing the assailants flee the scene. In denying the motion, the trial court ruled that the videotape would be admissible so long as the proper foundation was laid, and determined that Vargas could view the videotape to refresh her recollection.

above the stairs. Second, the three scenes each depicted one White male wearing a white shirt coming down the stairs and running off, whereas Vargas testified she saw two males, one Hispanic and one "Black" or "dark," wearing dark clothing on the night of the murder. Third, while one scene correctly showed Vargas's vantage point from inside her apartment looking out the bedroom window, another scene which featured a woman and child standing outside the apartment was inaccurate in this regard.[18] Defendant asserts that these inaccuracies were prejudicial in that they created a misleading impression of what Vargas witnessed and transformed her "shaky" identification of him into a memorable and persuasive image.

■ In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them. (*DiRosario* v. *Havens* (1987) 196 Cal.App.3d 1224, 1232 [242 Cal.Rptr. 423].) Within these limits, " 'the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time the [videotape] is taken. [Citation.]' " (*Id.*, at pp. 1232-1233.)

■ In this case, the trial court properly found the videotape admissible. The videotape had been offered as demonstrative evidence to show the jurors the relative locations of the victims' apartment, Vargas's apartment, the rear stairway and the driveway of the apartment building. In particular, the videotape had been intended in part to show Vargas's vantage point as she witnessed the assailants flee the scene. Therefore, once Vargas confirmed in her testimony that the videotape accurately showed the area where she was and where she saw the assailants, the trial court could correctly conclude that the videotape was a reasonable representation of the physical layout of the apartment building and Vargas's vantage point. Moreover, the court could properly find that a viewing of the videotape would aid the jurors in their

---

[18]Defendant also objects to other portions of the videotape that panned the apartment building and the surrounding area, showing the stairway and its position relative to Vargas's apartment. Two of these scenes showed different perspectives of the bottom of the stairway, Vargas's door and her window, with one zooming in to a close-up. In these scenes, Vargas's apartment door was standing open, although she did not testify that the door was open on the night of the crime. Defendant contends this film footage wrongly suggested that Vargas could have seen the fleeing suspects through the doorway, as well as through the window, and that her ability to have seen the suspects was much greater than her testimony warranted.

determination of the facts of the case notwithstanding the claimed inaccuracies.[19] (*DiRosario* v. *Havens, supra*, 196 Cal.App.3d at pp. 1232-1233.)

Relying on *People* v. *Boyd, supra*, 222 Cal.App.3d 541, and *People* v. *Vaiza, supra*, 244 Cal.App.2d 121, defendant contends that the difference in lighting conditions precluded admission of the videotape. Unlike the instant situation, however, those cases involved photographs or films that purported to show lighting conditions at the time of the incidents in question. Because the purpose of the evidence in those cases was to demonstrate to the jury the lighting conditions under which witnesses were able to view the events of the crime, those conditions assumed great significance in assessing the admissibility of the evidence. (See *People* v. *Boyd, supra*, 222 Cal.App.3d at p. 566; *People* v. *Vaiza, supra*, 244 Cal.App.2d at p. 127.) But here the videotape was not offered for the purpose of showing lighting conditions on the night in question. Therefore, defendant's reliance on the above cases is misplaced.

Furthermore, we reject defendant's claim that the videotape's inaccuracies created a misleading impression of the events witnessed by Vargas, as well as his further claim that the tape should have been excluded as being more prejudicial than probative. First, defendant fails to demonstrate how the various inaccuracies could have made the videotape misleading as to the purposes for which it was offered. Second, the inaccuracies either were obvious to the jurors (such as the fact that Vargas had not testified to seeing one White male in a white shirt flee the scene), or, if not so, were specifically brought to their attention. For example, the prosecutor elicited testimony from Vargas that the videotape was filmed during the day, while the events she witnessed occurred at night. He also had Vargas clarify that, consistent with one of the videotaped scenes, her vantage point was from the inside of her apartment looking out through her bedroom window. Moreover, the prosecutor made no attempt to pass the videotape off as depicting exactly what Vargas saw the night of the murder. He also never assumed or suggested through his questioning of Vargas that she was outside of her apartment, or that she was looking through an open bedroom door when she saw the assailants. Hence, any potentially prejudicial effects of the inaccuracies were minimized, if not virtually eliminated. No abuse of discretion appears.

Under circumstances such as these, we must assume that the jurors were intelligent people and that they understood and took into account the differences identified by defendant on appeal. (See *Greeneich* v. *Southern Pacific*

---

[19]The same is true for those videotaped scenes which were intended to show the length of time that the assailants turned to look in Vargas's direction and the direction in which they ran. According to the record, Vargas's testimony verified the accuracy of the videotaped depictions in this regard.

*Co.* (1961) 189 Cal.App.2d 100, 108 [11 Cal.Rptr. 235] [court properly admitted motion picture with sound of train purporting to run over crossing section in question, even though lighting and other conditions in motion picture were dissimilar to those surrounding accident].) Admission of the videotape did not constitute error, prejudicial or otherwise.

### b. *Refreshing Vargas's Recollection*

■ Defendant also contends it was erroneous for the court to admit the videotape at trial to refresh Vargas's recollection, and to allow the prosecutor to play and refer to the videotape, since Vargas had not stated that she could not remember any of the facts which the prosecutor sought to elicit. (See *People* v. *Lee* (1990) 219 Cal.App.3d 829, 840 [268 Cal.Rptr. 595] ["A witness may refer to hearsay to refresh his recollection; however, before doing so the witness must testify he cannot remember the fact sought to be elicited."].)

This claim is devoid of merit. Contrary to defendant's assertion, the prosecutor offered the videotape to demonstrate the physical layout of the apartment building, and to show Vargas's vantage point as she viewed the assailants fleeing the scene of the crime. Since the videotape was neither offered nor admitted at trial for the purpose of refreshing Vargas's recollection, *People* v. *Lee, supra,* 219 Cal.App.3d at page 840, is inapposite.

Additionally, the court committed no error in allowing Vargas to view the videotape to refresh her recollection before taking the stand. Even if Vargas could remember the events independently without the videotape, defendant has cited no authority under which Vargas could have been prevented from watching it before trial.[20]

### 2. *Hearsay Evidence Regarding Identifications*

Menlo Park Police Detective Ronald Williams testified at trial that: (a) Vargas identified Juan Garcia at his preliminary hearing; (b) Vargas told the

---

[20]In his reply brief, defendant contends that the videotape may have subliminally suggested to Vargas that her ability to recall what she saw the night of the murder was much greater than her own memory warranted. Since the record discloses no basis for defendant's assertion, we decline to engage in such speculation.

Defendant also claims that admission of the videotape violated his state and federal constitutional rights to due process, a fair trial, a reliable guilt determination in a capital case and the fair application of state law. We reject these claims. At trial, defendant failed to make any such objections. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 972-973, fn. 10 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Moreover, these matters are not properly raised: they are perfunctorily asserted without argument in support. (*Id.,* at p. 985, fn. 15.) In any event, the admission of the videotape did not implicate any of the cited federal or state constitutional protections.

detective at Garcia's preliminary hearing that she had previously recognized Garcia in a live lineup; and (c) neither Vargas, Zavala nor any other person had chosen Richard Lopez or Nathan Howard from a photographic lineup. Defendant contends the admission of these hearsay statements constituted prejudicial error and denied him the benefit of various constitutional protections.

### a. *Identification of Garcia at Preliminary Hearing*

The prosecutor asked Detective Williams on direct examination whether Vargas had positively identified Garcia at a preliminary hearing. Defense counsel objected on hearsay grounds. After the prosecutor asserted it was "a prior identification," the trial court overruled the objection. The detective then testified that Vargas did identify Garcia in court.

Under Evidence Code section 1238, evidence of a statement of identification is not made inadmissible by the hearsay rule when the statement would have been admissible if made by the witness while testifying and the following additional foundational requirements are met: "[¶] (a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence; [¶] (b) The statement was made at a time when the crime or other occurrence was fresh in the witness' memory; and [¶] (c) The evidence of the statement is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time."

Defendant contends there had been no evidence, from Vargas or any other witness, that the occurrence was fresh in her mind at the time of her statement. (Evid. Code, § 1238, subd. (b).) He also asserts that Vargas had not previously testified that she made an identification of Garcia at the preliminary hearing. (*Id.*, § 1238, subd. (c).) Defendant argues that these foundational deficiencies severely undermined any asserted reliability of the purported identification. Once admitted, he contends, Vargas's prior identification of Garcia served to show that she had consistently identified Garcia, thereby lending significantly more credibility to her allegedly less certain identification of defendant.

Even if the foundational requirements for a prior identification were not all satisfied, the admission of the challenged evidence could not possibly have prejudiced defendant. First of all, the evidence was essentially cumulative of other evidence in the record demonstrating Vargas's recognition of Garcia. Vargas testified both on direct and redirect examination that, although she did not initially identify Garcia at his live lineup because she was

afraid for herself and her child, she nonetheless recognized Garcia as one of the men she saw. Vargas was also able to recognize and identify Garcia from a photograph at the time of trial.

More significantly, Vargas's recognition and identifications of defendant were not, as defendant suggests, uncertain. At trial, Vargas explained that although she recognized defendant as one of the fleeing men when initially shown his photo in 1987, she chose not to identify him at that time because she was afraid. However, Vargas overcame her fear and stepped forward to identify defendant both at his preliminary hearing and at a subsequent photographic lineup. She also identified him at trial. Since Vargas's testimony was both consistent and unwavering in this regard, it is not reasonably probable that the admission of Vargas's identification of Garcia at his preliminary hearing affected the verdict.[21] (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Finally, defendant argues that his constitutional right of confrontation was abridged because he was unable to cross-examine Vargas at Garcia's preliminary hearing and because Vargas was excused as a witness before Detective Williams took the stand. Not only was this claim waived by the failure to assert it below (Evid. Code, § 353), it is without merit. ■ Where the witness is available at trial for cross-examination, the principal danger of admitting hearsay evidence is not present (see *People* v. *Gould* (1960) 54 Cal.2d 621, 626-627 [7 Cal.Rptr. 273, 354 P.2d 865]), and neither the federal nor the state constitutional right of confrontation is violated (*California* v. *Green* (1970) 399 U.S. 149, 153-164 [26 L.Ed.2d 489, 494-501, 90 S.Ct. 1930]; *People* v. *Chavez* (1980) 26 Cal.3d 334, 349-361

---

[21]We are not persuaded by the claim that Vargas's identification of defendant was questionable because she had stated at various times during the investigation that she had seen a Black man fleeing with Garcia. The record reasonably demonstrates that Vargas had used the term "Black" to describe a person with a skin tone darker than her own, not a person of African-American ethnicity. For instance, when the prosecutor showed Vargas a photo of defendant at trial, she stated: "That's the person I saw when I saw him coming down the stairs." The prosecutor then asked: "And the skin tone in this photograph, is this closer to what you remember?" Vargas replied: "Yes, dark. Black." Similarly, when defense counsel asked Vargas whether she repeatedly called the suspect a Black man to police because she was afraid, Vargas responded: "Yes, I said—I didn't say—not in that kind of—the way you've made it sound, just because of that. I just said a Black man, because to me he was a Black man. I even call my brother Black man. He's very dark. I'm very light skinned." This testimony, which effectively clarified that Vargas was not referring to an African-American when she used the terms "Black" and "Black man," is consistent with testimony and statements by Zavala and nearby resident Vanessa Sturns that the two fleeing suspects were Hispanic.

Defendant identifies other minor discrepancies in Vargas's early descriptions of the suspects and in her recollection of the events. Such discrepancies do not persuade us any differently.

[161 Cal.Rptr. 762, 605 P.2d 401]; see also *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1220 [14 Cal.Rptr.2d 702, 842 P.2d 1]). Here the record shows that Vargas had not been excused, but had testified on rebuttal in response to other new evidence elicited by the defense during its cross-examination of Detective Williams. Because Vargas apparently was available for recall and cross-examination on this matter had defense counsel so requested, defendant's right of confrontation was not abridged.[22]

### b. *Vargas's Recognition of Garcia at Prior Lineup*

Immediately after Detective Williams testified that Vargas identified Garcia at his preliminary hearing, the prosecutor asked him: "The date of the preliminary hearing where you had the discussion with Mrs. Vargas, did she indicate to you that she had in fact recognized Mr. Garcia on the stage?" When defense counsel objected to the question as "leading and hearsay," the prosecutor responded: "It's a prior inconsistent statement." After the trial court overruled the objection, Williams answered: "Yes. She stated that she had identified him on each of the occasions; however, she was in fear of safety for herself and for her family and that's why she failed to specifically point him out in those situations."

 Defendant contends that the trial court erred in overruling his objection because Vargas's purported statement to the detective was consistent, not inconsistent, with her testimony. Defendant claims that the erroneous admission of the statement prejudiced him by making Vargas's testimony appear more credible and persuasive than it actually was.

This claim is unavailing. Even if the challenged evidence was not admissible as a prior inconsistent statement, any error in its admission was clearly harmless. First, the statement was merely cumulative of Vargas's trial testimony. Second, as discussed previously, Vargas was consistent and unequivocal in her recognition of defendant. Given the record, it is not reasonably probable that admission of the statement affected the verdict. (*People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant next claims for the first time on appeal that the erroneous admission of Vargas's extrajudicial statement abridged his right of confrontation. The record, however, discloses that defendant's counsel did, in fact,

---

[22]Defendant also claims for the first time on appeal that the erroneous admission of the prior identification denied him due process, a fair jury trial and a reliable guilt determination. Not only have these claims been waived by the failure to assert them below (Evid. Code, § 353), the admission of the evidence did not substantially implicate any of the cited constitutional protections. In any event, the error was harmless under any standard. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.)

cross-examine Vargas earlier about Garcia's live lineup, although he did not dwell on the matter. Moreover, as noted previously, Vargas was apparently available for additional cross-examination had defense counsel so requested. Under these circumstances, defendant's right of confrontation was not abridged. (*California* v. *Green, supra,* 399 U.S. at pp. 153-164 [26 L.Ed.2d at pp. 494-495]; *People* v. *Johnson, supra,* 3 Cal.4th at p. 1220; *People* v. *Chavez, supra,* 26 Cal.3d at pp. 349-361.)[23]

### c. *"Nonidentification" of Richard Lopez and Nathan Howard*

Detective Williams testified without objection that Vargas and Zavala viewed photographic lineups containing the photographs of Richard Lopez (Ontiveros's boyfriend) and Nathan Howard (a friend of Garcia's who appears to have been of African-American ethnicity). He further testified without objection that neither Vargas nor Zavala identified these two men as suspects in the case, and that Zavala specifically stated that Lopez was not involved in the crimes. Subsequently, the prosecutor asked: "With respect to the photographic line-ups of Richard Lopez and Nathan Howard, in the entirety of the investigation in this case[,] has anyone identified a photograph of Richard Lopez as a participant in this crime?" Defense counsel objected on the grounds that the question was argumentative and called for opinion, hearsay and speculation. After the prosecutor responded that the question called for acts occurring in the witness's presence and that the absence of an identification was not hearsay, the objection was overruled. The detective responded: "No one ever identified Richard Lopez or Nathan Howard as being participants in this crime."

 Defendant contends the court erred in admitting Detective Williams's testimony that no one, including Vargas and Zavala, identified Lopez or Howard during the course of the investigation. He claims that such "nonidentification" evidence constituted inadmissible hearsay, and that its admission abridged his constitutional right of confrontation and prejudiced his attempt to inject reasonable doubt into the jurors' minds that a third party (i.e., Howard) committed the crimes.

We see no basis for reversal. In the first place, defense counsel failed to object to the questions and responses pertaining to Vargas and Zavala. Although counsel subsequently objected to the more generalized question asking if anybody had ever identified Lopez as a participant, this was

---

[23]Defendant also contends that the erroneous admission of the challenged evidence denied him due process, a fair jury trial and a reliable guilt determination in a capital case. We cannot agree. Not only have these claims been waived by defendant's failure to assert them at trial, but by any standard, the perceived error was harmless. (See *Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711]; *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

insufficient to preserve for review the issues concerning Vargas's and Zavala's responses. (Evid. Code, § 353; *People* v. *Zapien* (1993) 4 Cal.4th 929, 979-980 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

■ Defendant asserts that if this issue is deemed waived, counsel was necessarily incompetent because there was no legitimate tactical reason for not objecting to the questions pertaining to Vargas and Zavala. We disagree. "Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence. [Citations.] To establish ineffective assistance, a defendant must show that counsel's actions 'fell below an objective standard of reasonableness under prevailing professional norms.' [Citation.]" (*People* v. *Hayes* (1990) 52 Cal.3d 577, 621-622 [276 Cal.Rptr. 874, 802 P.2d 376]; see *People* v. *Zapien, supra,* 4 Cal.4th at p. 980 [convictions will be reversed only if the record on appeal affirmatively discloses that counsel had "no rational purpose" for the act or omission].) In this case, defense counsel reasonably might have chosen for tactical reasons not to object because Vargas and Zavala were available for recall and cross-examination, and thus could have testified directly about these matters. (See *People* v. *Ratliff* (1986) 41 Cal.3d 675, 692 [224 Cal.Rptr. 705, 715 P.2d 665].)

■ In any event, even assuming that the issue had been preserved for review and that some or all of the evidence constituted inadmissible hearsay,[24] we are satisfied that the admission of the testimony was not prejudicial. Inasmuch as there had been no evidence that anyone had ever identified Howard or Lopez as a participant in the crimes, Williams's testimony merely reflected the state of the record. Moreover, defense counsel only briefly raised the issue of Howard's or Lopez's possible involvement during his closing argument, presumably because the evidence supporting this theory

---

[24]Defendant argues that, like a positive identification, a failure to identify is evidence either of a statement or of assertive conduct intended as a substitute for oral or written verbal expression. (See *People* v. *Mayfield* (1972) 23 Cal.App.3d 236, 240 [100 Cal.Rptr. 104] [declarant's conduct of pointing to a photograph in response to a question is assertive conduct and hearsay].) Although there might be instances in which the absence of an identification would not constitute hearsay, the prosecutor in this case eventually used the challenged nonidentification evidence for a hearsay purpose, i.e., as the basis for arguing in closing that Vargas and Zavala "exonerated" Howard and Lopez, and that the two essentially told police that Howard and Lopez were not the right ones.

On a related note, the Attorney General contends that the prior identification exception to the hearsay rule (Evid. Code, § 1238) furnishes a basis for the admission of nonidentification evidence. Since we conclude that admission of the evidence was harmless in any event, we decline to address this issue.

was marginal at best.[25] In contrast, the evidence pointing to defendant's involvement was strong, consisting of, inter alia: (1) positive identifications by both Vargas and accomplice Ontiveros; (2) evidence that on the morning after the crimes, defendant sought treatment for an arm injury matching descriptions provided by Vargas, Ontiveros and Zavala; and (3) evidence that on that same morning, defendant requested his brother to lie about his arm injury and to retrieve his car from Ontiveros. Thus, it is not reasonably probable that the perceived error affected the verdict. (*People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.)[26]

### 3. *Reading of Vargas's Testimony to Jury*

During guilt phase deliberations, the jury requested portions of testimony of Vargas and two other witnesses. With respect to Vargas, the jury requested "[d]irect and/or cross concerning what photo line-ups were shown to her prior to preliminary hearing and what identifications were made."[27] The trial court ordered certain excerpts to be read to the jury, including three portions of Vargas's testimony explaining that she did not identify defendant in the photo lineup predating the preliminary hearing because she was afraid. The court, however, refused defense counsel's request to read portions of her recross-examination testimony that, according to defendant, would have tended to cast a very different light on her alleged "fear" and would have suggested that, had she been truly afraid of defendant, she would not have identified him at his preliminary hearing.[28]

---

[25]The evidence concerning the possible involvement of Lopez and Howard is fairly summarized as follows. Lopez, who was Ontiveros's live-in boyfriend, was present at the bar with Ontiveros on the night of the murder. According to Ontiveros, Lopez left the bar before she discussed the proposed robbery with Garcia and defendant. Howard, who appeared to be African-American, was called as a witness by defendant and testified that he grew up with Juan Garcia and described himself as a "partner" of Garcia's. According to defendant, Howard "somewhat resembles" a composite drawing done by a sketch artist from Vargas's descriptions the day after the murder.

[26]Defendant belatedly contends for the first time on appeal that the erroneous admission of the challenged evidence denied him due process, a fair jury trial and the right to present a defense, and a reliable guilt determination. Even if the issue is not deemed waived (Evid. Code, § 353), the perceived error did not violate any of defendant's constitutional rights. Moreover, by any standard, the error was harmless. (See *Chapman* v. *California, supra*, 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711]; *People* v. *Watson, supra*, 46 Cal.2d at p. 836.)

[27]The jury had initially requested "Maria Vargas testimony on when she saw photo line up." The request at issue here followed the trial court's instructions to the jury to narrow its initial request.

[28]The specific portions requested by defense counsel were: (1) Vargas's testimony allegedly showing that she had not become upset at defendant's preliminary hearing immediately after identifying him; (2) her statement that she did not identify accomplice Garcia at his lineup because she was afraid; and (3) her testimony to the effect that she had not gotten over her fear when she identified defendant at the preliminary hearing. Defendant contends these

Defendant contends that the court's refusal to delete Vargas's statements that she was afraid or, in the alternative, to include her other testimony that tended to contradict or explain that remark, was an abuse of discretion that unfairly highlighted testimony unfavorable to defendant and violated his rights to due process, a fair jury trial and a reliable guilt determination. He contends that Vargas's fear testimony should not have been read for the additional reason that it raised the possible, but impermissible, inference that defendant had threatened her.

In response, the Attorney General asserts that defendant waived any objection to some parts of the challenged testimony because it was his counsel who requested that they be read. (Evid. Code, § 353.) Although defendant disputes the waiver contention, he requests that we review the matter in the context of an ineffective assistance claim if a waiver is found.

We find it unnecessary to decide the issues of waiver and ineffective assistance since the underlying claim is so clearly lacking in merit. Vargas's testimony concerning her fear was directly relevant to why she did not identify defendant at the photo lineup. To have omitted this testimony as part of the reading would have grossly distorted the record. No error appears.

The court also did not err in denying defendant's request to read portions of Vargas's recross-examination testimony pertaining to her identification of defendant *at* his preliminary hearing and to her failure to identify *Garcia* at his *live* lineup. Unlike the fear evidence, this other testimony was not responsive to the jury's request for "what photo line-ups were shown to her prior to the preliminary hearing and what identifications were made."

In any event, the court's ruling, even if in error, did not prejudice defendant. The reading of Vargas's testimony was brief, and given in conjunction with testimony by two other witnesses. Additionally, the reading included defense counsel's questioning of Vargas to the effect that if Vargas was actually afraid of defendant, "she could have said what she said at Garcia's live lineup." In substance, this was precisely the point defense counsel had hoped to make with the other excluded portions of Vargas's testimony. (See fn. 28, *ante*.) Accordingly, any perceived error was harmless. (*People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.)

Finally, defendant argues that Vargas's fear testimony impermissibly suggested that he or someone associated with him had threatened her. (See *People* v. *Mason* (1991) 52 Cal.3d 909, 946-947 [277 Cal.Rptr. 166, 802

---

portions of Vargas's testimony implied that her failure to identify defendant's photo resulted from a lack of recognition, not fear.

P.2d 950]; *People* v. *Weiss* (1958) 50 Cal.2d 535, 554 [327 P.2d 527]; *People* v. *Pitts* (1990) 223 Cal.App.3d 606, 778-781 [273 Cal.Rptr. 757].) We reject this claim at the outset because it was not asserted at trial. (Evid. Code, § 353.) We also find it unpersuasive on the merits. There is no suggestion in the record, either from Vargas's own testimony or from the conduct of trial, including the prosecutor's arguments, that the jury had been told or otherwise left with the impression that Vargas's fear might have been attributable to a threat.

### 4. *Evidence Regarding the Victims' Relationship*

#### a. *Exclusion by the Trial Court*

On direct examination, the prosecutor asked Zavala if he and his brother were "very close." Zavala replied: "Of course." On cross-examination, Zavala was asked if he had an uncle in Mexico named Castro. After the trial court sustained the prosecutor's relevance objection to this question, defense counsel made an offer of proof, outside the presence of the jury and the witness, that Zavala and Barragan had an uncle named Castro in Mexico who had heard Zavala indicate that he and Barragan for a long time had not been speaking because of Barragan's drug dealing. Defense counsel argued that the evidence would show that the brothers in fact were not close, and that the drug dealing was a source of irritation between them. Defense counsel also referred to a series of police reports indicating that Zavala was initially suspected to be Barragan's murderer.

The court sustained the prosecutor's objection pursuant to Evidence Code section 352, finding that the probative value of the proffered evidence would be outweighed, if not by the time it would take to introduce it, then by the confusion it would cause. The court also denied defendant's motion to strike Zavala's earlier testimony that he and Barragan were close.

 Defendant contends that the trial court prejudicially erred in excluding the above evidence. We disagree.

 Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. (*People* v. *Dyer* (1988) 45 Cal.3d 26, 73 [246 Cal.Rptr. 209, 753 P.2d 1].) Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.

[Citations.]" (*People* v. *Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79].)

 Applying this standard, we find no abuse of discretion. First of all, the relevance of the proffered evidence was not clear since the defense did not establish when the alleged communication between Zavala and his uncle took place, or when the supposed falling out between the brothers occurred. Second, even if a relevant time frame could have been demonstrated, the proffered evidence had little, if any, significance to the vital issues in the case against defendant.[29] Thus, even though defense counsel had represented to the trial court that he did not intend to dwell on the subject, the court cannot be faulted for concluding that the probative value of such evidence was outweighed by concerns that an exploration of the relationship between the two brothers would consume undue time and confuse the issues.

In any event, assuming there was an abuse of discretion, reversal is not warranted. Defendant's involvement in the instant crimes was firmly established through two witnesses other than Zavala: Maria Vargas and defendant's accomplice, Cynthia Ontiveros. Hence, it is not reasonably probable that a more favorable result would have occurred had the evidence been admitted. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

### b. *Prosecutorial Misconduct and Ineffective Assistance of Counsel*

 Defendant contends that the prosecutor committed misconduct by stating in his guilt phase closing argument that Zavala loved his brother, that he had no motive to lie, and that he had no reason to falsely identify the wrong person as his brother's killer. Defendant claims that the prosecutor, having obtained the favorable ruling excluding defendant's proffered evidence, then used the evidence of Zavala's closeness to Barragan to convince the jury that Zavala's less than certain identification of defendant was in fact accurate. He claims this use of the evidence contradicted an earlier representation made by the prosecutor that the only purpose for establishing the brothers' closeness was to help the jurors appreciate Zavala's state of mind as he was perceiving the attack on Barragan. (Cf. *People* v. *Varona* (1983) 143 Cal.App.3d 566, 570 [192 Cal.Rptr. 44] [finding misconduct where prosecutor argued a falsehood to the jury and also argued the "lack" of evidence even though the defense was ready and willing to produce it].)

We need not address these claims on the merits because defense counsel's failure to object to the prosecutor's remarks waives the issue on appeal.

---

[29]The defense case was not based on the theory that Zavala may have killed his brother; nor was there any evidence to support such a theory.

(*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1334-1335 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Nevertheless, we will reach the merits in response to defendant's assertion that the failure to assign misconduct constituted ineffective assistance of counsel.

■ Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 199 [19 Cal.Rptr.2d 836, 852 P.2d 331]; *People* v. *Cox* (1991) 53 Cal.3d 618, 656 [280 Cal.Rptr. 692, 809 P.2d 351].) If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails. Moreover, " 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.]" (*People* v. *Cox*, *supra*, 53 Cal.3d at p. 656.)

■ In this case, neither incompetence nor prejudice has been established. First of all, the main thrust of the prosecutor's statements, i.e., that Zavala had no reason to identify anyone but the guilty party as his brother's murderer, was not dependent on the evidence that the brothers were close. Whether or not the brothers shared a close relationship, the record remained devoid of any evidence suggesting a reason or motive for Zavala to wrongly identify defendant. Since the gist of the prosecutor's argument was appropriate, defense counsel's failure to assign misconduct was not unreasonable. In any event, defendant fails to demonstrate prejudice. Overwhelming evidence of defendant's involvement in the instant crimes was presented through Vargas, Ontiveros and others. Thus, even if a competent attorney would have succeeded in persuading the trial court to strike this entire aspect of the prosecutor's argument, it is not reasonably probable that the omission would have resulted in a more favorable result for defendant. (*People* v. *Mayfield*, *supra*, 5 Cal.4th at p. 199; *People* v. *Cox*, *supra*, 53 Cal.3d at p. 656.) No basis for reversal appears.[30]

---

[30]Defendant further claims that the trial court's erroneous exclusion of the proffered evidence, the prosecutor's misconduct and counsel's ineffectiveness violated or abridged his federal constitutional rights to due process, a fair guilt trial and a reliable verdict at the guilt phase of a capital case. We reject these claims. At trial, defendant failed to make any objection whatever based on any federal constitutional provision. (*People* v. *Ashmus*, *supra*, 54 Cal.3d at pp. 972-973, fn. 10.) Moreover, these points are not properly raised. (*Id.*, at p. 985, fn. 15.)

### 5. *Exclusion of Zavala's Opinion Testimony*

On cross-examination, defense counsel asked Zavala if he had previously told a defense investigator "that you thought it looked like the attackers had come to the apartment to kill your brother?" The trial court sustained the prosecutor's objection that the question called for speculation as to the intent of the attackers.

 Defendant contends the trial court erred because the question called not for speculation, but for the witness's opinion as to what he personally perceived during the attack. Defendant claims the error was prejudicial because the evidence would have created a reasonable doubt on the special circumstance allegations and the underlying charges of attempted robbery and burglary by showing that defendant's purpose when he entered the apartment was strictly to kill Barragan.

While not disputing the issue of error, the Attorney General argues that no possible prejudice could have resulted from the omission of the evidence. We agree that any perceived error was harmless.

At trial Cynthia Ontiveros testified that she, Garcia and defendant planned to rob Zavala and Barragan. She provided details of their planning and of the events leading up to the attack. She also described what happened after the three fled the crime scene, providing particulars concerning defendant's injury, his disposal of the murder weapon, and the washing and return of defendant's car. Although Zavala may have thought it looked like the attackers had come to kill his brother, that would not have been necessarily inconsistent with Ontiveros's testimony and Zavala's other testimony indicating that the two attackers coordinated their efforts to gain access to the apartment, subdue the brothers and obtain whatever "it" was. Additionally, if admitted, Zavala's testimony arguably would have bolstered the theory that Garcia and defendant conspired to rob the brothers and to leave no witnesses. Given all the evidence in the record, as well as the fact that there was no evidence that defendant previously knew or even heard of Barragan, it is highly unlikely that the jury would have believed the motive was other than robbery.[31]

### 6. *Accomplice Corroboration*

 Defendant contends that because the sole evidence of burglary and attempted robbery came from the uncorroborated testimony and statements

---

[31]For the same reasons, we reject defendant's claims, belatedly asserted for the first time on appeal, that the exclusion of the evidence deprived him of the rights to present a defense, to due process and a fair trial, and to a reliable special circumstance and penalty determination.

of accomplice Ontiveros,[32] there was legally insufficient evidence to support the burglary and attempted robbery convictions, the felony-murder theory of first degree murder, and the felony-based special-circumstance findings. Alternatively, defendant contends that even if there was sufficient corroboration, the judgment must be reversed because the jury was inadequately instructed on the principles of accomplice corroboration.

### a. Sufficiency of Corroborative Evidence

The law requiring corroboration of accomplice testimony is well established. ▇▇▇ "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ." (§ 1111.) " 'The requisite corroboration may be established entirely by circumstantial evidence. [Citations.] Such evidence "may be slight and entitled to little consideration when standing alone. [Citations.]" ' " (*People* v. *Zapien, supra,* 4 Cal.4th at p. 982, quoting *People* v. *Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127].) " 'Corroborating evidence "must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." [Citation.]' " (*People* v. *Zapien, supra,* 4 Cal.4th at p. 982, quoting *People* v. *Sully* (1991) 53 Cal.3d 1195, 1228 [283 Cal.Rptr. 144, 812 P.2d 163].) In this regard, "the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. [Citation.]" (*People* v. *Perry* (1972) 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129].) " 'Corroborating evidence is sufficient if it substantiates enough of the accomplice's testimony to establish his credibility [citation omitted].' " (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1206-1207 [249 Cal.Rptr. 71, 756 P.2d 795].)

▇▇▇ In applying the foregoing rules, we find there was substantial corroborative evidence connecting defendant to the crimes in question. Zavala testified that: (1) when he opened the door for Ontiveros, a man with a tire iron and a man with a knife immediately rushed into the apartment and started attacking him and his brother; (2) during course of the attack, the man with the tire iron (whom he later identified as Garcia) asked him, "[¿]donde la tienes?" ("where do you have it?"); (3) Zavala assumed that "it" meant money or drugs; (4) after Zavala said that "it" was in the closet, the man with the knife (whom he later described as looking similar to defendant)

---

[32]The jury had been instructed that Ontiveros was an accomplice as a matter of law.

told Garcia, "finish him too"; and (5) the two attackers fled when the telephone began ringing and the man with the knife said, "Well let's get out of here the police might going to come [*sic*]."

Although Zavala could not identify defendant with certainty, Vargas could and did. She positively identified defendant and Garcia as the two men who had fled past her window on the night of the crimes, and testified that defendant fled the crime scene with an injured arm. Zavala also testified that the knife-wielding attacker fled with an injured arm, while Dr. Billings testified that on the morning of May 5, 1987, defendant received stitches for an injury to his left arm caused by a sharp instrument. Further corroborating evidence came from Raymond Rodriguez, who admitted that, at defendant's request, he lied about defendant's arm injury and retrieved defendant's car from Ontiveros the morning after the crimes had occurred. Physical evidence also tended to connect defendant to the crimes. Barragan's wounds were consistent with face-to-face stabbings by a left-handed assailant; hospital records reflected that defendant was left-handed. Additionally, traces of blood consistent with defendant's blood type were found inside the handle of the knife found by the police with Ontiveros's help. Finally, blood on a tissue in defendant's car trunk was consistent with the blood of either Zavala or Barragan, but not with the blood of defendant or Garcia.

While defendant apparently concedes that the above evidence sufficiently tends to connect him with Barragan's murder, he claims it does not adequately connect him with an attempted robbery or burglary. (See *People* v. *Reingold* (1948) 87 Cal.App.2d 382, 403 [197 P.2d 175] [circumstances must tend to connect the accused with the specific offense for which he is on trial].) Focusing on the circumstances testified to by Zavala, defendant argues that the unadorned question—"where do you have it?"—does not in itself reflect any intent or attempt to commit the crime of robbery or burglary. In his view, the question is an ambiguous and essentially meaningless question if considered without aid or assistance from Ontiveros's testimony. (See *People* v. *Perry*, *supra*, 7 Cal.3d at p. 769.) We disagree.

Even though the attackers were not specific in demanding money or drugs, the totality of circumstances testified to by Zavala, even apart from Ontiveros's testimony, clearly justified the jury's determination that an attempted robbery and burglary had taken place. (See, e.g., *People* v. *Jackson* (1963) 222 Cal.App.2d 296, 298 [35 Cal.Rptr. 38] [attempted robbery conviction upheld where evidence established that defendant entered store, pointed a gun at store operator, and said only, "This is it."]; *People* v. *Gilbert* (1963) 214 Cal.App.2d 566, 567-568 [29 Cal.Rptr. 640] [where two armed

men appeared in market shortly after closing time and simultaneously displayed their weapons, one pointing at proprietor near cash drawer and the other herding remaining occupants to rear room, lack of phrase such as "this is a stickup" or "hand over your money" does not bar the reasonable inference that a forceful taking of property was intended].) Although Zavala testified that it was Garcia who demanded where "it" was, the jury could reasonably infer from all the testimony given by Zavala that the attackers coordinated their efforts in a joint plan to rob the brothers. The circumstances additionally supported the inference that the attackers would have succeeded in that plan had it not been for the telephone ringing.[33] (Cf. *People* v. *Zapien, supra,* 4 Cal.4th at p. 984 [upholding special circumstance finding that defendant murdered victim during commission of attempted robbery and burglary where jury could reasonably conclude that defendant fled without money or valuables because he knew police had been telephoned].) Contrary to defendant's assertions, there is nothing fanciful or illogical about these inferences.

The record contains more than ample corroborating evidence supporting the burglary and attempted robbery convictions, the conviction for first degree felony murder and the felony-based special-circumstance findings.[34] That being the case, we reject defendant's further contentions that the verdict violates his rights to due process, a reliable guilt determination and other perceived constitutional protections.

b. *Instructional Error*

After discussions with counsel, the trial court gave the following instructions: CALJIC Nos. 3.11 (testimony of accomplice must be corroborated); 3.12 (sufficiency of evidence to corroborate an accomplice); 3.16 (witness accomplice as matter of law); 3.18 (testimony of accomplice to be viewed with distrust).

---

[33]Pointing to the evidence that Garcia did not immediately go to the closet to obtain whatever "it" was once Zavala responded to Garcia's question, defendant argues that the question cannot logically be deemed an "immediate step" in the execution of an intended robbery which would have been completed if not interrupted by some unintended circumstance. (See CALJIC No. 6.00 [defining "attempt"].) Defendant is wrong. A jury could reasonably infer that, but for the telephone ringing, Garcia would have gone directly to the closet once he "finished" Zavala pursuant to defendant's instruction.

[34]Because we reach this conclusion, we need not and do not address defendant's contention that it cannot be determined from the record whether any or all of the jurors found defendant guilty of murder on a theory of premeditation and deliberation. We also do not address his contention that, in the event of a reversal, principles of double jeopardy preclude a retrial on the charges and special circumstance allegations prosecuted in this case. Finally, we do not address the Attorney General's contention that defendant's arguments "do not affect his burglary conviction and felony-murder special circumstance based on burglary because, based on [defendant's] theory, he could have entered the apartment to kill rather than to rob and kill."

Defendant contends the court erred in refusing to give a proposed addition to CALJIC No. 3.11, and in failing to instruct with CALJIC No. 3.13 (one accomplice may not corroborate another). Defendant contends these errors deprived him of due process, a fair jury trial, and reliable guilt, special circumstance and penalty determinations. These contentions are without merit for the reasons set forth below.

Although the trial court gave the standard CALJIC No. 3.11 instruction ("A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense."), it refused defendant's request to further instruct that: "As used in this instruction, 'testimony' includes statements made out of court as well as statements made in court by an accomplice." ▉ Defendant contends this proposed addition was necessary because the prosecutor relied on accomplice Ontiveros's out-of-court statements to police, as well as on her in-court testimony.[35] (See *People* v. *Andrews* (1989) 49 Cal.3d 200, 213-214 [260 Cal.Rptr. 583, 776 P.2d 285] [holding that § 1111 applies to an accomplice's out-of-court statements when used as substantive evidence of guilt]; *People* v. *Belton* (1979) 23 Cal.3d 516, 524-526 [153 Cal.Rptr. 195, 591 P.2d 485].) He theorizes that if the jurors had concluded that Ontiveros's out-of-court statements were not testimony, they could have improperly relied on such statements to provide the requisite corroboration for her in-court testimony.

We are not persuaded. Even though the trial court should have given defendant's proposed clarification to avoid any possibility of confusion (see *People* v. *Andrews*, *supra*, 49 Cal.3d at p. 215, fn. 11), the refusal to do so was not prejudicial error. The court's instructions made clear that accomplices were to be distrusted, and that their testimony could not furnish the sole basis for a conviction. (See CALJIC Nos. 3.11, 3.12, 3.18.) Moreover, neither the trial court nor the prosecutor ever told or otherwise suggested to the jury that it should distinguish between Ontiveros's out-of-court and in-court statements for purposes of the corroboration requirement.[36] (See *People* v. *Andrews*, *supra*, 49 Cal.3d at pp. 214-215.) When arguing the issue of corroboration during his closing argument, the prosecutor made no mention of Ontiveros's out-of-court statements. Rather, he directed the jury's

---

[35]These out-of-court statements described how Ontiveros, Garcia and defendant planned the robbery, and were not materially different from the testimony Ontiveros gave at trial. Evidence of these statements was provided through the testimony of Menlo Park Police Detective Terri Molakides.

[36]Given the specific nature of the court's instructions on accomplice corroboration, we are unpersuaded by defendant's suggestion that the jury was misled by the trial court's more general instruction that a witness's prior consistent or inconsistent statements may constitute "evidence of the truth of the statement as stated by the witness on such former occasion."

attention to the testimony provided by Vargas and Zavala, as well as to the physical evidence such as the presence of defendant's blood type on the retrieved knife, the blood found in defendant's car, and defendant's arm injury.

As we have already demonstrated, such evidence amply tended to connect defendant to the crimes. Based on the strength of that evidence, there is no reasonable probability that the jury would have reached a different result had it been given the clarifying instruction. (49 Cal.3d at p. 215; *People* v. *Watson, supra*, 46 Cal.2d at p. 836.)

 Defendant next contends that the trial court erred in not giving CALJIC No. 3.13, which provides: "The required corroboration of the testimony of an accomplice may not be supplied by the testimony of any or all of [his] [her] accomplices, but must come from other evidence." According to defendant, this instruction was necessary because the only inference of an intent to rob, apart from the evidence supplied by Ontiveros, came from fellow accomplice Garcia.

Because the corroboration requirement of section 1111 is a substantial right, we address this claim even though defense counsel stated at trial that CALJIC No. 3.13 did not apply. (§ 1259; *People* v. *Andrews, supra*, 49 Cal.3d at p. 213; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 781 [248 Cal.Rptr. 126, 755 P.2d 310].) Turning to the merits of the claim, however, we find that the instruction did not apply. Zavala, not Garcia, was the source of the evidence corroborating Ontiveros's testimony that defendant and Garcia intended to rob the brothers. Moreover, even though the evidence offered by Zavala included his recounting of the "[¿]donde la tienes?" ("where do you have it?") question originating from Garcia, that evidence falls outside the ambit of section 1111.

 "In enacting section 1111, the Legislature intended to eliminate the danger of a defendant being convicted solely upon the suspect, untrustworthy and unreliable evidence coming from an accomplice, who is likely to have self-serving motives that affect his credibility." (*People* v. *Belton, supra*, 23 Cal.3d at p. 526.) CALJIC No. 3.13, which instructs that one accomplice may not corroborate another, acknowledges this danger in the context of multiple accomplices who may be motivated by self-interest to offer complementary but inaccurate testimony adverse to the defendant.

 As a preliminary matter, we address the Attorney General's argument that section 1111 does not apply for the reason that Garcia was not an accomplice because "an 'accomplice' is one who testifies at trial." This

argument is without merit. Under section 1111, an accomplice is "defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the *testimony* of the accomplice is given." (Italics added.) As our cases make clear, the term "testimony" may refer to extrajudicial statements as well as in-court testimony. (*People* v. *Andrews, supra,* 49 Cal.3d at p. 214; *People* v. *Belton, supra,* 23 Cal.3d at pp. 524-526.)

 Nonetheless, evidence of Garcia's "[¿]donde la tienes?" question did not warrant the giving of CALJIC No. 3.13. Significantly, Garcia made this utterance in defendant's presence during their attack on Zavala and Barragan for the reasonably apparent purpose of facilitating a robbery. Thus, even if the question could be deemed a statement, it clearly was not made to law enforcement officials in the hope of leniency or immunity. (Compare with *People* v. *Belton, supra,* 23 Cal.3d at pp. 519, 525.) Garcia's utterance, and the context in which it was made, implicated none of the dangers which section 1111 was intended to address. Under these circumstances, the giving of CALJIC No. 3.13 would have been inappropriate and unnecessary. (Cf. *People* v. *Sully, supra,* 53 Cal.3d at p. 1230 [accomplice's excited utterance made in reaction to seeing defendant smash victim's face with sledgehammer was not "testimony" requiring corroboration for purposes of § 1111].)

In sum, these claims of prejudicial instructional error, whether considered singly or together, are without merit. So too are the constitutional challenges predicated on these claims.

### 7. *Conspiracy Instructions*

Although defendant was not charged with conspiracy, defense counsel and the prosecutor agreed below that the court should instruct the jury with CALJIC Nos. 6.10.5 (conspiracy and overt act—defined—not pleaded as a crime charged), 6.11 (conspiracy—joint responsibility) and 6.24 (determination of admissibility of coconspirator's statements).[37] Defendant presently contends the court committed prejudicial error in giving these instructions, particularly with respect to those instructions permitting criminal liability for the declaration of coconspirator.

The Attorney General argues that because defense counsel failed to object to the admission of Garcia's question into evidence, and because counsel affirmatively consented to the conspiracy instructions, defendant may not

---

[37]At the time, the prosecutor told the court he was "kind of going through this for the first time using a conspiracy instruction on the theory of admissibility of evidence as opposed to culpability for a crime."

now complain that the instructions were given. We agree that counsel's consent to the instructions bars appellate review (see *People* v. *Wader* (1993) 5 Cal.4th 610, 658 [20 Cal.Rptr.2d 788, 854 P.2d 80] [counsel invited error where he requested reading of challenged penalty phase instruction]), but will address the merits of defendant's claims since he additionally contends that counsel was ineffective.

In challenging the instructions, defendant once again asserts that, apart from accomplice Ontiveros's statements, the only evidence suggesting an intent to rob was Garcia's "[¿]donde la tienes?" question. Defendant posits that since he himself never said anything to indicate an intent to rob or steal, the jury could not have found him guilty of attempted robbery, burglary, felony murder or the special circumstances unless it acted on the conspiracy instructions given by the court which allowed it to attribute Garcia's utterance to him as a coconspirator in a plan to rob or steal.[38] Defendant evidently contends that these instructions lacked foundation because an alleged conspiracy to rob or steal had not been sufficiently established by independent proof from some source other than the statements of alleged conspirators. (See *People* v. *Murphy* (1943) 60 Cal.App.2d 762, 773 [141 P.2d 755].) If the conspiracy instructions had not been erroneously given, defendant claims, the jury would not have found against him.

It is firmly established that evidence of conspiracy may be admitted even if the defendant is not charged with the crime of conspiracy. (*People* v. *Belmontes*, *supra*, 45 Cal.3d at p. 790, citing with approval *People* v. *Jourdain* (1980) 111 Cal.App.3d 396, 404 [168 Cal.Rptr. 702]; *People* v. *Washington* (1969) 71 Cal.2d 1170, 1174 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541].) Once there is proof of the existence of the conspiracy there is no error in instructing the jury on the law of conspiracy. (*Ibid.*)

To determine whether there was sufficient proof of a conspiracy in this case, we apply the following rules. ■■■ "Although the existence of the conspiracy must be shown by independent proof [citation], the showing need only be prima facie evidence of the conspiracy. [Citation.] The prima facie showing may be circumstantial [citation], and may be by means of any competent evidence which tends to show that a conspiracy existed. [Citation.]" (*People* v. *Jourdain*, *supra*, 111 Cal.App.3d at p. 405.) Furthermore, the independent proof required to establish the existence of a conspiracy may consist of uncorroborated accomplice testimony. (*People* v. *Price* (1991) 1 Cal.4th 324, 444 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Cooks* (1983) 141 Cal.App.3d 224, 312 [190 Cal.Rptr. 211].)

---

[38]Defendant did not object to the admission of Garcia's question into evidence, nor is he contending on appeal that such evidence was erroneously admitted.

██ We find that accomplice Ontiveros's testimony at trial, standing alone, provided prima facie evidence of a conspiracy. In addition, we find that the existence of a conspiracy was sufficiently established through Zavala's testimony of the events taking place at the apartment.

██ Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]" (*People* v. *Cooks*, *supra*, 141 Cal.App.3d at p. 311.) ██ From what Zavala witnessed and testified to, the jury could reasonably infer that the two male assailants agreed and coordinated with each other and with Ontiveros to forcibly gain access to the apartment for the purpose of robbing or stealing from the brothers. The two assailants gave and took instructions from each other, with Garcia acting on defendant's commands to "finish" Zavala and to get out before the police arrived.

Having reviewed the record, we are satisfied that the trial court properly instructed on the principles of conspiracy. A fortiori, counsel's failure to object to the challenged instructions did not amount to ineffective assistance.

Because no error appears, we reject defendant's related claims that delivery of the conspiracy instructions violated his constitutional rights to due process, a fair trial by jury, and reliable guilt, special circumstance and penalty determinations. We also reject defendant's claim that admission of Garcia's statement deprived him of his right to confront Garcia. (*People* v. *Brawley* (1969) 1 Cal.3d 277, 290-291 [82 Cal.Rptr. 161, 461 P.2d 361] [admission of statements under California's coconspirator exception to hearsay rule not violative of federal confrontation clause]; *People* v. *Earnest* (1975) 53 Cal.App.3d 734, 743-744 [126 Cal.Rptr. 107].)

Finally, we reject defendant's state and federal constitutional claims based on the trial court's failure to instruct the jury, sua sponte, that: (1) a finding of the existence of a conspiracy involving defendant cannot be had on uncorroborated accomplice testimony; and (2) the requisite corroboration cannot be supplied by the declaration of a conspirator. The first proposed instruction misstates the law. (*People* v. *Price*, *supra*, 1 Cal.4th at p. 444 ["The existence of a conspiracy may be proved by uncorroborated accomplice testimony; corroboration of accomplice testimony is needed only to connect the defendant to the conspiracy."].) The second inappropriately attempts to merge the corroboration of accomplice rule with the coconspirator exception to the hearsay rule.

### 8. *Instructions Regarding Permissible Inferences*

Defendant argues that the trial court erred in giving a series of instructions that unfairly permitted the jury to draw critically adverse inferences against him based on evidence of his behavior before, during and after the events in question. Defendant claims that these errors were particularly devastating with respect to the special circumstance allegations, and that they deprived him of due process, a fair jury trial and a reliable jury determination on guilt, special circumstances and penalty. As we will demonstrate, no error appears.

### a. *CALJIC No. 2.71.7*

Over defense objection, the trial court gave CALJIC No. 2.71.7, specifically relating to a defendant's preoffense statements.[39] According to the record, this instruction evidently was given because of Ontiveros's testimony in which she recounted the conversations she had with Garcia and defendant before the murder. ■ Defendant argues that the instruction was not sufficiently supported by the evidence because Ontiveros did not attribute any particular statement to defendant, but referred to defendant as being part of the conversations only when the prosecutor asked leading questions. We conclude otherwise.

Although Ontiveros identified certain statements made specifically to and by Garcia, she repeatedly affirmed that her conversations were with both Garcia and defendant, and that all three of them discussed the plan to get drugs from the brothers.[40] She also testified that, after having discovered that the brothers had no more drugs, she had a conversation with Garcia and

---

[39]The trial court instructed: "[¶] Evidence has been received from which you may find that an oral statement of intent was made by the defendant before the offense with which he is charged was committed. [¶] It is your duty to decide whether such a statement was made by the defendant. [¶] Evidence of an oral statement ought to be viewed with caution."

[40]Portions of Ontiveros's testimony supporting this conclusion include the following: "Q [Prosecutor]: . . . When you started discussing with Mr. Garcia and Mr. Rodrigues the young brothers in Menlo Park that you could get drugs from, did you discuss a plan about how to get drugs from them? A [Ontiveros]: Yes. Q: Can you describe for the ladies and gentlemen of the jury the conversation among the three of you concerning how you could go about getting the drugs from the brothers. [Defense counsel]: Objection. Leading as to who the conversation was with. [Prosecutor]: I'll withdraw the question and rephrase it, your honor. The court: Very well. Q [Prosecutor]: Did the three of you discuss the plan? A [Ontiveros]: Yes. Q: And can you describe to the jury in detail, as you recall it, what your conversation was, what the plan was that you devised to get drugs from the brothers? A: Well, I said that I would go up to the door. And they knew me, so I knew that they would open the door. And at that point, when the door was open, that they could rush in after me. . . . Q: When you were talking over with Mr. Garcia and Mr. Rodrigues the plan by which you would go over and get the door open, and the two men could rush in and scare the brothers into giving up their drugs—[Defense counsel]: Objection. Misstates the evidence. This was

defendant in which they agreed to go up to the apartment and get money instead. Thus, even though Ontiveros did not ascribe any particular statement to defendant, the jurors could reasonably infer from her testimony that defendant made a pre-offense oral statement by actively participating in planning the robbery, or at least by assenting to the plan. CALJIC No. 2.71.7 was properly given.

### b. *CALJIC No. 2.71.5*

At trial, Ontiveros recounted various statements made by Garcia in defendant's presence as the three drove away from the crime scene in defendant's car. In substance, Garcia told Ontiveros that Garcia kept asking Zavala for the money as they were fighting, and that Zavala kept saying it was under the couch. When Garcia made these statements, defendant apparently said nothing. Over the defense's objection, the trial court gave the adoptive admission instruction contained in CALJIC No. 2.71.5.[41]

▆▆▆▆ Defendant maintains that the court's delivery of CALJIC No. 2.71.5 was improper because the statements identified as the basis for the instruction lacked the foundational requirements of an adoptive admission, in that: (1) the record fails to show that he either heard or had any knowledge of the statements made by Garcia (see Evid. Code, § 1221; *People* v. *Lebell* (1979) 89 Cal.App.3d 772, 779-780 [152 Cal.Rptr. 840]); and (2) Garcia's statements did not accuse or implicate him in any way (see *People* v. *Preston* (1973) 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508

between Cynthia Ontiveros and Juan Garcia. [Prosecutor]: I don't believe that's accurate. The court: Objection overruled. You may proceed. [Prosecutor] Thank you, your honor. [¶] As part of the discussions between the three of you, as to how you would carry out the plan to rob the brothers of their drugs, did you mention, or suggest, or discuss with the two men the use of weapons? A [Ontiveros]: I told them that they wouldn't need no weapons. Q: Okay. [¶] How did you explain that to the two men, Mr. Garcia and Mr. Rodrigues? A: Well, Mr. Garcia had asked me if they had weapons in the house. And I said that I had never seen any, and I didn't think that they had any; and if they did, the way I was going to set it up they wouldn't have time to get them. And I told them that they wouldn't need any. Q: And at that point, when you were having this discussion, did either Mr. Garcia or Mr. Rodrigues disagree with that or take issue with that? A: Not that I remember."

[41]The court instructed: "If you should find that from the evidence, if you should find from the evidence that there was an occasion outside of, outside of court when the defendant, under conditions which reasonably afforded him an opportunity to reply, failed to make denial in the face of an accusation expressed directly to him or in his presence charging him with the crime for which he is now on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature; the circumstances of his silence on that occasion may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as—as it supplies meaning to the silence of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement."

P.2d 300]). Defendant claims that the giving of the instruction under these circumstances was erroneous in light of *People* v. *Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203], which held: "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference."

Although defense counsel objected to the giving of CALJIC No. 2.71.5, he did not object on foundational or other grounds when evidence of Garcia's statements was admitted. Because counsel failed to object to admission of the evidence, the Attorney General argues that defendant waived any instructional error claim. Defendant disagrees. He asserts that Garcia's statements were not offered or admitted into evidence as an adoptive admission, and that in any event, *People* v. *Hannon*, *supra*, 19 Cal.3d 588, precludes a finding of waiver. In that case we held that the lack of objection to admission of testimony does not waive the right to appellate review of the propriety of jury instructions affecting the *substantial rights* of a defendant. (19 Cal.3d at p. 600 [deciding issue in context of CALJIC No. 2.06]; see § 1259.)

Even if the claim is not deemed waived, it fails for lack of merit. As the Attorney General points out, aside from Garcia's postoffense statements, there was evidence in the record that prior to the crimes, defendant was with Ontiveros and Garcia when the plan to rob the victims was discussed. In response to the prosecutor's questions, Ontiveros confirmed: (1) that "the three of [them] discuss[ed] the plan"; (2) that she told Garcia and defendant that she "would go up to the door. And they knew me, so I knew that they would open the door. And at that point, . . . that they could rush in after me"; (3) that she told Garcia and defendant that "they wouldn't need no weapons"; and (4) that she did not remember either Garcia or defendant disagreeing or taking issue with that. (See fn. 40, *ante*.) Inasmuch as defendant was a party to the discussions, it may be reasonably inferred that he was afforded the opportunity to refuse to participate or to otherwise dissociate himself from the planned activity; but that he did not do so. Such evidence, which indicated that defendant participated without demur in the planning of a robbery, warranted the inference that an adoptive admission had been made. (See *People* v. *Fauber* (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

c. *CALJIC Nos. 2.03, 2.04 and 2.06*

Over the defense's objection, the trial court gave several jury instructions relating to statements or efforts by defendant which might tend to prove a

consciousness of guilt: CALJIC No. 2.03 (consciousness of guilt—falsehoods); CALJIC No. 2.04 (efforts by defendant to fabricate evidence); and CALJIC No. 2.06 (efforts to suppress evidence).[42] ■■■ Defendant argues that it was prejudicial error to give these instructions, and that he was thereby deprived of his federal constitutional rights to due process, a fair trial by jury, and reliable guilt, special circumstance and penalty determinations. We are not persuaded.

First, defendant contends that CALJIC No. 2.04 was erroneously given because there was insufficient evidence in the record to warrant any inference that he had attempted to persuade a witness to "testify" falsely, or tried to fabricate evidence "to be produced at trial." While acknowledging that his brother admitted at trial that defendant had asked him to lie about defendant's arm injury, defendant nevertheless maintains that his brother's testimony fell outside the scope of CALJIC No. 2.04 because the incident occurred *before* judicial proceedings had been initiated. We cannot agree.

CALJIC No. 2.04 does not require judicial proceedings to actually be in progress when the attempt to procure false testimony or to fabricate evidence is made. It was sufficient that the jury could reasonably infer from the incident that defendant expected his brother to be a witness in the event of a trial, or that defendant sought to fabricate evidence in anticipation of a trial.

Next, defendant contends that CALJIC No. 2.06 was erroneously given because the evidence did not support the prosecutor's rationale for the instruction, i.e., that defendant threw away or otherwise destroyed or concealed the knife used in the attack, as well as his bloodstained clothes. We are not convinced.

Ontiveros testified that as Garcia and defendant were discussing the knife on the way home after the attack, she felt a blast of air in the car as if

---

[42]The trial court instructed on CALJIC No. 2.03 as follows: "If you find that before this trial the defendant made willfully false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt, but it is not sufficient of itself to prove guilt. The weight to be given such a circumstance and its significance, if any, are matters for your determination."

The court instructed on CALJIC No. 2.04 as follows: "If you find that a defendant attempted to persuade a witness to testify falsely or try [*sic*] to fabricate evidence to be produced at trial, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such attempt is not sufficient to prove guilt and its weight and significance, if any, are matters for your determination."

The court instructed on CALJIC No. 2.06 as follows: "If you find that a defendant attempted to suppress evidence against him in any manner such as by destroying or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. [¶] However, such evidence is not sufficient in itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

defendant had rolled down the backseat window. Although Ontiveros admitted she did not actually see defendant toss the knife out, she never saw it again and authorities later found the knife in the area where she thought it had been thrown. CALJIC No. 2.06 was therefore properly given because the jury could reasonably infer from this evidence that defendant attempted to suppress evidence. (See, e.g., *People* v. *Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1296-1297 [3 Cal.Rptr.2d 808] [CALJIC No. 2.06 properly given based on circumstantial evidence indicating that defendant threw murder weapon down gutter].)[43]

Finally, defendant claims that the trial court should have modified CALJIC Nos. 2.03, 2.04 and 2.06 to apply only to the murder charge and not to the charges of attempted robbery, burglary and the corresponding special circumstances. Again, defendant argues there was insufficient evidence corroborating Ontiveros's testimony regarding defendant's involvement in the latter crimes. This claim must be rejected.

In the first place, if defendant believed the instructions required clarification or modification, it was incumbent upon him to request it. (*People* v. *Johnson, supra,* 3 Cal.4th at p. 1236.) In any case, the unmodified instructions correctly guided the jury's consideration of the evidence because, as we have previously explained, there was ample corroborating evidence tending to connect defendant to the planned robbery and burglary, as well as to the murder. Additionally, it must be remembered that the defense relied on an all-or-nothing strategy to cast doubt solely on the issue of identity. Certainly the trial court had no sua sponte duty to make instructional modifications that were arguably inconsistent with, or even detrimental to, that strategy.[44]

In sum, the jury would not have been unreasonable in drawing inferences that defendant's false statements about his arm injury, his attempt to persuade his brother to lie and his effort to get rid of the knife all tended to show consciousness of guilt of *all* the charged crimes. Defendant's conduct was clearly probative on the issue of identity of the second assailant who was seen fleeing the crime scene with an injured arm. No error appears. (See *People* v. *Lewis* (1990) 50 Cal.3d 262, 276 [266 Cal.Rptr. 834, 786 P.2d 892] [rejecting argument that standard CALJIC No. 2.03 should have been

---

[43]Because we reach this conclusion, we do not address whether the apparent disappearance of defendant's bloodstained clothes would have independently supported this instruction.

[44]Defendant's claim that counsel was ineffective for failing to request the proposed instructional modifications must be rejected on appeal. Counsel's omission was consistent with the defense strategy challenging identity, and thus appears to have resulted from an informed tactical choice within the range of reasonable competence. (See *People* v. *Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

tailored to require some relationship between defendant's false statements and various crimes charged].)

### d. *Cumulative Effect of Instructions*

Defendant argues that the erroneous delivery of CALJIC Nos. 2.71.5, 2.71.7, 2.03, 2.04 and 2.06, whether considered singly or together, deprived him of his constitutional rights. He is mistaken. Inasmuch as none of the five instructions was erroneous, it is inconceivable that defendant's constitutional rights were violated.

### 9. *Instructions Regarding Circumstantial Evidence and Requisite Mental States*

Pursuant to defense counsel's wishes, the trial court gave CALJIC No. 2.01, which instructs on the sufficiency of circumstantial evidence to prove a defendant's guilt,[45] rather than CALJIC No. 2.02, which instructs more specifically on the sufficiency of circumstantial evidence to prove a defendant's specific intent or mental state.[46] ▮▮▮ Defendant now contends the court erred in failing to instruct sua sponte on CALJIC No. 2.02. He claims

---

[45]The trial court instructed as follows: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence and reject that interpretation which points to his guilt. [¶] If, on the other hand, one interpretation of such evidence appears to you to be reasonable, and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and reject the unreasonable."

[46]CALJIC No. 2.02 provides: "The [specific intent] [or] [mental state] with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of the offenses charged [in Count(s) ____, ____, ____ and ____], unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required [specific intent] [or] [mental state] but (2) cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to [any] such [specific intent] [or] [mental state] is susceptible of two reasonable interpretations, one of which points to the existence of the [specific intent] [or] [mental state] and the other to the absence of the [specific intent] [or] [mental state], you must adopt that interpretation which points to the absence of the [specific intent] [or] [mental state]. If, on the other hand, one interpretation of the evidence as to such [specific intent] [or] [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." According to the Use Note to CALJIC No. 2.02, the instruction "is designed for use *instead of* CALJIC 2.01 in a specific intent or mental state case in which

the error was prejudicial because the prosecutor relied substantially, if not exclusively, upon circumstantial evidence to prove the requisite mental states for the crimes charged.

 "It is the general rule that a trial court is not required to instruct on the rules of law applicable to circumstantial evidence where the alleged circumstantial evidence is incidental to, and corroborative of, direct evidence. [Citations.]" (*People* v. *Malbrough* (1961) 55 Cal.2d 249, 250-251 [10 Cal.Rptr. 632, 359 P.2d 30].) Moreover, "when the only inference to be drawn from circumstantial evidence points to the existence of a requisite mental state, a circumstantial evidence instruction need not be given *sua sponte.*" (*People* v. *Morrisson* (1979) 92 Cal.App.3d 787, 794 [155 Cal.Rptr. 152].) Although defendant and the Attorney General agree that substantial circumstantial evidence was presented below, they disagree as to whether such evidence was merely incidental to the direct evidence, and whether it gave rise to only one rational inference regarding the requisite mental state.

We need not resolve these disputed issues. Because the trial court delivered the more inclusive instruction under CALJIC No. 2.01, its refusal to additionally instruct with CALJIC No. 2.02 clearly was not prejudicial error. (*People* v. *DeLeon* (1982) 138 Cal.App.3d 602, 608 [188 Cal.Rptr. 63]; see *People* v. *Bloyd* (1987) 43 Cal.3d 333, 352 [233 Cal.Rptr. 368, 729 P.2d 802].)

 Defendant next contends the trial court erred in failing to instruct with a modified version of CALJIC No. 3.31 (concurrence of act and specific intent). While conceding that the trial court's unmodified instruction was correct with respect to the specific intent crimes of burglary, attempted robbery and the felony-murder theory of first degree murder, defendant maintains it was inadequate with respect to the prosecutor's other theory of willful, deliberate and premeditated murder.[47] In essence, his position is that the unmodified instruction could have led a reasonable juror to conclude that this theory did not require concurrence of act and the mental states of premeditation and deliberation.

If defendant believed that a modification to CALJIC No. 3.31 was required, he was obligated to request it. In any event, the court's instructions,

---

the *only element of the offense* which rests substantially or entirely on circumstantial evidence is the element of specific intent or mental state." (Italics added.)

[47]The version of CALJIC No. 3.31 given by the court read: "Now, in the, in each of the crimes charged in the information, namely murder, attempted robbery and burglary, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator, and unless such specific intent exists, the crime to which it relates is not committed. [¶] The specific intent required is included within the definition of the crimes charged."

when considered as a whole, properly guided the jury's consideration of the evidence. (*People* v. *Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Immediately after delivering CALJIC No. 3.31, the court gave CALJIC No. 8.20 on the elements of willful, deliberate and premeditated murder, including the instruction: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." This instruction adequately expressed the need for joint operation of act and intent on that theory. (*People* v. *Kozel* (1982) 133 Cal.App.3d 507, 522 [184 Cal.Rptr. 208]; cf. *People* v. *Benjamin* (1975) 52 Cal.App.3d 63, 84-85 [124 Cal.Rptr. 799].)

 Defendant next contends that the trial court committed prejudicial error by giving an inadequate version of CALJIC No. 8.83.1 (special circumstances—sufficiency of circumstantial evidence to prove required mental state), by failing to give CALJIC No. 8.83 (special circumstances—sufficiency of circumstantial evidence—generally) and by failing to give CALJIC No. 3.31 as to the special circumstance allegations (concurrence of act and specific intent). We disagree.

First, we are not persuaded by defendant's assertion that the court's version of CALJIC No. 8.83.1 was misleading in referring to the term "required mental state" in the singular rather than plural form, or in failing to list each of the required mental states to which it applied. Even if defendant's failure to request such clarifications below is disregarded, the point is not well taken. As defendant himself points out, the court instructed on the mental state required for each of the special circumstances (CALJIC No. 8.81.17) immediately before reading the circumstantial evidence instruction.[48] Considering the instructions as a whole, no reasonable juror would

---

[48]The court instructed as follows: "[¶] Now, to find that the special circumstance, referred to in these instructions as murder in the commission of burglary or robbery, is true, it must be proved; [¶] One, that the murder was committed while the defendant was engaged in the commission or attempted commission of a burglary or robbery; [¶] Two, that the defendant intended to kill a human being or intended to aid another in the killing of a human being; [¶] Three, that the murder was committed in order to carry out or advance the commission of the crime of, crime of burglary or attempted robbery or to facilitate the escape therefrom or to avoid detection. [¶] In other words, the special circumstances referred to in these instructions is not established if the burglary or attempted robbery was merely incidental to the commission of the murder. [¶] Now, the mental state with which an act is done may be manifested by the facts surrounding its commission. You may not find the special circumstances charged in this case to be true unless the proved facts not only are consistent with the theory that the defendant had the required mental state, but cannot be reconciled with any other rational

have understood the challenged instruction not to apply to each of the requisite mental states. There was no error.[49]

■ We are likewise unconvinced by defendant's next argument that the court's failure to give CALJIC No. 3.31 as to the special circumstance allegations permitted the jury to conclude that concurrence of act and specific intent was not required in order to find such allegations true. Assuming the court's omission constituted error (see Use Note to CALJIC No. 8.83.1; Use Note to CALJIC No. 2.02), the instructions, when considered as a whole, properly guided the jury's consideration of the evidence. (*People* v. *Wilson, supra,* 3 Cal.4th at p. 943.) The jury was instructed that CALJIC No. 3.31 applied with respect to the underlying crimes of burglary and attempted robbery. It was also instructed pursuant to CALJIC No. 8.81.17. (See fn. 48, *ante.*) A reasonable juror receiving these instructions would have understood that concurrence of act and specific intent was required for the special circumstance allegations, and could not have believed otherwise. (See *People* v. *Mickey* (1991) 54 Cal.3d 612, 676 [286 Cal.Rptr. 801, 818 P.2d 84].) The perceived error was harmless under any standard. (*Ibid.*)

■ Further, we find without merit the argument that, since the prosecutor substantially relied upon circumstantial evidence to prove that defendant's "purpose" in committing the charged murder was to carry out the

---

conclusion. [¶] Also, if the evidence as to the required mental state is susceptible of two reasonable interpretations, one of which points to the existence thereof and the other to the absence thereof, you must adopt that interpretation which points to its absence. [¶] If, on the other hand, one interpretation of the evidence as to the required mental state appears to you to be reasonable, and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable." (See CALJIC Nos. 8.81.17, 8.83.1.)

[49]Relying on *People* v. *Salas* (1976) 58 Cal.App.3d 460 [129 Cal.Rptr. 871], defendant additionally contends that the trial court should not have used the term "mental state[s]" in its instruction under CALJIC No. 8.83.1, but instead should have expressly listed and related each required specific intent as part of the instruction. Defendant, however, did not request this modification and the trial court was not required to make the modifications sua sponte. Defendant's reliance on *People* v. *Salas, supra,* is misplaced. That case did not hold that a trial court must always expressly identify and list all of the required mental states in instructions pertaining to the sufficiency of circumstantial evidence on specific intent. Rather, it held that, because the defendant there was charged with robbery with the specific intent to inflict great bodily injury (§ 213), it was error for the trial court to expressly instruct the jury that the circumstantial evidence instruction embodied in CALJIC No. 2.02 applied to proof of the specific intent for the crime of robbery, without also expressly instructing that it applied to proof of the specific intent to commit great bodily injury. (58 Cal.App.3d at pp. 474-475.) Unlike the situation in *People* v. *Salas, supra,* the trial court in this case did not specifically state or otherwise imply that the rules governing the sufficiency of circumstantial evidence contained in CALJIC No. 8.83.1 applied to some but not all of the required specific intent findings. No error appears.

burglary or attempted robbery, or alternatively, to facilitate escape or to avoid detection, CALJIC No. 8.83 should have been given instead of CALJIC No. 8.83.1. As indicated previously, the court's version of CALJIC No. 8.83.1 instructed on the sufficiency of circumstantial evidence to prove the required "mental state" for the special circumstance allegations. (See fn. 48, *ante*.) A reasonable juror would have understood this instruction to apply to the circumstantial evidence concerning defendant's purpose in committing the murder. No error appears.

In sum, we conclude that none of the perceived instructional errors, whether considered singly or together, warrants the reversal of defendant's conviction. We come to this conclusion whether we employ the "reasonable probability" test or the less tolerant "reasonable doubt" test. Likewise, we find no violation of defendant's state or federal constitutional rights.

### 10. *Reasonable Doubt Instruction*

Without any defense objection, the trial court gave the standard version of CALJIC No. 2.90 at the close of the guilt phase. Defendant now claims that this instruction, which defines "reasonable doubt" as that state of mind in which the jurors "cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge," is constitutionally defective in light of *Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328]. This claims fails.

We have consistently rejected similar claims in the past. (*People* v. *Webb* (1993) 6 Cal.4th 494, 531 [24 Cal.Rptr.2d 779, 862 P.2d 779]; *People* v. *Sims* (1993) 5 Cal.4th 405, 456-457 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People* v. *Noguera* (1992) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Recently, the United States Supreme Court upheld the constitutionality of CALJIC No. 2.90. (*Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Although the high court criticized the instruction's use of the term "moral certainty" (*Victor* v. *Nebraska,* 511 U.S. at pp. __ [127 L.Ed.2d at pp. 595-596, 114 S.Ct. at pp. 1247-1248], "it is clear that giving CALJIC No. 2.90 is not error, *at least not yet.*" (*People* v. *Freeman, ante,* 450, 503 [34 Cal.Rptr.2d 558, 882 P.2d 249], italics added.)

Even though we reject defendant's challenge to the use of CALJIC No. 2.90 at his trial, we remain mindful of the concerns expressed in *Victor* v. *Nebraska, supra,* 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]. We therefore reiterate that, until the Legislature or the CALJIC committee acts on this matter, trial courts in future cases should consider the modifications suggested in *People* v. *Freeman, supra, ante,* at pages 503-504.

### 11. *Effect of Alleged Errors*

Defendant claims that the various asserted errors, both singly and in combination, denied him due process and undermined the reliability of the guilt verdicts. Whether or not expressly discussed, we have considered and rejected all of these claims as being without merit. No more need be said. (See *People* v. *Mickle* (1991) 54 Cal.3d 140, 197 [284 Cal.Rptr. 511, 814 P.2d 290].)[50]

### C. PENALTY PHASE ISSUES

#### 1. *Jury Selection*

■■■ Defendant contends the trial court erred and violated his federal and state constitutional rights in granting the prosecutor's request to exclude prospective jurors Grace Levario and Melissa Cassiday for cause based on their stated views about the death penalty. Defendant is mistaken.

The United States Supreme Court has held that a prospective juror may be excluded for cause without compromising a defendant's rights under the Sixth and Fourteenth Amendments to trial by an impartial jury if the juror's views on capital punishment " 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-857, 105 S.Ct. 844], fn. omitted; see *Darden* v. *Wainwright* (1986) 477 U.S. 168, 175-178 [91 L.Ed.2d 144, 153-156, 106 S.Ct. 2464].) We apply the same standard to claims under our state Constitution. (*People* v. *Guzman* (1988) 45 Cal.3d 915, 955 [248 Cal.Rptr. 467, 755 P.2d 917]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. (See *People* v. *Guzman, supra*, 45 Cal.3d at pp. 954-956.)

■■■ Generally, "the qualification[s] of jurors challenged for cause are 'matters within the wide discretion of the trial court, seldom disturbed on appeal.' [Citation.]" (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 675 [276 Cal.Rptr. 788, 802 P.2d 278].) There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity.

---

[50]Pursuant to section 1252, the Attorney General contends on appeal that the trial court erroneously excluded forensic evidence establishing that defendant's allegedly rare blood type was found at the crime scene. In response, defendant contends this issue is not properly before us and is without merit in any event. We need not and do not address such contentions in light of our conclusion that none of defendant's claims warrants reversal of his convictions.

(*Wainwright* v. *Witt, supra*, 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852]; *People* v. *Guzman, supra*, 45 Cal.3d at p. 954.) Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror. (*People* v. *Hill* (1992) 3 Cal.4th 959, 1003 [13 Cal.Rptr.2d 475, 839 P.2d 984]; *People* v. *Guzman, supra*, 45 Cal.3d at p. 954.) Accordingly, "[w]hen . . . a juror gives conflicting testimony as to her capacity for impartiality, the determination of the trial court on substantial evidence is binding on the appellate court." (*People* v. *Kaurish, supra*, 52 Cal.3d at p. 675; see also *People* v. *Clark* (1993) 5 Cal.4th 950, 1025 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Hill, supra*, 3 Cal.4th at p. 1004.)

▮▮▮ In this case, the voir dire of prospective jurors Levario and Cassiday amply supported the trial court's decision to exclude them. Although some of Levario's responses during questioning could be construed as reflecting her capacity for impartiality, others furnished substantial evidence of her inability to conscientiously consider a death verdict.[51] Similarly, while Cassiday's initial answers reflected impartiality, her later responses raised sufficient doubts as to whether she could impose the death penalty in this case.[52] Given this record, defendant's claims of state and constitutional error must be rejected. (*People* v. *Clark, supra*, 5 Cal.4th at pp. 1025-1026; *People* v. *Hill, supra*, 3 Cal.4th at p. 1004.)

[51]During initial questioning by the court, Levario indicated she would not always and in every case vote either for or against the death penalty, even though she had "mixed emotions" about her ability to impose the death penalty. She stated during defense questioning that she could follow the court's instructions during the penalty phase. Later on, Levario indicated during the prosecutor's questioning that she believed she would have a problem voting for the death penalty, even if the evidence supported such a penalty. After noting Levario's contradictory responses, the trial court asked several questions for clarification. "Q [The court]: Now, if you imagine that after you've heard the evidence of aggravation and mitigation, that is, the bad as opposed to the good, and you find that the bad outweighs the good and that the bad is substantial when compared to the good, and you are faced with the possible choice between the two penalties, if you thought that the evidence in this case justified it, that is, justified the death penalty, could you vote to put someone to death? A [Levario]: I don't think so, no. Q: And are you saying that under no circumstances in any case could you ever vote in such a fashion? A: No. I—I—. Q: Even though you felt that the evidence in the case justified the death penalty are you saying that you could in no case vote for the death penalty? A: I think that's the way I feel right now, yes. Q: You're certain of that? A: It's a hard question." Thereafter, the court rephrased the question one last time. "Q: Are you telling us that in, under no circumstances in any case even though you felt that the penalty of death was justified that could you vote for death? A: I don't think so. I—I just can't understand really the death and the life imprisonment, it, to me it's just an, almost just as bad life imprisonment."

[52]Cassiday initially indicated during the court's questioning that she could impose the death penalty if the evidence justified it. She also stated during the defense's questioning that she was "for" the death penalty, but would very cautiously weigh the circumstances before making a penalty decision. But Cassiday began to equivocate when the prosecutor asked her: "Okay. The real question is if you're faced with that situation in which you've made that independant [*sic*] decision you've come across it fairly and honestly and you've come to the conclusion, 'Yes, this is a case that warrants the death penalty,' is there going to be any

### 2. *Espinoza Homicide*

On June 6, 1980, Ernest Espinoza died after being shot and stabbed at a pay telephone in Oakland, California. Defendant and five others were charged with the murder of Espinoza. Defendant was alleged to have been armed with a firearm, and to have suffered a prior felony conviction. Codefendant Raymond Rodriguez (defendant's brother) was alleged to have personally used a firearm, and codefendant Toby Jaramillo was alleged to have personally used a deadly weapon. Pursuant to a plea bargain in August 1980, defendant pleaded guilty to being an accessory under section 32, and the arming and prior conviction allegations were dismissed. Raymond pleaded guilty to manslaughter with personal use of a rifle, and Jaramillo pleaded guilty to manslaughter with personal use of a knife. A fourth codefendant pleaded guilty to felony assault with a deadly weapon. Charges against the fifth and sixth codefendants were dismissed.

At the penalty phase, the prosecutor introduced evidence in aggravation of defendant's participation in the Espinoza homicide (§ 190.3, factor (b)) and evidence of his conviction as an accessory (§ 190.3, factor (c)). Defendant challenges the admission of this evidence on three grounds. First, he claims that the prosecutor violated the notice provisions of section 190.3 and used deceptive tactics in introducing the identification testimony of witness Rejon Mitchell. Second, he contends that no evidence of the Espinoza homicide should have been admitted because the murder charge filed against defendant in that case had been dismissed pursuant to a plea bargain, and the charge was stale. Third, he argues that the court erred in allowing defendant's conviction in the Espinoza matter to be characterized as accessory to a murder. As we shall demonstrate, none of these claims warrants reversal of the death judgment.

### a. *Mitchell's Identification Testimony*

Defendant contends that the prosecutor violated the notice provisions of section 190.3 and misled defense counsel in presenting Rejon Mitchell's "surprise" testimony identifying defendant as the actual shooter of Espinoza.

---

feelings or any belief that's going to prevent you or substantially impair you in casting that vote for the death penalty?" After answering "[i]t's possible," Cassiday thought for a moment and added, "[i]t just hit me, you know, when you said, the way you—yes, it's possible." She subsequently stated: "Right. I—I don't know if I could do it, no. [¶] Probably—I don't know, I really don't, honestly." After further questioning, when asked if she were placed in a position where she intellectually and rationally understood that the death penalty was the appropriate verdict, Cassiday indicated she thought she would still be substantially impaired in her ability to follow the law and cast that vote because of her "moral views" and "sleeping at night."

The background of this contention is as follows. On September 11, 1987, the prosecutor filed notice of his intention to introduce at the penalty phase evidence in aggravation concerning "[t]he incident occurring on or about June 6, 1980, in Oakland, California, in which the defendant participated in the stabbing and shooting of ERNEST ESPINOZA, resulting in his death." The trial in this case commenced on April 11, 1988. On April 13, 1988 and on May 23, 1988, the prosecutor served two amended notices, again specifying the Espinoza incident.

On August 1, 1988 (after the close of the guilt phase), the trial court held a hearing on a defense motion to exclude evidence of the Espinoza homicide as an aggravating factor. Defense counsel essentially argued that the evidence should not be admitted under section 190.3, factor (b) because the preliminary hearing transcript from the Espinoza case did not establish that defendant engaged in any violence, attempted violence, threat of violence or implied violence. When the court asked the prosecutor whether he intended to offer any evidence in addition to the preliminary hearing transcript, the prosecutor replied: "I've indicated, the People's investigator to the defense investigator, that there are potentially several additional witnesses at the crime scene who may be called to testify about what they observed, which would include observing [defendant] accompanying a group of nine, as they've been referred to, at the time of the killing of Ernest Espinoza. It's consistent with what Danny Nunez testified to at the preliminary hearing, it would certainly place [defendant] at the scene of the crime at the time of the commission of the crime."

After further discussions, the court asked: "So what I need to know is do you have any evidence that would place the defendant in a position where he is more responsible for the act than what is shown in the preliminary examination and, of course, I don't know what's in the transcript." The prosecutor replied: "That's difficult to answer at this time because some of the witnesses have just been located very recently, and I haven't had a chance to actually interview them. . . ." Thereafter the prosecutor stated: "*There's the possibility that there may be a witness who places [defendant] as the actual shooter.* If that were to be the case, obviously that would be a—." (Italics added.) The court indicated it would make a preliminary determination under Evidence Code section 402[53] of the admissibility of the Espinoza homicide evidence based on the transcript, but would also listen to additional witness evidence if offered.

---

[53]Evidence Code section 402 provides: "[¶] (a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [¶] (b) The court may hear and determine the question of admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests. [¶] (c) A ruling on the admissibility of

Subsequently, the prosecutor argued that the evidence showed that defendant was at least an aider and abettor in the Espinoza killing, if not the actual shooter: "All of the surrounding circumstances indicate that [defendant] had a vendetta or score to settle with certain members of the group of the 60's, because of a confrontation that took place earlier in the day in front of the church; a confrontation in which a shot was fired by one of the members of the Varrio San Leandro, which the independent witnesses I have had a chance to talk with so far indicate they believe was, in fact, [defendant]. [¶] This morning I indicated to the court that there's at least the possibility that another witness will be contacted who observed the shooting of Ernest Espinoza, and places the shooter as [defendant] as opposed to Raymond, the brother. [¶] I haven't had a chance to confirm that with that witness yet because that person is presently out of state. So that's only a possibility. [¶] I bring it up at this point only insofar as that became apparent to this [sic] earlier today; and, therefore, out of an abundance of caution in wanting to share that with the court and counsel, I wanted to bring it up. . . ." Defense counsel responded that the prosecutor was taking great liberties with the facts, and that the evidence showing defendant's involvement in a previous murder was highly prejudicial and would foreclose the jury's ability to look rationally at other evidence presented during the penalty phase. The trial court ultimately ruled there was sufficient evidence showing that defendant was involved in the incident, at least as an aider and abettor.

The penalty phase commenced before the jury on August 2, 1988. On August 3, the prosecutor called Rejon Mitchell as a witness. Defense counsel did not object when Mitchell took the stand. Mitchell testified he was in his house when he heard gunshots. He looked out the window, and saw a group of men at a gas station watching another man shoot at Espinoza. After the shooting, the group ran by Mitchell's house. Mitchell opened his front door and could see the group, including the shooter, about 15 to 20 feet away.

After eliciting the above testimony, the prosecutor pursued the following line of questioning. "Q [Prosecutor]: Did you get a look at the shooter? A [Mitchell]: I did. Q: Subsequent to that, during the investigation by the Oakland Police Department, did you look at some photographs? A: Yes, I did. Q: And did you pick somebody out as the shooter? A: Yes, I did. Q: I realize this is some years ago this event has happened. [¶] Do you still recall what the shooter looked like? A: Yes. Q: I'd ask you to look around the courtroom and see if you see that person in court today. A: Yes. Q: Would you tell the jury where that person is now, and what he's wearing? A: The defendant sitting right there in the yellow top sweater (indicating). Q [Prosecutor]: May the record reflect identification with reference to the defendant

evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

Mr. Rodrigues, your honor? The court: The record will so reflect. Q [Prosecutor]: Now, you said you had a chance to see the persons in the group. [¶] Were you able to, in looking at them from the vantage point you had —." At this point, defense counsel interjected: "Your honor, I'm going to object to any last question and any further questions on the basis of collateral estoppell [*sic*]. [¶] This is, apparently, an attempt to prove [defendant] is the shooter. The District Attorney is aware somebody else was found guilty of that. [¶] I believe that's totally improper." The trial court overruled the objection.

Afterwards, outside the presence of the jury, defense counsel reiterated his argument to the court that Raymond Rodriguez's prior plea to manslaughter and defendant's own plea to accessory barred the prosecution from trying to prove that defendant shot Espinoza. The prosecutor responded that the jury was free to determine, based on all the evidence presented, whether Raymond or defendant killed Espinoza. The prosecutor further stated: "I know when I came to court a few days ago, and said there was one witness we were looking for who might possibly place, who saw [defendant] as the shooter, it was Rejon Mitchell that I was thinking of. [¶] I finally had an opportunity to talk to him today. Until he had a chance to look around the courtroom, I was not able to determine for sure whether he was going to say, 'Arnaldo Rodrigues' or say, 'No, it was someone else who looked similar, but that's not him.' [¶] The jury, as I understand it, is free to either accept or reject the admissions of all types that are given to them. And they are not bound by a prior adjudication in the form of the taking of a plea." The court then concluded that the collateral estoppel rule was inapplicable. Thereafter defense counsel made no other argument.

It was not until the next morning, after the direct, cross- and redirect examination of Rejon Mitchell had been completed, that defense counsel complained about the prosecutor's failure to alert the defense that Mitchell would identify defendant as Espinoza's killer. At that time, defense counsel requested the trial court to dismiss the case pursuant to section 1385.

The trial court denied the request, concluding that the prosecutor had adequately advised the court and counsel about the possibility of a witness who would identify defendant as the shooter. In finding there was no misconduct, the court noted that the prosecutor's previous statements had been consistent with the witness's own testimony that he was out of town in another county. The court then granted defense counsel a continuance from that Thursday morning to the following Monday to determine the availability of physical evidence in the Espinoza case, and the need for a further continuance. The next day, August 5, defendant filed a formal motion for mistrial.

On Monday, August 8, the prosecutor informed the court that the physical evidence in the eight-year-old Espinoza case had been either returned or destroyed after the completion of that case. There were, however, some tape-recorded statements of witnesses, including one of Rejon Mitchell, that were found and were made available to the defense. After hearing arguments, the court denied the mistrial motion, but granted the defense an additional one-week continuance until August 15 to prepare on the Espinoza incident.

At a status hearing on August 10, defense counsel reported he could not complete his investigation by August 15 and requested another one-week continuance. After counsel detailed the work still remaining, the court ordered the prosecutor to proceed on penalty phase evidence other than the Espinoza incident on August 15, and indicated that at the end of that day, the defense would be allowed to show good cause for a further continuance.

On August 15, defense counsel did not request any further continuances. The prosecutor resumed his presentation of evidence on the Espinoza matter the next day, and the defense thereafter presented its side.

 On appeal, defendant argues that the motion for mistrial under section 1385 should have been granted because the prosecutor: (1) failed to give notice of the identification evidence under section 190.3; and (2) committed misconduct which incurably prejudiced defendant's case. We first address the argument that the notice provisions of section 190.3 were violated.

Section 190.3 provides in pertinent part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." The purpose of this provision "is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial. [Citation.]" (*People* v. *Taylor* (1990) 52 Cal.3d 719, 736 [276 Cal.Rptr. 391, 801 P.2d 1142].) However, "where the prosecution learns of evidence it intends to use in aggravation at the penalty phase for the first time after trial has commenced, exclusion of this evidence under section 190.3 is not necessarily compelled. [Citation.] Under such circumstances, the defendant is entitled to prompt notice of the newly discovered evidence, and, if necessary, to a reasonable continuance to enable him or her to prepare to

meet that evidence. If the prosecution's delay in affording notice is unreasonable or unexcused, or if the delay would prejudice the defense, the court must exclude the evidence. [Citations.]" (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1070 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

 Defendant's claim that the prosecutor failed to give the required statutory notice must be rejected. First of all, the claim is barred. Defense counsel did not object on notice grounds when Mitchell took the stand and gave his testimony, even though counsel knew that Mitchell would be testifying on the Espinoza matter and that Mitchell's name had not been included on the prosecutor's penalty phase witness list. Although defense counsel raised the notice issue the next day, his failure to do so earlier effected a waiver of the point. (See *People* v. *Clark* (1990) 50 Cal.3d 583, 626, fn. 34 [268 Cal.Rptr. 399, 789 P.2d 127] [defendant's failure to object and to seek a continuance waives any subsequent claim that notice was inadequate]; cf. *People* v. *Newberry* (1962) 204 Cal.App.2d 4, 9 [22 Cal.Rptr. 23] [motion to strike expert opinion testimony properly denied where defense counsel waited until after testimony was admitted to challenge witness's qualifications as an expert].)

Even assuming that the claim was not waived, it is without merit. The prosecutor notified defendant several months before the start of trial that he intended to introduce evidence in aggravation of "[t]he incident occurring on or about June 6, 1980, in Oakland, California, in which the defendant participated in the stabbing and shooting of ERNEST ESPINOZA, resulting in his death." This notice gave ample warning to the defense that it should anticipate the prosecutor to introduce at the penalty phase all admissible evidence relevant to defendant's participation in the Espinoza homicide. Although Mitchell's name was not listed on the prosecutor's July 26, 1988, list of penalty phase witnesses, the prosecutor did not know at that time that Mitchell might potentially be able to identify defendant as a person who shot Espinoza. Once the prosecutor learned of the potential new evidence, he acted promptly in informing both the court and the defense. Under these circumstances, no violation of section 190.3 appears. (*People* v. *Mitcham*, *supra*, 1 Cal.4th at p. 1070.)

Finally, any lack or delay in notice must be deemed harmless. "In the absence of any indication that the delay in notice had in some fashion affected the manner in which defense counsel handled the prior proceedings, the appropriate remedy for a violation would ordinarily be to grant a continuance as needed to allow defendant to develop a response. [Citations.]" (*People* v. *Carrera* (1989) 49 Cal.3d 291, 334 [261 Cal.Rptr. 348, 777 P.2d 121].) Here the trial court granted the defense a continuance of 11

calendar days to prepare to meet the Mitchell testimony. When the trial finally resumed, defense counsel did not ask for more time. We therefore conclude that the defense was not prejudiced by the delay in notice.[54]

■ We next consider defendant's claim that the motion for mistrial should have been granted because of the prosecutor's gross misconduct. In particular, he claims that the prosecutor affirmatively misled the defense by indicating he did not have specific names of potential witnesses who might be able to identify defendant as Espinoza's shooter, when in fact the names of Rejon Mitchell and his brother Eric Mitchell were known to him. He also asserts that the prosecutor intentionally violated discovery orders and failed to abide by an express assurance to notify the defense when the identification witnesses were located so that a defense investigator could be present during any questioning of the witnesses prior to their testimony at trial.

■ Prosecutorial misconduct may constitute an appropriate basis for a mistrial motion. (See *People* v. *Wharton* (1991) 53 Cal.3d 522, 565 [280 Cal.Rptr. 631, 809 P.2d 290].) " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial. is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*Ibid.*)

■ Applying these principles, we conclude the denial of defendant's mistrial motion was not an abuse of discretion. To begin with, there is substantial evidence in the record to support the trial court's determination that the prosecutor did not act in bad faith. The prosecutor promptly informed the court and defense counsel of the possibility of identification witnesses immediately after receiving the information. Although the prosecutor admittedly failed to tell the defense that it was Rejon Mitchell who might potentially identify defendant, the prosecutor had not been able to speak to Mitchell to ascertain his probable testimony until the day he took the stand. Viewed as a whole, the record adequately supports the conclusion that the prosecutor did not act intentionally to mislead the defense.

More importantly, even assuming that the prosecutor committed misconduct, the record fails to show that the trial court abused its discretion in

---

[54]Because any delay in notice was harmless, there is no need to address defendant's contention that, although the prosecutor might have first "learned" of the possible identification evidence from an individual named Hilario Rodriguez shortly before the penalty phase began, notice was nonetheless untimely under section 190.3 because the prosecutor knew of Rodriguez before trial and could have interviewed him and obtained the information regarding Mitchell at that time. There is likewise no need to address his contention that, in addition to the statutory notice provision, a discovery order issued in April 1988 allegedly required the notice sought here.

determining that defendant was not incurably prejudiced. In this regard, defendant claims that the requisite prejudice existed because the prosecutor's actions permanently deprived him of the opportunity to test Mitchell's ability to make an identification in a nonsuggestive atmosphere. Insofar as defendant contends that an in-court identification not preceded by a lineup is impermissibly suggestive and prejudicial as a matter of law, he is wrong. (Cf. *Evans* v. *Superior Court* (1974) 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681] [holding there is no absolute right to a pretrial lineup before an in-court identification; rather, *upon timely request*, defendant *may* be afforded a pretrial lineup *if* eyewitness identification is shown to be a material issue *and* there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve].) He is also mistaken in his assertion that once Mitchell made his in-court identification of defendant, "there was no effective way to ameliorate its impact and no way to balance the playing field between the prosecution and defense." To the contrary, it has long been recognized that "[i]n the case of in-court identifications not preceded by a lineup . . . , the weaknesses, if any, are directly apparent at the trial itself and can be argued to the court and jury without the necessity of depending on an attempt to picture a past lineup by words alone." (*People* v. *London* (1969) 274 Cal.App.2d 241, 242-243 [78 Cal.Rptr. 848]; see *People* v. *Breckenridge* (1975) 52 Cal.App.3d 913, 935-936 [125 Cal.Rptr. 425] [noting continuing validity of principle after *Evans* v. *Superior Court*, *supra*, 11 Cal.3d at p. 625].) No abuse of discretion appears.[55]

Finally, relying on *Lankford* v. *Idaho* (1991) 500 U.S. 110 [114 L.Ed.2d 173, 111 S.Ct. 1723], defendant claims that the prosecutor's misconduct and violation of section 190.3 violated his federal constitutional rights to due process, confrontation and a reliable penalty determination, among others. Not only have these constitutional claims been waived by the failure to assert them at trial (*People* v. *Ashmus*, *supra*, 54 Cal.3d at pp. 972-973, fn. 10), they lack merit.

In *Lankford* v. *Idaho*, *supra*, the United States Supreme Court concluded that a defendant was denied due process when a trial judge imposed the death penalty after the prosecution had given notice that it would not recommend death. In reversing the judgment of death, the court observed that the character of the sentencing proceeding did not provide the defendant with any indication that the trial judge contemplated death as a possible

---

[55]Defendant additionally claims he was prejudiced because the photo lineup shown to Mitchell shortly after the shooting was lost or destroyed in 1980. According to defendant, the loss of the lineup rendered him unable to determine whether Mitchell's photo identification of him was made from a suggestive or otherwise unfair lineup. This claim was not advanced in defendant's mistrial motion and is not properly before us.

sentence. (500 U.S. at pp. 119-120 [114 L.Ed.2d at pp. 183-184].) The court reasoned that if defense counsel had been notified that death was being contemplated, presumably she would have advanced arguments addressing the impropriety of such a sentence. (*Id.*, at p. 122 [114 L.Ed.2d at p. 185]). Significantly, the high court was not concerned with whether the defendant's arguments would ultimately prevail; rather, it framed the critical issue as "whether inadequate notice concerning the character of the hearing frustrated counsel's opportunity to make an argument that might have persuaded the trial judge to impose a different sentence, or at least to make different findings than those he made." (*Id.*, at p. 124 [114 L.Ed.2d at pp. 186-187].)

Defendant's attempted analogy to *Lankford* v. *Idaho*, *supra*, 500 U.S. 110, is unavailing. Unlike the situation there, the defense here was given ample opportunity to meet the challenged evidence and to persuade the jury of its case. As noted previously, the trial court granted the defense 11 days to prepare to meet Mitchell's testimony. At the end of that period, the defense sought no further continuance. When the trial resumed, the defense was able to introduce an array of witnesses to rebut Mitchell's testimony. The defense called Lieutenant Burnham Matthews, who had investigated the Espinoza killing and had twice interviewed Mitchell the day after the shooting. According to Matthews, Mitchell did not identify defendant, and the records of the investigation did not show that Mitchell had ever been shown a photographic lineup, or that he had ever made any identification. The defense also offered favorable testimony through four witnesses who were participants in the Espinoza incident. Toby Jaramillo testified that he saw Raymond, defendant's brother, shoot Espinoza, and that he never saw defendant shoot him. Raymond Alvarez and Daniel DeSoto did not claim that they saw the actual shooting, but both exonerated defendant. Raymond testified that he shot Espinoza 18 times, that he was convicted of manslaughter and served time for his crime, and that defendant was nowhere in the area at the time of the shooting. Under these circumstances, *Lankford* v. *Idaho*, *supra*, does not call for reversal of defendant's death judgment.[56]

---

[56]Defendant further claims that his right to effective confrontation was violated since the penalty jury was allowed to absorb Mitchell's in-court identification for two weeks before the defense was in a position to undertake an effective examination. This claim was not asserted at trial, and it lacks merit in any event. In the first place, defense counsel conducted a full cross-examination of Mitchell immediately after conclusion of the direct examination. Second, defendant concedes on appeal that Mitchell's resumed testimony, if anything, strengthened his earlier identification of defendant. We agree with this assessment; after having seen defendant's brother Raymond both in person at trial and in a 1987 photograph, Mitchell stated unequivocally that it was defendant, not Raymond, who shot Espinoza. Therefore, we fail to see how an earlier presentation of such damaging testimony could have made defendant's examination of Mitchell more effective.

### b. Dismissal of the Murder Charge and Staleness

 In reliance upon *People* v. *Harvey* (1979) 25 Cal.3d 754, 758 [159 Cal.Rptr. 696, 602 P.2d 396], defendant asserts that an implied term of his negotiated dismissal of the Espinoza murder charge and arming allegation was that he would suffer no adverse consequences by reason of the facts underlying the dismissed charges. He therefore claims that the admission of the Espinoza homicide evidence violated his right to due process and other fundamental constitutional protections.

As defendant acknowledges, we have squarely rejected the argument that the use of dismissed charges as a circumstance in aggravation violates an implicit term of a plea bargain when used at a capital penalty hearing. (*People* v. *Frank* (1990) 51 Cal.3d 718, 728-729 [274 Cal.Rptr. 372, 798 P.2d 1215]; *People* v. *Melton* (1988) 44 Cal.3d 713, 755-756 [244 Cal.Rptr. 867, 750 P.2d 741] [determining that the general rule of *People* v. *Harvey*, *supra*, 25 Cal.3d at p. 758, is inapplicable to capital sentencing].) We see no reason to revisit the issue.

Defendant also contends that because his conviction of being an accessory constituted an acquittal of murder, relitigation of the dismissed murder charge during the penalty phase violated his federal due process rights and the state and federal constitutional guarantee against double jeopardy. Defendant is mistaken.

"A bargained conviction or dismissal does not constitute an acquittal under section 190.3. [Citations.]"[57] (*People* v. *Garceau* (1993) 6 Cal.4th 140, 199 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Frank*, *supra*, 51 Cal.3d at pp. 728-729; *People* v. *Melton*, *supra*, 44 Cal.3d at pp. 755-756.) Moreover, the constitutional guarantee against double jeopardy "is inapplicable where evidence of prior criminal activity is introduced in a subsequent trial as an aggravating factor for consideration by a penalty phase jury. [Citations.]" (*People* v. *Garceau*, *supra*, 6 Cal.4th at pp. 199-200, *People* v. *Frank*, *supra*, 51 Cal.3d at p. 729; *People* v. *Melton*, *supra*, 44 Cal.3d at p. 756, fn. 17.)

 Defendant further contends that, in any event, no evidence of the 1980 homicide should have been admitted under section 190.3 because the charges against him were impermissibly stale at the time of his trial in 1988. He asserts that, due to the passage of time and the loss of all physical

---

[57]Defendant claims the trial court in the Espinoza matter was wrong in concluding that accessory to a felony was a "necessarily lesser offense" of murder. (See fn. 60, *post.*) We agree. (*People* v. *Preston*, *supra*, 9 Cal.3d at p. 319.) We therefore reject any notion that defendant's plea to accessory meant that he had been prosecuted and acquitted of murder as a matter of law.

evidence,[58] he could not adequately confront and challenge the accuracy of the other evidence against him in the homicide. He contends that the prosecutor's use of the homicide violated his constitutional rights to due process, confrontation, a fair jury trial and a reliable penalty determination. We reject these contentions.

Under section 190.3, factor (b), a prosecutor may offer evidence in aggravation of criminal violence that has occurred at any time. (*People* v. *Garceau*, *supra*, 6 Cal.4th at p. 199; *People* v. *Douglas* (1990) 50 Cal.3d 468, 529-530 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 202 [222 Cal.Rptr. 184, 711 P.2d 480].) Even though certain evidence in the Espinoza case had been lost, all otherwise available evidence, including witness statements, was provided to the defense. Moreover, despite the loss of physical evidence, numerous witnesses were able to testify on the matter, many on defendant's behalf. Not only was defendant afforded the opportunity to call his own witnesses, but he was also allowed to conduct full cross-examinations of all adverse witnesses. Accordingly, defendant was not deprived of due process and his constitutional rights were not violated. (*People* v. *Garceau*, *supra*, 6 Cal.4th at pp. 198-200; *People* v. *Frank*, *supra*, 51 Cal.3d at pp. 728-729.)

### c. *Characterization of Prior Conviction*

Before the start of the penalty phase, the trial court conducted a bifurcated trial on the prior conviction allegations. Over the defense's objection, the court ruled that for purposes of the prosecutor's case in the penalty phase under factor (c) of section 190.3, defendant's prior conviction under section 32[59] would be characterized as a conviction of accessory *to a murder*.

Defendant contends this characterization was in error because the record of that prior conviction established only that he had pleaded guilty as an accessory to a felony, without specifying *which* felony, and there was no evidence indicating the nature of the underlying felony. He emphasizes that, although he and several others had been charged with the murder of Espinoza, the transcript of the change of plea hearing which had been offered to the court demonstrated that his codefendants pleaded guilty only to

---

[58]Such evidence included a photo lineup used by one of the investigating officers, clothes of the victim and of one of the codefendants, bullets taken from the victim's body, and, possibly, laboratory tests performed on the bullets.

[59]Penal Code section 32 provides as follows: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

manslaughter. Defendant asserts that his plea must be understood in that context.

In response, the Attorney General asserts that the prior conviction was properly characterized because the hearing transcript makes reasonably clear that both defendant and the trial court understood defendant to be pleading guilty of being an accessory to a murder, which was the only felony charged.[60]

Although we are not convinced of the Attorney General's reading of the transcript, we nonetheless find any error harmless. Evidence of the facts underlying the prior conviction was otherwise admissible under section 190.3, factor (b). (See *People* v. *Montiel* (1993) 5 Cal.4th 877, 917 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *Melton, supra,* 44 Cal.3d at p. 764.) Therefore, the jurors were properly presented with evidence and argument as to whether the Espinoza homicide constituted murder, or something less.

Contrary to defendant's assertions, the jurors were not led to believe that the underlying conviction foreclosed them from finding that the Espinoza killing was manslaughter, as opposed to murder. In fact, quite the opposite was true. The court instructed on second degree murder, voluntary manslaughter, and heat of passion and sudden quarrel. These instructions clearly applied to the Espinoza homicide evidence, which was the only evidence of a homicide offered under section 190.3, factor (b). In the face of these instructions, the jurors could not possibly have concluded that they were required to view the killing as a murder. Indeed, any conceivable doubt in the jurors' minds was resolved in defendant's favor by the prosecutor's closing argument explicitly emphasizing to the jurors that they were not foreclosed from determining how the Espinoza killing occurred.[61] In addition, the prosecutor argued that the evidence did not support a conclusion

---

[60] The transcript reflects the following interchange. "The clerk: Jose Rodriquez [*sic*], to the crime of a felony, to wit, murder, a violation of Section 187 of the Penal Code, as charged in the Information, how do you plead, guilty or not guilty? Defendant Jose Rodriquez [*sic*] (repeating after [counsel]): I plead guilty to Section 32 of the Penal Code, accessory after the fact. The Court: The Court finds that Section 32 is a necessarily lesser offense charged in the Information, and accept [*sic*] the plea."

[61] The prosecutor argued: "More importantly, the question may arise in your mind, are you foreclosed from making your own independent determination of what exactly Mr. Rodrigues did or did not do at the time of the killing of Ernest Espinoza. At the time Mr. Espinoza was set upon by a gang much as a pack of wolves might set upon its prey and stabbed, and gunned down on the streets of Oakland like a dog? [¶] Are you precluded from determining as to how that event occurred? Of course not. If that were the case, you would not have been permitted to hear the testimony, the testimony that's been regulated by the rules of evidence and by the watchful eye of Judge Shelton, who is the trial judge in this case, has sat there for the purpose

that the killing was committed under heat of passion or sudden quarrel. The jurors could reasonably infer therefrom that the prior conviction did not control the issue of whether a murder or manslaughter occurred.

In light of the foregoing, we conclude it is not reasonably possible that the characterization of the prior conviction, even if in error, affected the judgment to defendant's detriment. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### 3. *Jill M. Incident*

In October 1976, Jill M. reported to police that she had been raped, sodomized and forced to engage in oral copulation by at least three men at a house in San Leandro. Jill identified defendant as one of her attackers. Although defendant was charged with sexual assault, the charge was dismissed after the preliminary hearing. Prior to this trial, the prosecutor gave notice he would introduce as evidence in aggravation "[t]he incident occurring on or about October 16, 1976, in San Leandro, California, in which the defendant, while acting in concert with others, engaged in the forcible rape, forcible sodomy, and forcible oral copulation of JILL [M.]."

### a. *Staleness and Loss of Evidence*

Shortly before the start of the penalty phase, the defense moved to exclude any evidence of the Jill M. incident, citing the speedy trial and due process provisions of the federal and state Constitutions, as well as the state statute of limitations. The defense argued it was severely disadvantaged in defending against the 12-year-old unadjudicated charge, and was substantially prejudiced by the loss of certain evidence, including, among other things, photos shown to Jill for identification purposes, and vaginal and rectal swabs and smears taken from Jill the morning after the alleged incident. In hearings on the motion, the defense also complained of prejudice due to other unavailable evidence including the failure of defense witness Dr. McGlynn to independently recall the examination of Jill he conducted the morning after the incident. In rejecting these arguments, the trial court determined, inter alia, that the defense was not prejudiced because it could confront both

---

of determining a fair trial is had by both sides, a fair trial based on evidence and law. [¶] Well, the plea that Mr. Rodrigues entered into as a result of the Ernest Espinoza event was as an accessory. That means someone who harbors, aids, or conceals a felon after the fact, after the crime has been committed, knowing such a crime has been committed. [¶] We'll go into much more in detail whether you think that's all Mr. Rodrigues did. For the time being, bear in mind that at the very least Mr. Rodrigues went to prison for that event as an accessory."

Jill and San Leandro Police Captain Lewis Pollack, who had investigated the case, regarding Jill's original photographic identification of defendant.[62]

■ Defendant maintains that the admission of the Jill M. evidence violated his constitutional rights to due process, a speedy trial and a reliable sentencing determination. Relying on *Gardner* v. *Florida* (1977) 430 U.S. 349 [51 L.Ed.2d 393, 97 S.Ct. 1197], defendant also claims he did not have a fair opportunity to confront and rebut the evidence against him on this incident. In this regard, he contends his ability to defend against the charge was effectively destroyed by the loss of critical physical evidence. We disagree.

First, unlike *Gardner* v. *Florida, supra,* 430 U.S. 349, in which the defendant was sentenced to death due in part to the trial court's reliance on a sentencing report, the contents of which were not revealed to defense counsel, the mere passage of time between defendant's 1976 crimes and defendant's trial did not significantly diminish his ability to challenge the evidence in question. (*People* v. *Wharton, supra,* 53 Cal.3d at p. 601.) Therefore, admission of the evidence did not violate his rights to due process and a reliable sentencing determination. (*People* v. *Garceau, supra,* 6 Cal.4th at pp. 198-199; *People* v. *Frank, supra,* 51 Cal.3d at p. 729.) Nor did it violate his right to a speedy trial. (*People* v. *Johnson, supra,* 3 Cal.4th at p. 1244 [expiration of limitations period does not bar admission of prior unadjudicated criminal activity for purposes of § 190.3, factor (b)]; *People* v. *Heishman* (1988) 45 Cal.3d 147, 192 [246 Cal.Rptr. 673, 753 P.2d 629].)

Contrary to defendant's assertions, the state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in determining the appropriate penalty, so long as reasonable steps are taken to assure a fair and impartial penalty trial. (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 77 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Remoteness of the offense affects the weight, not admissibility, of the offense. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 476 [276 Cal.Rptr. 356, 801 P.2d 1107].) Here the defense was given proper notice of this aggravating factor, and was able to confront the witnesses who were available. Moreover, the jury had been instructed that aggravating circumstances—including the crimes against Jill M.—must be proved beyond a reasonable doubt. No constitutional error appears. (*People* v. *Wharton, supra,* 53 Cal.3d at p. 601.)

---

[62]The court also conducted a hearing pursuant Evidence Code section 402 prior to the presentation of the Jill M. evidence to the jury. Although the court had initially indicated some concerns as to the existence of credible evidence of the alleged assault on Jill, the court ultimately decided, after Jill gave testimony outside the presence of the jury, that there was "plausible evidence in the record to indicate that, in fact, there is a strong probability that it is true. . . ."

Second, defendant was not impermissibly prejudiced by the failure of witness Dr. McGlynn to independently recall his examination of Jill M., nor by the loss of the vaginal and rectal swabs and smears. At the defense's request, the court allowed McGlynn's testimony from the December 1976 preliminary hearing in the Jill M. case to be read into the record. That testimony, which was fairly favorable to the defense, indicated that McGlynn found some tenderness and redness but no abrasions on Jill's vaginal and urethral areas, and no laceration, redness or evidence of trauma in her rectal area. The testimony also indicated that sperm was found in the vagina, but not in the rectum. Most significantly, the testimony reflected McGlynn's opinion that the amount of "trauma" he observed during the examination was not consistent with a rape by three men.

██ Third, defendant was not denied a fair trial by the loss of the photos shown to Jill M. for identification purposes. We are not persuaded by defendant's claim that without the lost photographs, the defense could not show how suggestive they may have been, or demonstrate how the photo lineup procedure may have impermissibly affected Jill's subsequent identifications of defendant both at his 1976 preliminary hearing and at trial below. This argument is similar to arguments made in other cases concerning the fairness of allowing an in-court identification of a defendant where evidence of a previous photo identification is no longer available due to inadvertence of the People. (See, e.g., *People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 762-764 [170 Cal.Rptr. 62]; *People* v. *Posten* (1980) 108 Cal.App.3d 633, 646-647 [166 Cal.Rptr. 661]; *People* v. *Dewberry* (1974) 40 Cal.App.3d 175, 181 [114 Cal.Rptr. 815].) In those cases, it was repeatedly recognized that "[a] mere claim that the procedure might have been unfair is not enough to require that the People must produce the photographs where evidence establishes their nonavailability is due to inadvertence and not intended destruction. [Citations.]" (*People* v. *Kaiser, supra,* 113 Cal.App.3d at p. 764; *People* v. *Posten, supra,* 108 Cal.App.3d at pp. 646-647; *People* v. *Dewberry, supra,* 40 Cal.App.3d at p. 181.) Thus, admission of an in-court identification is considered fair when the defendant is given the opportunity to cross-examine the pertinent witnesses in order to expose the potential for error in the lineup method (*People* v. *Kaiser, supra,* 113 Cal.App.3d at p. 764; *People* v. *Dewberry, supra,* 40 Cal.App.3d at p. 181), and when it appears that the in-court identification is based on the personal observation of the defendant at the time of the alleged crime, rather than on the previous lineup (*People* v. *Kaiser, supra,* 113 Cal.App.3d at p. 763; *People* v. *Posten, supra,* 108 Cal.App.3d at p. 647; *People* v. *Dewberry, supra,* 40 Cal.App.3d at p. 181.)

In this case, defendant fails to establish any unfairness. The defense was able to confront and cross-examine both Jill M. and Lewis Pollack, who

showed her the photographs. In particular, Pollack was able to remember many of the details of the photographic display, and his testimony reflected that it was eminently fair.[63] In addition, although Jill was questioned about the various times she identified defendant, nothing in her testimony suggested that her photo identification contributed to her subsequent identifications at the preliminary hearing or at the penalty phase itself. Under these circumstances, defendant was not denied a fair trial due to the lost photos.

Defendant's reliance upon *United States* v. *Wade* (1967) 388 U.S. 218, 239-242 [18 L.Ed.2d 1149, 1164-1166, 87 S.Ct. 1926] and *Gilbert* v. *California* (1967) 388 U.S. 263, 269-272 [18 L.Ed.2d 1178, 1184-1186, 87 S.Ct. 1951] is misplaced. Unlike the instant situation, those cases involved prior lineups that had occurred in the absence of counsel in violation of the Sixth Amendment. The United States Supreme Court held that, under those circumstances, admission of the in-court identifications without first determining that they were not tainted by the illegal lineup, but were of independent origin, was constitutional error. (*Ibid.*) Those cases are inapposite and do not further defendant's claims.

b. *Rebuttal Evidence Concerning Jill M.'s Fear*

Defendant called Carlos Pasillas, who testified on direct examination that he was at the San Leandro house when Jill M. arrived. Pasillas observed Jill calmly conversing with some of his friends in the living room, smoking a cigarette and drinking a beer. Pasillas, who was living at the house with his girlfriend Norma Rodriquez (defendant's sister), did not hear Jill scream or indicate in any way that she was being forced sexually against her will that night. After the prosecutor attempted to discredit Pasillas's testimony by extracting an admission that he never came forward with his story, defense counsel elicited testimony on redirect examination that Pasillas stopped his involvement after becoming aware that the case against defendant was dismissed.

Subsequently, over the defense's objection, the court allowed Jill M. to testify briefly on rebuttal as follows. "Q [Prosecutor]: And after you went to court at the preliminary hearing and testified to the magistrate about how

---

[63]Pollack testified that he showed Jill M. a number of photos, including twelve color photos in a stack and two groups of black and white photos containing five photos each. Pollack still had a written record of whose photos were in the color lineup, and was able to describe most of those individuals. He remembered that defendant was depicted in the color photos, but not in the others. Pollack also testified that the photos "were all fairly similar," that most of the photographed individuals were in the same age group and were fairly similar in stature, ranging from five feet, nine inches to five feet, ten inches in height and weighing between one hundred fifty and one hundred sixty pounds.

Mr. Rodrigues raped you, sodomized you, and forced you to commit oral copulation upon him, at some point did you have occasion to contact either the police department or the office of the prosecutor to ask them not to require you to participate in the prosecution any further? [¶] A [Jill M.]: Yes, I did. [¶] Q: And can you tell the ladies and gentlemen of the jury, briefly, what state of mind, if any, led you to ask not to have to go through that any further? [¶] A: I was pregnant, and I feared for my life. [¶] Q: Was there anything else—well, was that your state of mind, fear for your life? [¶] A: Fear, yes."

 Defendant first contends the admission of Jill M.'s state of mind testimony was erroneous because the evidence was irrelevant. Defendant is wrong.

" 'The admission of rebuttal evidence rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of "palpable abuse." ' " (*People* v. *Kelly* (1990) 51 Cal.3d 931, 965 [275 Cal.Rptr. 160, 800 P.2d 516].) Although we find that Jill's state of mind testimony was not particularly probative since the defense did not question witnesses regarding the reasons for the dismissal, we cannot conclude that the trial court committed "palpable abuse" in admitting the evidence. On the basis of the record, we may reasonably infer that, having been informed by defense counsel that the reasons for the dismissal were not ascertainable, the court admitted Jill's testimony in order to allow the prosecutor to offset any impression left by witnesses that the charges against defendant were dismissed because of insufficiency of the evidence or questions concerning Jill's credibility. This was within the court's broad scope of discretion.

Defendant next contends that Evidence Code section 352 compelled exclusion of Jill M.'s testimony concerning her fear because such testimony impermissibly suggested that defendant or someone associated with him had threatened her. (See *People* v. *Mason*, *supra*, 52 Cal.3d at pp. 946-947; *People* v. *Pitts*, *supra*, 223 Cal.App.3d at pp. 778-781; cf. *People* v. *Weiss*, *supra*, 50 Cal.2d at p. 554.) We disagree.

The record establishes that the trial court made diligent efforts to ensure that no prejudicial inference arose. First, the trial court precluded any testimony regarding the source of Jill M.'s alleged fear, and did not allow the prosecutor to ask Jill whether she had ever been threatened. Second, the court specifically admonished the jurors that "the testimony as to the state of mind of the witness as to her reason for declining to proceed with the case, that testimony was offered for the limited purpose of showing her state of mind at the time she apparently made that request. [¶] And as she's testified,

it's not offered for any other purpose, and you may not consider it for any other purpose." Third, the court permitted defense counsel to ask Jill on cross-examination: "Did Jose Rodrigues threaten you?" As was anticipated from testimony given to the court outside the jurors' presence, Jill M. replied: "No, he did not." Thus, the court effectively ensured that the jurors would not be left with the impression that Jill's fear may have been caused by a threat attributable to defendant. (See *People* v. *Mason, supra,* 52 Cal.3d at p. 947.) The evidence was properly admitted.[64]

### 4. *Roach Shooting*

In April 1977, Frank Roach was wounded in the back by a shot from a pump-action, sawed-off shotgun. Roach had identified defendant as the shooter from a photo lineup shown to him four or five days after the incident, and also identified defendant at the preliminary hearing. At the penalty phase, Roach was able to identify defendant, but remarked that defendant looked "a lot different ten years ago" and that defendant had "changed quite a bit."

Defendant contends he was denied due process, the right of confrontation and the right to a reliable penalty determination due to the passage of time since the Roach shooting and the destruction of important physical evidence such as the photo lineup shown to Roach, and the shotgun seized by the police. These contentions are without merit.

Admission of the aggravating evidence was proper since the defense received notice of it and was afforded the opportunity to cross-examine the prosecution's witnesses and to call its own witnesses.[65] (*People* v. *Wharton, supra,* 53 Cal.3d at p. 601.) Moreover, as previously discussed, defendant's constitutional rights were not violated by the mere passage of time. (*Ibid.*; *People* v. *Garceau, supra,* 6 Cal.4th at pp. 198-199; *People* v. *Frank, supra,* 51 Cal.3d at p. 729.)

Defendant fails to establish that his right of confrontation was defeated because of the loss of physical evidence. Even though the shotgun and photo lineup were no longer available, the defense had access to the preliminary hearing transcript and police reports, as well as the names of pertinent witnesses. As for the photo lineup, there is no indication in the record that Roach's photo identification contributed to his two subsequent identifications. (Cf. *People* v. *Kaiser, supra,* 113 Cal.App.3d at p. 764; *People* v.

---

[64]For the same reasons, we reject defendant's related contention that his federal constitutional rights were violated because Jill M.'s fear testimony was inherently prejudicial and gave the prosecutor an unfair and significant advantage.

[65]The defense called Oscar Payne, who testified that he and another participant had fired the gun, but that defendant had not touched it.

*Posten, supra,* 108 Cal.App.3d at p. 647; *People* v. *Dewberry, supra,* 40 Cal.App.3d at p. 181.) Moreover, the defense was able to cross-examine both Roach and the police officer who showed the photo lineup.[66] We note from the officer's testimony that the names of the other five individuals whose pictures were shown to Roach were still available. Under these circumstances, we find that the loss or destruction of evidence did not substantially hinder defendant's right of confrontation. (*People* v. *Douglas, supra,* 50 Cal.3d at p. 530 [defendant's ability to cross-examine witnesses not affected by the destruction of court reporter's notes where preliminary hearing transcripts and police reports were available].)

### 5. Calles Incident

Defendant claims that the trial court should have excluded evidence of the Calles incident for lack of timely notice under section 190.3. The facts underlying this claim are as follows.

On September 11, 1987, the prosecutor initially filed a notice of aggravating factors which made no mention of the Calles incident. On April 11, 1988, the day the case was called for trial, the defense filed a trial memorandum attempting to limit the introduction of evidence in aggravation at the penalty phase to those incidents listed in the September 1987 notice. That same day, over defense objection, the prosecutor gave oral notice that he intended to introduce additional evidence in aggravation, including "[t]he incident occurring on January 21st, 1981, at the department of corrections facility in Susanville in which the defendant committed assault with serious bodily injury and battery on prison inmate Calles, C-a-l-l-e-s, Prison Number C-23539." The prosecutor filed a written amended notice to this effect on April 13, 1988. On April 25, the defense filed a response to the amended notice which argued that evidence of the Calles incident should be excluded on statute of limitations grounds. The trial court rejected this argument.

On August 1, 1988, after the conclusion of the guilt phase, the court conducted a hearing under Evidence Code section 402 to evaluate the defense's claim that evidence of the Calles incident should be excluded because there was insufficient evidence of defendant's identity as the perpetrator of the assault. At that time, the prosecutor informed the court and defense counsel that Calles would testify that he saw out of the corner of his eye that he was struck by someone wearing a glove, and that defendant was

---

[66]The testimony of these two witnesses suggested nothing improper about the lineup. In particular, the officer testified that he showed Roach six photos of individuals of the same race with similar hair color, complexion and weight. Furthermore, he stated that he admonished Roach that the person involved in the shooting may or may not be present in the photos, and that he should not feel obligated to identify anyone.

the only person in his presence at the time of the assault who was wearing weightlifting gloves. After hearing Calles's testimony, the trial court ruled the evidence admissible.

■ Defendant first claims that some or all of the evidence of the Calles incident should have been excluded as untimely under section 190.3 because the amended notice filed on April 13, 1988, omitted to mention the "corner-of-the-eye/weightlifting glove" evidence. He is wrong.

Not only does the claim appear to have been waived by defense counsel's failure to make a specific objection based on section 190.3 at the August 1988 hearing (*People* v. *Turner* (1990) 50 Cal.3d 668, 708 [268 Cal.Rptr. 706, 789 P.2d 887]; see also *People* v. *Johnson* (1993) 6 Cal.4th 1, 51 [23 Cal.Rptr.2d 593, 859 P.2d 673]), it is clearly lacking in merit. Section 190.3 does not require a summation of a witness's expected testimony. (*People* v. *Roberts* (1992) 2 Cal.4th 271, 329-330 [6 Cal.Rptr.2d 276, 826 P.2d 274]; cf. *People* v. *Pride* (1992) 3 Cal.4th 195, 258 [10 Cal.Rptr.2d 636, 833 P.2d 643] [prosecutor not barred from introducing all the circumstances of a duly noticed incident simply because each and every circumstantial fact not recited].) In any event, defendant cannot now complain about the notice issue because he failed to request a continuance at trial, thereby indicating that the timing of the particular notice was not prejudicial to the defense. (See *People* v. *Johnson, supra*, 6 Cal.4th at p. 51; *People* v. *Turner, supra*, 50 Cal.3d at p. 708.)[67]

■ Defendant also maintains there was insufficient evidence of identity to permit evidence of the Calles incident to go to the jury. He is wrong.

As noted above, the trial court held a hearing under Evidence Code section 402 to determine whether sufficient evidence existed to present the incident to the jury. Applying the abuse of discretion standard (see *People* v. *Clair* (1992) 2 Cal.4th 629, 676 [7 Cal.Rptr.2d 564, 828 P.2d 705]), we find the trial court could properly rule the incident admissible. Calles testified at the hearing that he spoke with defendant for 10 minutes regarding his failure to attend a Mexican/Puerto Rican inmate meeting. Defendant, who was

---

[67]In his reply brief, defendant appears to additionally contend that the Calles evidence should have been excluded entirely because the April 13 notice was not provided "within a reasonable period of time as determined by the court, *prior to trial*." (§ 190.3, italics added.) Defendant contends that in this case, the statute required notice prior to April 11, the date that trial was scheduled to commence. This claim is rejected. The April 13 notice was filed three weeks prior to the commencement of jury selection, and defendant sought no continuance. Thus, whether or not there was a technical violation of section 190.3, under circumstances such as these there was no denial of any substantial right protected by the statute. (*People* v. *Johnson, supra*, 6 Cal.4th at p. 51.)

wearing weightlifting gloves, sat on a bed opposite Calles, while another inmate sat on the same bed as Calles to his right. Defendant got up and moved to the right behind Calles. Within a matter of seconds, Calles saw a fist in a weightlifting glove come toward his head from behind, and he was knocked unconscious.

Although defendant is correct that Calles stated he did not actually see defendant strike him, that Calles did not tell prison officials after the incident about the gloved hand, and that he only recently recalled the gloved hand detail, these were matters which affected the credibility of Calles as a witness, not the admissibility of his testimony or the admissibility of the assault as an aggravating factor. Viewing the totality of the evidence presented, a rational jury could conclude that defendant was the one who struck Calles and that the elements of the charged conduct could be proven beyond a reasonable doubt.[68] Accordingly, the trial court did not abuse its discretion in ruling as it did.

Defendant next urges us to adopt a rule that, as a matter of state and federal constitutional due process, evidence of a defendant's alleged prior misconduct must be excluded from the capital sentencing determination whenever: (1) the alleged misconduct occurred in prison; (2) physical evidence and prison records of the circumstances of the alleged incident have been destroyed or lost and percipient witnesses cannot be identified; (3) the primary prosecution witness is another inmate who has never previously identified the defendant in spite of opportunity to do so; and (4) prison officials relied on unspecified information from anonymous inmates to establish the defendant's culpability. Defendant asserts such a rule is necessary because prison officials are under no obligation to preserve evidence when no criminal charges are filed, and because in-house informants may be tempted to fabricate evidence to assist the state in a capital case, supposedly in exchange for "diverse and substantial advantages."

We decline defendant's request. Defendant's proposed rule contravenes our previous determination that the state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in a capital case, *so long as reasonable steps are taken to assure a fair and impartial penalty trial. (People* v. *Hawthorne, supra,* 4 Cal.4th at p. 77.) Since defendant fails to demonstrate that existing methods for safeguarding the fairness

---

[68]Once the trial court ruled the Calles evidence admissible, other evidence was presented to the jury which further strengthened the prosecutor's case. Calles testified that when defendant moved behind him, no one else was back there within arm's reach. In addition, a correctional officer testified that he interviewed defendant as a suspect on the day of the assault and saw that he had abrasions on his knuckles, although defendant had claimed he got them from working out on a punching bag.

of a penalty trial are inadequate, we see no valid basis for adopting such an extraordinary blanket rule of exclusion.

Finally, defendant contends that evidence of the Calles incident should not have been admitted because critical evidence was either missing or lost, and because the expiration of the applicable statute of limitations created an irrebuttable presumption that his right to a fair trial would be prejudiced. He contends that admission of the incident violated his rights to due process, to effective confrontation of witnesses, and to a reliable penalty judgment. These contentions are essentially repetitive of those made with respect to the Jill M. and Roach incidents, and they are rejected for the reasons already stated.

### 6. *Rodriguez Incident*

Correctional Officer Leo Rodriguez testified that in November 1984, defendant verbally abused him and threatened to "kick [his] ass" when Rodriguez sought to have him removed from his food serving assignment.

Defendant contends the evidence was inadmissible because it did not show criminal conduct, violence or a threat of violence as required under section 190.3, factor (b). He contends this error violated his federal constitutional rights and requires reversal of his death judgment. We conclude otherwise.

Section 190.3, factor (b) requires the trier of fact to take into account, if relevant, "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Under this factor, the term "criminal activity" is "limited to conduct *that violates a penal statute.*" (*People* v. *Wright* (1990) 52 Cal.3d 367, 425 [276 Cal.Rptr. 731, 802 P.2d 221], italics in original.)

In this case, the question is whether the Rodriguez evidence demonstrated a violation of section 148, which criminalizes resisting, delaying or obstructing a peace officer,[69] or a violation of section 71, which criminalizes the

---

[69] At the time of defendant's trial, section 148, subdivision (a) provided in pertinent part: "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, . . . is punishable by a fine . . . or by imprisonment . . . , or by both such fine and imprisonment." (§ 148, subd. (a), as amended by Stats. 1987, ch. 257, § 1, p. 1260.)

threatening of public officers and employees.[70] Defendant contends no violation of section 148 was established because there was no evidence showing that he acted with the specific intent to delay or resist a peace officer. He contends no violation of section 71 was demonstrated because there was insufficient evidence showing that the officer reasonably believed that defendant's threat could be carried out.

While not conceding the point, the Attorney General makes no attempt to argue that the Rodriguez incident constituted conduct properly falling under section 190.3, factor (b), or that there was substantial evidence in the record of a Penal Code violation. Rather, it is asserted that any erroneous admission of the evidence did not prejudice defendant. We agree.

Even assuming that the Rodriguez evidence was improperly admitted, the record does not demonstrate prejudice under our state law penalty phase harmless error test or any federal constitutional violation. (*People* v. *Brown*, *supra*, 46 Cal.3d at p. 449.) The jurors had already convicted defendant of the brutal murder of Juan Barragan and found true two special circumstances. They had heard all about the circumstances of the crime (§ 190.3, factor (a)), including the manner in which defendant savagely stabbed an unarmed victim to death without giving him any chance to surrender his property and thus preserve his life. They had heard how defendant ordered Garcia to kill Epifanio Zavala once he revealed that "it" was in the closet. The jurors were also presented evidence of numerous other incidents in aggravation, which included violent felonies as well as injurious assaults against police officers and other individuals. In light of all the evidence, it was not reasonably possible that the jurors could have drawn any more damaging inferences from the evidence of defendant's threat to Rodriguez than had already been established by the circumstances of the underlying crimes and defendant's history of violent and assaultive conduct. We therefore conclude that any erroneous admission of the evidence was harmless. (*People* v. *Wright*, *supra*, 52 Cal.3d at pp. 428-429; *People* v. *Brown*, *supra*, 46 Cal.3d at p. 449.)[71]

---

[70]Section 71 provides in pertinent part: "Every person who, with intent to cause, attempts to cause, or causes, . . . any public officer . . . to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly communicated to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out, is guilty of a public offense . . . ."

[71]In light of our conclusion that any error in admitting the Rodriguez evidence was harmless, we do not address defendant's additional claims regarding inadequate notice (§ 190.3) and unavailable evidence, or his contention that the incident was inadmissible to show defendant's adjustment in prison (see *People* v. *Taylor*, *supra*, 52 Cal.3d 719, 752-753

### 7. Correctional Facility Fire

At defense counsel's request, the trial court held a hearing under Evidence Code section 402 to determine the admissibility of the prosecutor's proposed evidence in aggravation that on New Year's Eve, 1980-1981, defendant participated in setting fires at the correctional facility at Susanville. After Correctional Officer Frank Shipman testified concerning a fire he had witnessed, the defense moved to exclude the evidence on the ground it was insufficient to establish defendant's participation and identity in the fire incident beyond a reasonable doubt.[72] The trial court disagreed and ruled the incident admissible.

■■■■ Defendant first argues that evidence of the incident was erroneously admitted because there was insufficient evidence to prove his identity in the incident. Defendant compares the correctional fire facility incident to the situation in *People* v. *Crandall* (1969) 275 Cal.App.2d 609 [80 Cal.Rptr. 81], in which the Court of Appeal reversed a defendant's conviction for possession of marijuana that was thrown from a car in which the defendant and two others were riding. In that case, the record established that the police could not see who threw the marijuana, and did not know who was next to the window when it was thrown. There was also no inference that the marijuana was possessed jointly by all the people in the car, or that the defendant was an aider or abettor to the crime. On the basis of that record, the evidence was deemed insufficient to connect the defendant with possession of the marijuana. (275 Cal.App.2d at pp. 610-611.)

Defendant's comparison fails. Unlike the situation in *People* v. *Crandall, supra,* 275 Cal.App.2d 609, Shipman's testimony provided substantial evidence of defendant's identity. Shipman testified that he saw a pair of hands throwing burning paper out of a window and onto an existing fire in the prison common area. Four or five seconds later, Shipman, with the aid of his

---

(conc. opn. of Mosk, J.) [aggravating circumstances enumerated in § 190.3 do not include future dangerousness]).

Moreover, in reaching our conclusion, we have considered the fact that the prosecutor's closing argument asked the jury to consider, based on defendant's past record, whether defendant would present a threat or danger to others in prison if sentenced to life without possibility of parole. Although a prosecutor may not initiate introduction of expert testimony on the issue of future dangerousness of a defendant, he or she may argue the issue so long as the arguments do not render the penalty trial unfair. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 110-111; see also *People* v. *Taylor, supra,* 52 Cal.3d at p. 750, fn. 11.) In this case, the prosecutor's argument was proper given the evidence of defendant's assault on inmate Calles. No basis for reversal appears.

[72]The defense also argued that an injury allegedly suffered by Shipman was caused by a different fire located elsewhere in the prison. The trial court agreed with this aspect of defendant's argument and that issue is not before us.

flashlight, saw defendant jump back from the window when he saw Shipman. Defendant was the only inmate in the area near the window; the others were further away in the bed area. Shipman observed defendant move away from the window and attempt to get back into a bed, as if trying to avoid being seen. Contrary to defendant's assertions, this evidence would allow a rational jury to make a determination beyond a reasonable doubt as to defendant's identity.

Defendant next claims that evidence of the incident was inadmissible because the conduct at issue did not constitute arson (§ 451),[73] and did not amount to criminal activity involving violence or a threat of violence. Although defendant may have raised this issue at the outset of trial, his failure to renew the specific objection at the Evidence Code section 402 hearing waives the issue on appeal. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 960 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949].)

In any event, no basis for reversal appears. Assuming arguendo that the evidence did not sufficiently support a finding beyond a reasonable doubt that defendant committed criminal activity, the other properly admitted evidence was overwhelming. On this record, we conclude it is not reasonably possible that the jury would have rendered a different verdict had the challenged evidence not been admitted. (*People* v. *Wright, supra,* 52 Cal.3d at p. 429; *People* v. *Brown, supra,* 46 Cal.3d at p. 449.)[74]

### 8. *Character Evidence*

At various times before and during the penalty phase, defense counsel asked the trial court for a ruling as to what evidence might be admitted in rebuttal if the defense were to present what he characterized as *background* evidence in mitigation. As described by counsel, this background evidence consisted of evidence that defendant suffered seizures when he was four or five years of age, evidence that his father died when he was young, two or three photographs of defendant earlier in his life, and "one other similar piece of evidence" that counsel did not identify. The prosecutor asserted that

---

[73]Section 451 provides in pertinent part: "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of, any structure, forest land or property."

[74]Defendant's related federal constitutional claims are also rejected. First, the claims were waived by defendant's failure to assert them at trial. Second, the state law error at issue does not rise to the level of a constitutional violation. (*People* v. *Brown, supra,* 46 Cal.3d at p. 449.) Third, the claims fail in any event because application of the "reasonable doubt" standard (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711]) would also yield a finding of no harm.

if the defense were to present such evidence, he would seek to introduce rebuttal evidence of defendant's *character* that: (1) on July 19, 1983, defendant stabbed inmate Timothy Gomez at the Department of Corrections at Folsom, California; and (2) in December 1987, while incarcerated in the San Mateo County jail, defendant conspired with inmate Anthony Amoroso to commit the crime of escape.[75]

During arguments on the issue, defense counsel asserted that the prosecutor should not be permitted to introduce character evidence or any evidence of the stabbing and escape incidents in rebuttal because defendant's evidence would merely show "things that have happened in his life, . . . things that were not in his range of choices of conduct," and "[n]ot character and not mental condition or physical condition through a psychiatrist but just things that have happened to Mr. Rodrigues, not things that he has himself done." Defense counsel sought to restrict the scope of rebuttal to the truthfulness of the particular incidents, i.e., whether it was true that defendant suffered childhood seizures or that his father died when he was young. In opposition, the prosecutor argued, inter alia, that the only logical reason for defendant's proffered evidence was "for the purpose of evoking a sympathetic response which shows a characteristic of the defendant which is worthy of sympathy." The prosecutor asserted that "any pitch or plea that's made for sympathy in that regard, is something that may be rebutted by otherwise relevant evidence that would evoke from the jury the opposite conclusion, which is that the defendant is not worthy."

In ruling on this matter, the trial court made clear it was not inclined to admit the escape evidence.[76] However, the court refused to otherwise limit the scope of rebuttal in the manner proposed by defendant: "The court would rule that in the event the evidence of the nature that the defense is proffering would be admitted, that the people would be entitled to offer rebuttal evidence, rebuttal character evidence in a broader scope than what the defense propose. [¶] Offer any evidence that would indicate to the jury that the defendant should not be treated with sympathy or that this penalty should not be mitigated would seem appropriate. So long as it's appropriate evidence." Faced with this ruling, defendant introduced no evidence in mitigation.

 On appeal, defendant contends that the trial court's ruling constituted prejudicial error. In *People* v. *Rodriguez* (1986) 42 Cal.3d 730 [230

[75]The prosecutor had initially sought to introduce evidence of both of these incidents in its case in aggravation, but the trial court ruled that the prosecutor's notice with respect to the Gomez stabbing incident was insufficient under section 190.3.

[76]According to the trial court, evidence of the attempted escape was inadmissible under Evidence Code section 352 since it was more prejudicial than probative. This aspect of the court's ruling is not at issue here.

Cal.Rptr. 667, 726 P.2d 113], we cautioned that not *"any* evidence introduced by defendant of his 'good character' will open the door to *any and all* 'bad character' evidence the prosecutor can dredge up." (42 Cal.3d at p. 792, fn. 24.) Rather, "the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*Ibid.*) In *People* v. *Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965], we held that rebuttal evidence showing a defendant's misconduct as a teenager was not properly admitted where the defendant had presented evidence of adverse circumstances experienced in early childhood without any evidence of good character or general reputation for lawful behavior. (50 Cal.3d at pp. 1191-1193.) Relying on these cases, defendant claims the trial court's ruling unfairly resulted in the complete absence of mitigating evidence, thus rendering the death judgment constitutionally unreliable.

The Attorney General argues that defendant's claim of harm is speculative, and urges us to find the claim not reviewable under the rule applied in *Luce* v. *United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443, 105 S.Ct. 460] (*Luce*), *People* v. *Collins* (1986) 42 Cal.3d 378 [228 Cal.Rptr. 899, 722 P.2d 173] (*Collins*) and *People* v. *Sims*, *supra*, 5 Cal.4th 405 (*Sims*).

In *Collins*, an opinion authored by Justice Mosk, we held that California courts are to follow the federal rule stated in *Luce*, *supra*, 469 U.S. 38, which held that the denial of a motion *in limine* to exclude a prior conviction offered for impeachment under rule 609(a) of the Federal Rules of Evidence (28 U.S.C.)[77] is not reviewable on appeal if the defendant refuses to testify. (*Collins*, *supra*, 42 Cal.3d at pp. 383-388.) We found that the reasons given by the United States Supreme Court for this procedure were sound and equally applicable to California practice. First, without the precise factual context that such testimony would have provided, the appellate court cannot review the balance required to be drawn between the probative value and prejudicial effect of the prior conviction. (*Id.*, at p. 384.) Second, the trial court's *in limine* ruling is necessarily tentative because the court retains discretion to make a different ruling as the evidence unfolds. Also, when the defendant does not testify, there is no way to know whether the prosecutor ultimately would have used the prior conviction to impeach: if the prosecution's case is strong and the defendant is impeachable by other means, the prosecutor might elect not to use a questionable prior conviction. Thus, any possible harm stemming from the *in limine* ruling is " 'wholly speculative.' " (*Ibid.*) Third, "when the trial court errs in ruling the conviction admissible the reviewing court cannot intelligently weigh the prejudicial effect of that

---

[77]Federal Rules of Evidence, rule 609(a)(1) requires the trial court to weigh the probative value of the conviction against its prejudicial effect.

error if the defendant did not testify." (*Ibid.*) If such rulings were reviewable on appeal, " 'almost any error would result in the windfall of automatic reversal; the appellate court could not logically term "harmless" an error that presumptively kept the defendant from testifying.' " (*Ibid.*, citing *Luce, supra,* 469 U.S. at p. 42 [83 L.Ed.2d at pp. 448].) Finally, requiring a defendant to testify before the trier of fact in order to preserve his objections will also tend to discourage the making of motions *in limine* solely to "plant" reversible error in the record in the event of conviction. (42 Cal.3d at pp. 384-385.)

In *Collins* we observed that no witness has the right to give testimony immune from impeachment: "It is settled that such impeachment does not violate the due process clause of either the federal or the state Constitution [citations], or the federal privilege against self-incrimination [citation]. . . . 'Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.' . . . 'It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. [Citations.] It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. [Citations.] Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify.' [Citation.]" (*Collins, supra,* 42 Cal.3d at pp. 387-388.) For these reasons, we concluded that impeachment by prior felony conviction does not violate the California privilege against self-incrimination, and held that the *Luce* rule is not inconsistent with any constitutional mandate.[78]

In *Sims,* a death penalty case, the defendant argued on appeal that the trial court erred in denying his motion to bar the prosecution, in the event defendant testified during the guilt phase, from cross-examining him regarding evidence of unadjudicated murders in another state. (5 Cal.4th at p. 453.) There, based on the reasoning in *Collins,* we held that the defendant's claim of error was not reviewable because he elected not to testify at his trial. (*Id.,* at pp. 454-456.) In *Sims,* as in *Collins,* the trial court had no occasion to ascertain the *precise nature* of defendant's testimony because he elected not to testify; the court therefore had no basis for determining whether the

[78]We did, however, hold that our decision to adopt the *Luce* rule was to be given prospective effect only. (42 Cal.3d at pp. 388-389.)

probative value of the impeachment evidence would outweigh its prejudicial effect. (*Sims, supra,* 5 Cal.4th at p. 455.) Moreover, the alleged harm was wholly speculative and the defendant's tactical choice not to testify had thwarted our ability to judge the prejudicial effect of the asserted error. (*Id.,* at pp. 455-456.) We therefore employed the procedural rule adopted in *Collins,* concluding that the identical purpose and justification for the rule were directly applicable to the trial court's denial of defendant's *in limine* motion. (*Ibid.*) In so doing, we observed that numerous federal court decisions had applied the *Luce* rule to preclude appellate review of a trial court's refusal to bar prospective use of evidence *other than prior convictions* for impeachment of a defendant's testimony. (*Ibid.*)

It is debatable whether the *Luce* rule is properly applicable in the instant case. On the one hand, defendant appears correct that the *Luce* rule has never been applied to a claim challenging the denial of an *in limine* motion seeking to restrict the scope of rebuttal to mitigating evidence in the penalty phase of a capital case. On the other hand, the Attorney General makes plausible arguments that the same concerns which prompted application of the rule in *Collins* and in *Sims* are present in such a situation.

We find that, for purposes of this case, we need not go so far as to hold, under *Luce, Collins* and *Sims,* that a defendant must present his mitigating evidence to the trier of fact in order to preserve a claim challenging the denial of a motion *in limine* to limit the scope of rebuttal. All the same, we conclude, based on settled principles of appellate review, that the inadequacy of the present record requires us to reject defendant's claim.

"Before an appellate court can knowledgeably rule upon an evidentiary issue presented, it must have an adequate record before it to determine if an error was made." (*In re Mark C.* (1992) 7 Cal.App.4th 433, 445 [8 Cal.Rptr.2d 856].) The question here is whether defendant's offer of proof concerning his alleged mitigating evidence was sufficiently definite so that we may knowledgeably conclude that the trial court's ruling on the scope of rebuttal was both erroneous and prejudicial to defendant.

██ An offer of proof must consist of material that is admissible, and it must be specific in indicating the name of the witness and the purpose and content of the testimony to be elicited. (*In re Mark C., supra,* 7 Cal.App.4th at p. 445.) " 'The substance of evidence to be set forth in a valid offer of proof means the testimony of specific witnesses, writings, material objects, or other things presented to the senses, to be introduced to prove the existence or nonexistence of a fact in issue.' " (*Id.,* at p. 444; see *Douillard v. Woodd* (1942) 20 Cal.2d 665, 669 [128 P.2d 6].)

Defendant's offer of proof was clearly deficient under the foregoing authorities, leaving us with a record that is all too uncertain to warrant reversal of the penalty judgment. Defendant's alleged photos were never offered to the trial court for inspection; they are not a part of the appellate record and there is no way to ascertain what they might have shown and how they might have depicted defendant. Additionally, there is no indication of the manner in which the seizure and other evidence would have been introduced or by whom, and no basis for determining what questions might have been asked and what answers or impressions might have been given in the elicitation of the evidence.[79] Finally, the record contains no hint as to the nature or substance of the "one other similar piece of evidence" to which defense counsel referred but did not identify. Given the vagueness of the record, it is impossible to judge whether defendant's evidence would have met the requirements for admissibility under the Evidence Code, and whether, notwithstanding defense counsel's assertions to the contrary, defendant's evidence might have provided a basis for the proper admission of the prosecutor's rebuttal evidence.[80] Likewise, it is impossible to determine whether a jury might have been influenced by such evidence.

In sum, the record is far too vague and indefinite to permit us to determine defendant's claim of prejudicial error. Defendant's objections to the trial court's *in limine* ruling are therefore properly rejected.[81]

### 9. *Refusal to Excuse Juror Duba*

Late in the penalty phase, it came to light that Juror Ronald Duba was seen on the fourth floor of the courthouse (the jail floor), and that he there observed Transportation Deputy Matthew Powers and another deputy taking defendant out of the elevator. The morning after the incident, the court

---

[79]For all we know, defendant himself might have been one of the witnesses, thus strengthening the argument for application of the *Luce* rule.

[80]We have held that where a defendant's evidence painted a general picture that he was well-behaved, the prosecutor was properly permitted to introduce evidence of the defendant's acts of delinquency, including incidents of violence, which related directly to that general picture. (*People* v. *Mitcham, supra,* 1 Cal.4th at p. 1072; see also *People* v. *Siripongs* (1988) 45 Cal.3d 548, 576-578 [247 Cal.Rptr. 729, 754 P.2d 1306] [defendant's presentation of evidence that he was a devout Buddhist, coupled with testimony showing that one characteristic of a devout Buddhist was truth or honesty, would justify introduction of defendant's prior convictions involving dishonesty].)

[81]Defendant additionally contends that if counsel's decision not to present mitigating evidence in the face of the trial court's ruling is deemed unreasonable, such omission would constitute ineffective assistance. Because the appellate record does not contain the defense evidence at issue, it provides no basis for assessing whether counsel's performance was deficient or prejudicial. (See *People* v. *Whitt* (1990) 51 Cal.3d 620, 650 [274 Cal.Rptr. 252, 798 P.2d 849]; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 691-696 [80 L.Ed.2d 674, 695-699, 104 S.Ct. 2052].) The claim is rejected.

conferred with the prosecution and the defense and decided to conduct a hearing outside the presence of the other jurors.

At the hearing, the court questioned Duba and Deputy Powers on the stand, eliciting the following testimony. During his initial examination, Duba explained he was on the fourth floor because he had wanted to make a telephone call to his wife. He had picked the fourth floor over the first and second floors because he wanted more privacy. Duba represented he was capable of making a decision in the trial independent of his observation of defendant, and had no doubts he could put the incident out of his mind. Deputy Powers confirmed that Duba was sitting down by one of the telephones on the jail floor as he and another deputy were transporting defendant, who was handcuffed in front, to the jail. Duba saw them from between 15 and 20 feet away. When Powers asked Duba what he was doing there, Duba replied he was going to use the telephone to call his wife. Powers saw that Duba was writing something down in a spiral notebook, but did not see Duba use the telephone. Powers immediately reported the incident to the trial judge. When recalled for questioning, Duba clarified that what he was writing in his notebook were things he wanted to remember from trial. Duba had been taking notes this way periodically throughout the trial, and on this occasion he had decided to write his thoughts in his notebook before calling his wife. Duba also affirmed that he was not on the fourth floor to do any investigation. After ascertaining that Duba could disregard his observation of defendant and that he would not discuss the incident with the other jurors, the court allowed Duba to remain on the jury.

■■■ Defendant contends Duba's actions constituted juror misconduct and that the trial court erred in denying his request to replace Duba with one of the five alternate jurors.

■■■ To succeed on a claim of juror misconduct, "defendant must show misconduct on the part of a juror; if he does, prejudice is presumed; the state must then rebut the presumption or lose the verdict. [Citation.]" (*People* v. *Marshall* (1990) 50 Cal.3d 907, 949 [269 Cal.Rptr. 269, 790 P.2d 676].) "A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a *substantial likelihood* that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' [Citations.]" (*Id.*, at pp. 950-951, italics added; see *People* v. *Hardy* (1992) 2 Cal.4th 86, 174 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

■■■ The Attorney General does not dispute whether a juror's apparently innocent, inadvertent receipt of outside information constitutes true

juror misconduct. The Attorney General argues only lack of prejudice. For the reasons below, we hold that, even if the conduct here is treated as true juror misconduct, the presumption of prejudice has been rebutted.

 As we explained in *People* v. *Marshall, supra,* the substantial likelihood test is " 'an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' [Citation.] [¶] Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial." (50 Cal.3d at p. 951.)

 Even assuming that Juror Duba's unauthorized observation of defendant was improper, it could not have had any prejudicial effect. Defendant's appearance in custody and in handcuffs on the jail floor after court proceedings had concluded for the day was hardly inflammatory or surprising given the postconviction stage of the trial. It therefore was not inherently likely to have influenced the juror.[82] As we have previously recognized, the mere viewing of a defendant in handcuffs, even during court proceedings, does not result in an inherently unfair penalty phase trial. (*People* v. *Hardy, supra,* 2 Cal.4th at p. 180 [defendants handcuffed during jury view of crime scene].)

 Moreover, the perceived misconduct was de minimis and immediately brought to the trial court's attention. At a hearing held outside the presence of the other jurors, Duba explained that his presence on the fourth floor was for the innocent purpose of making a telephone call in private, and was not an effort to gather extrinsic evidence. When asked by the court, Duba gave assurances that he could disregard his observation of defendant, that he could carry out his oath as a juror, and that he would not discuss the event with the other jurors. The trial court, in allowing Duba to remain on the jury, implicitly determined after observing Duba's demeanor that his statements were credible. Under these circumstances, we will defer to the trial court's determination that Duba's neutrality and impartiality were not compromised by his observations. (See *People* v. *Zapien, supra,* 4 Cal.4th at pp. 993-994 [deferring to trial court's determination that juror appeared honest].)

We find no merit to defendant's claim that the trial court's prejudice analysis was deficient because the effect of Duba's observation of defendant

---

[82]Indeed, when asked by the trial court, Duba stated that, although he had not previously concluded that defendant was being held in jail during the trial because he had not received any information in that regard, the fact that defendant was with the two deputies on the jail floor "made sense" to Duba at the point he saw them.

*in handcuffs* was not considered. Although the court did not specifically ask Duba about defendant's handcuffed state, its questioning addressed Duba's reaction to his overall viewing of defendant. Since it is inherently improbable that Duba would have construed the court's inquiries and admonitions to not include any impression Duba may have formed in seeing defendant in handcuffs, we may fairly infer that his assurances of fairness extended to having observed defendant in such a state.[83]

We also reject defendant's claim that a reversal is warranted based on the trial court's erroneous consideration of the number of remaining alternate jurors. The fact that the court referred to this irrelevant factor does not undermine the soundness of its determination that Duba's unauthorized observation would not result in prejudice to defendant.

"In view of the foregoing, we conclude that the misconduct in question does not support a finding that there is a substantial likelihood that any juror was impermissibly influenced to the defendant's detriment. Therefore, we must hold the misconduct to be nonprejudicial." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 952.)

### 10. *Court's Rulings and Remarks Regarding the Defense's Arguments*

Defendant contends that the trial court made erroneous and unfair comments when ruling on two prosecution objections during the defense's closing argument. He also contends that the court's overall treatment of the defense was unfair in comparison to its treatment of the prosecution. We disagree.

During closing argument, defense counsel reminded the jury that an allegation of personal gun use (§ 12022.5) against defendant was dismissed when defendant pleaded guilty to a charge of assault with a deadly weapon (§ 245) on Frank Roach. Counsel continued: "What does that mean in simple layman's language? That means that the allegation as part of that charge that Mr. Rodrigues was the shooter, used a gun, 12022.5 means used a gun, got a gun in his hand, pulled the trigger, that was dismissed." At this point, the prosecutor objected and the following exchange took place: "[Prosecutor]: I would object, your Honor. That's a misstatement of the law, as the court well knows, it's an additional sentencing enhancement that does not erase from the underlying charge the use of the weapon. [Defense counsel]: I'm stating what the 12022.5 is, and it's a use of the weapon. [The court]: However, it still does not detract from the fact of the charge itself, so the objection is sustained."

---

[83]For the record, we note that defense counsel did not request the trial court to ask Duba about defendant's handcuffed state even though he was clearly given the opportunity to do so.

Defendant contends the above ruling and accompanying remarks were erroneous and resulted in the denial of his constitutional rights to due process, a fair trial, the effective assistance of counsel and a reliable penalty determination. Defendant reasons that because one can violate section 245 as either an aider and abettor or as the actual perpetrator, his conviction under section 245 did not necessarily connote an assault with a deadly weapon by him *personally*. Therefore, defendant argues, the trial court's ruling erroneously and effectively "squelched" defense counsel's "intended argument" that "because of the dismissal of the section 12022.5 allegation, the conviction of section 245, standing alone, was entirely consistent with the defense theory and evidence that Oscar Payne and Billy Grejeda—rather than [defendant]—shot Frank Roach in 1977." The record does not support defendant's claims.

First, defense counsel's sole comment in response to the prosecutor's objection was: "I'm stating what the 12022.5 is, and it's a use of the weapon." After the court made its ruling, counsel made no attempt to explain or elaborate upon his position. This was plainly insufficient to raise or preserve the arguments defendant makes on appeal.

As defendant apparently concedes, the clear import of the court's remark, viewed in its proper context, was that weapon use was included in the underlying charge of assault with a deadly weapon and that the dismissal of the enhancement allegation did not detract from that legal fact. We find nothing erroneous about such a remark and nothing in the court's ruling that foreclosed defense counsel from making the "intended argument" identified by defendant on appeal. In reaching this conclusion, we reject defendant's claim that the court's remark effectively told the jury that the underlying conviction of assault with a deadly weapon constituted a finding that defendant *personally* used a weapon.

Later during his closing argument, defense counsel began to sum up by specifically asking the jury to spare defendant's life, but the prosecutor again objected and the court again agreed with the prosecutor's position: "[Defense argument]: You have not seen any evidence which warrants the death penalty in this case. You know by what I said a few minutes ago that Mr. Rodrigues will spend the rest of his life in prison. [¶] When you are exercising your discretion and your total authority in this case about what is appropriate for the punishment you should determine whether or not Mr. Rodrigues is such a person that the prison system cannot control him that he must be put to death. [¶] You have not seen that kind of evidence. [Prosecutor]: Objection, your honor. That's not the legal standard at all that that should be imposed only if the legal system cannot control the defendant. [The court]: It's not the legal standard, but it's argument and I'll allow it in."

 Defendant contends that the court's remark "[i]t's not the legal standard" was improper, prejudicial and violative of his constitutional rights because it effectively told the jury that "although counsel can argue what he wants, the *law* says that you cannot spare the defendant's life solely because you find that he would not be a dangerous prisoner." No basis for reversal appears. We observe at the outset that these contentions have been waived by defendant's failure to assert them below. In any event, we conclude that no reasonable juror could possibly have construed the court's remark in the manner asserted by defendant, and that the court was correct in its assessment that defense counsel's argument did not reflect the legal standard. Even if we assume, however, that the court's comment was reasonably susceptible of defendant's construction, any possible misapprehension regarding the proper legal standard was eliminated when the court specifically instructed the jurors to consider, among other things: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record which appears to you as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." The court's brief remark was neither improper nor prejudicial.

Defendant next contends that the trial court's overall disparate treatment of the prosecutor and defense counsel during the penalty phase closing arguments was patently unfair to defendant and constituted prejudicial error. This contention is based on a comparison of the number of overruled defense objections with the fewer number of overruled prosecution objections. He also criticizes as unfair the comments made by the trial court in conjunction with those rulings.

Defendant fails to demonstrate that any of the trial court's rulings were erroneous, or that the cited remarks were incorrect or resulted in prejudice. Defendant also fails to establish that the court acted inequitably in any way. Whether considered singly or together, the rulings and remarks made by the court furnish no grounds for a reversal of the death judgment.

11. *Alleged Erroneous Foreclosure of Defense Counsel's Argument*

After the prosecutor presented his closing argument, defense counsel Edward Thirkell followed with his summation. Near the conclusion of his argument, Thirkell rhetorically asked the jurors if any of them was "so comfortable" with the prosecution's case and arguments "that you have no concern about another witness coming up, about a lack of compassion, about

taking from God the decision of when Mr. Rodrigues dies?" Thirkell further asked the jurors: "What did the Pope do seven years ago when he was shot? He forgave, prayed for the man's soul. Are we less than him? Are we different than him?"

Thereafter, the prosecutor made a short rebuttal argument, in which he angrily criticized Thirkell for "incredibl[y]" asking the jurors "to act as the Pope" and to "make a decision in this case that's in no way related to the evidence." He characterized Thirkell's argument not to "take away from God" as "nothing but a shoddy and emotional attempt to get you to abandon your sworn duties as jurors and not to make your decision in this case based on the evidence and on the law." The prosecutor implored the jurors to be influenced only by the law and the evidence, and "to do justice, which means making a tough decision but one that's warranted by what the law is for everyone in the state of California."

Defense counsel Geoffrey Carr then began what he described as a very brief argument in surrebuttal. After some introductory remarks, Carr told the jurors that, contrary to what the prosecutor argued, it was not inappropriate under the law for them to consider sympathy in making their decision. Thereafter, as Carr was arguing about the injustice of a person having to defend against an eight-year-old allegation when no witnesses to the incident could be produced other than the accuser, the prosecutor interrupted with an objection that the argument was clearly beyond the scope of rebuttal. Carr responded that his argument simply went to the meaning of justice and asserted that the case law supported a broad scope of surrebuttal. Although the court appeared to overrule the objection, it told Carr that "to the extent that you've made the statement I will allow it in," but that "if it gets close to going beyond, I won't allow it."

Carr continued his argument by emphasizing the injustice of using, as aggravating factors, stale incidents which had not resulted in convictions and as to which there had been failures of proof. When the prosecutor again objected that counsel was going beyond the scope of rebuttal, Carr again responded that the final statement to a jury in a capital case was not so limited. The court made no specific ruling on the prosecutor's objection, but stated it had discretion as to whether "that other argument is given." After stating its belief that defense counsel Thirkell had already adequately covered the area Carr was arguing, the court nonetheless allowed Carr's remark to remain.

Carr then resumed his argument, stating that the "last thing" with which he would leave the jurors was asking them to consider how they might feel

about their decision 10 or 15 years later. The prosecutor objected that the argument went "way beyond the scope of rebuttal." This time the court sustained the prosecutor's objection. Carr then stated: "And the last thing I'll ask you is that it's the sort of decision that any one of you can stop. You shouldn't hide behind other folks and say: [¶] 'Well, we all made this decision and therefore I can hide behind it like someone would in an execution.' " The court sustained the prosecutor's objection on the same grounds as before. When Carr asked whether he was being foreclosed from saying anything that was not directly related to the prosecutor's rebuttal, the court stated: "Mr. Carr, if you had been foreclosed from that you would have been sitting down now. [¶] You may proceed." Carr immediately concluded by stating: "Don't do it."

After the jurors were excused, defense counsel Carr stated on the record that he had further argument to make, that he felt he had been unnecessarily foreclosed, and that he felt constrained by the court's ruling. The court responded: "Mr. Carr, the court is not responsible for your feeling of constraint. The court, in the language, made it clear that you were clear, fully capable, free to make any appropriate argument that you chose to make."

 Defendant contends on appeal that the trial court erroneously foreclosed his surrebuttal argument, thereby constructively denying his constitutional right to counsel and depriving him of other constitutional protections. We cannot agree.

 It is firmly established that a criminal defendant has a constitutional right to have counsel present closing argument to the trier of fact. (*Herring v. New York* (1975) 422 U.S. 853, 856-862 [45 L.Ed.2d 593, 597-601, 95 S.Ct. 2550]; *People v. Bonin* (1988) 46 Cal.3d 659, 694 [250 Cal.Rptr. 687, 758 P.2d 1217] (*Bonin*); *People v. Cory* (1984) 157 Cal.App.3d 1094, 1105 [204 Cal.Rptr. 117].) Nonetheless, it is equally settled that a judge in a criminal case "must be and is given great latitude in controlling the duration and limiting the scope of closing summations." (*Herring v. New York, supra*, 422 U.S. at p. 862 [45 L.Ed.2d at p. 600]; see *People v. Cory, supra*, 157 Cal.App.3d at p. 1105.) The trial judge has broad discretion to limit counsel to a reasonable time and to terminate argument when continuation would be repetitive or redundant. (*Herring v. New York, supra*, 422 U.S. at p. 862 [45 L.Ed.2d at pp. 600-601].)

 Under the above authorities, the trial court did not abuse its discretion in limiting defense counsel Carr's argument. First, contrary to defendant's assertions, the court did not improperly foreclose arguments attempting to dissuade the jury from using "old, unreliable and inadequately

proved incidents as a basis for deciding to end [defendant's] life." Since defense counsel Thirkell had adequately covered this area (in emphasizing that the passage of time and its effect on witnesses in the Espinoza killing and in the Jill M. rape incident, and in arguing that for three of the aggravating circumstances, the prosecutor either relied on witnesses who never came forward until the original incidents had been concluded or had not interviewed all the available witnesses), the court acted well within its discretion in attempting to limit the redundancy of arguments presented by Carr. (*Herring* v. *New York, supra,* 422 U.S. at p. 862 [45 L.Ed.2d at pp. 600-601].) Second, the defense was not improperly foreclosed from appealing to the jurors' consciences and their sense of compassion and abiding justice. Not only was Carr able to make several such appeals before the court finally sustained the prosecutor's objections, but defense counsel Thirkell had been permitted earlier to argue the concepts of compassion, conscience and mercy without limitation. Under these circumstances, no constitutional error or violation appears.

The situation here is analogous to that in *Bonin, supra,* 46 Cal.3d 659. In that case, the trial court refused to allow the defendant's second counsel to argue on surrebuttal after the prosecution waived its rebuttal argument. There we held that the trial court's ruling did not deny or infringe upon the defendant's constitutional right to assistance of counsel because his first counsel had in fact presented a full and unrestricted argument on his behalf. (46 Cal.3d at pp. 694-695.) We observed that the defense's opportunity to participate fully and fairly in the adversary fact-finding process was not significantly limited, despite the omission of second counsel's argument, since defendant's first counsel apparently considered further argument by second counsel to be dispensable. (*Id.,* at p. 695)

Here, as in *Bonin,* defendant's right to assistance of counsel was neither denied nor significantly limited since defense counsel Thirkell presented a full and unrestricted closing argument, in addition to which defense counsel Carr presented surrebuttal argument. To be sure, the court sought to limit Carr to matters raised on rebuttal upon determining that Carr was essentially arguing in areas already covered by Thirkell. But, as noted previously, Carr's arguments regarding the issues of sympathy and compassion, and of staleness and failure of proof, were allowed to stand despite the prosecutor's early objections.[84]

■ Defendant next argues that the trial court's rulings violated section 1095, which provides in pertinent part: "If the offense charged is punishable

---

[84]Defendant asserts that his two defense counsel had agreed to divide closing argument between them, with Thirkell stressing fact-based points and Carr appealing to the jurors' consciences and sense of compassion and abiding justice. Thus, defendant claims, even if Thirkell's argument was entirely unrestricted, it could not fill the void created by Carr's

with death, two counsel on each side may argue the cause." He contends that under this section, it was error for the court to restrict the scope of Carr's argument to the content of the prosecutor's immediately preceding second argument. In support of this contention, defendant points out that in *Bonin, supra*, 46 Cal.3d at page 693, we held that under section 1095 the trial court should have allowed second defense counsel to argue even though the prosecutor waived rebuttal argument altogether. Defendant claims that the error here was prejudicial, and that it violated his constitutional rights to assistance of counsel, due process and a fair penalty determination.

No basis for reversal appears. First, there was no violation of section 1095 here because both of defendant's counsel were in fact permitted to argue. Second, even if *Bonin, supra*, 46 Cal.3d at page 693, supports the conclusion that section 1095 does not limit the scope of permissible surrebuttal by second counsel to matters raised in the prosecutor's rebuttal, that case did not suggest that section 1095 deprives a trial court of its discretionary power to limit excessively repetitive arguments made by counsel. Nor do we so hold in this case. Since the effect of the trial court's rulings was to foreclose Carr from making further duplicative arguments after others had already been allowed, we find no statutory violation and no abuse of discretion.[85]

### 12. *Refusal to Instruct on Lingering Doubt*

Defendant asked the trial court to instruct the jury as follows: "You are instructed that lingering doubt that the defendant committed the crimes for which he has been convicted of an amount or type less than a reasonable doubt is a factor that may be considered by you in determining which penalty to impose as well as in determining if aggravating factors outweigh mitigating factors." The trial court refused to give the requested instruction, but permitted the defense to argue to the jury that it could use any residual or lingering doubt as a factor in mitigation or as a reason not to impose the death penalty. ▮ Defendant contends that the refusal to give his lingering doubt instruction was error under California law and the federal Constitution, and that such error deprived him of his state and federal rights to due process, a fair trial, protection against cruel and unusual punishment and protection against an arbitrary and unreliable death judgment. We disagree.

---

inability to fully deliver his intended argument. Because this agreement is not found or otherwise described in the record, we cannot consider it on appeal. In any event, as we have shown, Thirkell himself had made several appeals to the jurors' sense of compassion, and Carr's appeals to the same effect were allowed to remain on the record.

[85]In his reply brief, defendant claims in the alternative that he was denied effective assistance of counsel if Carr could have completed his intended penalty phase arguments in view of the court's rulings but chose not to because he misread the situation. Since, among other things, the nature and likely effect of Carr's intended argument cannot be ascertained from the record, the claim is rejected on appeal.

Defendant clearly has no federal or state constitutional right to have the penalty phase jury instructed to consider any residual doubt about defendant's guilt. (*People* v. *Johnson, supra,* 3 Cal.4th at p. 1252; *People* v. *Fauber, supra,* 2 Cal.4th at p. 864; *People* v. *Cox, supra,* 53 Cal.3d at p. 677.)

Moreover, the trial court's refusal to give defendant's lingering doubt instruction did not otherwise amount to reversible error. In *People* v. *Cox, supra,* we observed that "[a]s a matter of statutory mandate, the court must charge the jury 'on any points of law pertinent to the issue, if requested' [citations]; thus, it may be required to give a properly formulated lingering doubt instruction when warranted by the evidence. [Citations.]" (53 Cal.3d at p. 678, fn. 20.) In that case, we rejected the defendant's proffered instruction because it erroneously prescribed that the jury evaluate lingering doubt in a particular manner. (*Ibid.*) Assuming for the sake of argument that defendant's proposed instruction in this case suffered no similar infirmity, and that it was warranted by the evidence, we are still unable to conclude that the court's refusal to give the proposed instruction caused prejudice. The record shows that the defense was properly permitted to argue the concept of lingering doubt to the jury, and that it did so. Moreover, the jury was instructed to consider, if applicable, "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record which appears to you as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." Clearly these instructions were "sufficient to encompass the concept of residual doubt about defendant's guilt." (*People* v. *Price, supra,* 1 Cal.4th at p. 488, and cases cited therein; *People* v. *Johnson, supra,* 3 Cal.4th at p. 1252.) Under these circumstances, we do not believe defendant would have derived any additional benefit had the requested instruction been given. (See *People* v. *Fauber, supra,* 2 Cal.4th at p. 864; see also *People* v. *Johnson, supra,* 3 Cal.4th at p. 1252.)[86]

### 13. *Refusal to Instruct on Mercy*

The trial court refused defendant's request to instruct the jury: "You are instructed that you may consider sympathy for the defendant or mercy in the general sense in determining which penalty to apply to the defendant." Defendant contends this refusal was violative of both state law and the Eighth Amendment and constituted reversible error.

---

[86]For the same reasons, we disagree with defendant's additional claim that a reversal is warranted because an alternate juror was substituted in at the penalty phase. (See *People* v. *Price, supra,* 1 Cal.4th at pp. 488-489 [rejecting argument that substitution of juror at penalty phase required court to give various residual doubt instructions sua sponte].)

As defendant acknowledges, we have rejected such contentions before. (*People* v. *Benson* (1990) 52 Cal.3d 754, 808 [276 Cal.Rptr. 827, 802 P.2d 330]; see also *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1195 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1322 [248 Cal.Rptr. 834, 756 P.2d 221].) Defendant provides no persuasive reason to reconsider our determination of this issue.

14. *Refusal to Instruct Regarding Sentence Received by Cynthia Ontiveros*

Defendant requested the court to instruct the jury "that in determining the appropriate punishment for the defendant in this case, you may consider the sentence received by Cynthia Ontiveros in return for her testimony. If you find that the imposition of death against Mr. Rodrigues is disproportionate in comparison to the sentence received by Cynthia Ontiveros you must return a verdict of life without possibility of parole."[87] He contends that the court's refusal to do so constituted error and rendered the death judgment constitutionally defective. We disagree.

As defendant recognizes, we have repeatedly rejected the contention that capital juries must be instructed during the penalty phase to consider the sentences imposed on a defendant's accomplices. (*People* v. *Danielson*, *supra*, 3 Cal.4th at p. 718; *People* v. *Gallego* (1990) 52 Cal.3d 115, 201 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1249 [255 Cal.Rptr. 569, 767 P.2d 1047].) "The focus in a penalty phase trial of a capital case is on the character and record of the individual offender. The individually negotiated disposition of an accomplice is not constitutionally relevant to defendant's penalty determination." (*People* v. *Johnson*, *supra*, 47 Cal.3d at p. 1249.)

Defendant asks us to reconsider our position in light of *Parker* v. *Dugger* (1991) 498 U.S. 308 [112 L.Ed.2d 812, 111 S.Ct. 731], a case in which a capital defendant in Florida was permitted to introduce, at an advisory sentencing hearing, evidence that none of his accomplices had received the death penalty. (498 U.S. at p. 314 [112 L.Ed.2d at pp. 821-822].) According to defendant, *Parker* v. *Dugger*, *supra*, and various federal cases preceding it, are dispositive of his claim that the jury was improperly precluded from considering accomplice Ontiveros's sentence.

In *People* v. *Mincey* (1992) 2 Cal.4th 408 [6 Cal.Rptr.2d 822, 827 P.2d 388], we reviewed the decision in *Parker* v. *Dugger*, *supra*, and determined

---

[87]According to defense counsel's closing argument, Ontiveros received a four-year sentence.

it did not suggest that California was constitutionally required to adopt the Florida rule allowing consideration of the sentences of accomplices at the penalty phase. (2 Cal.4th at pp. 479-480 [rejecting claim that evidence of codefendant's sentence must be admitted]; see also *People* v. *Belmontes*, *supra*, 45 Cal.3d at pp. 810-813.) We adhere to our reasoning in *People* v. *Mincey*, *supra*, in concluding that defendant's requested instruction was properly denied.

We have reviewed all of defendant's arguments on this issue and have determined that none supports reversal of his death sentence.

### 15. *Alleged Double Counting of Espinoza Evidence*

During the penalty phase, evidence of defendant's involvement in the 1980 shooting death of Ernest Espinoza was identified to the jury as a factor in aggravation under both factor (b) and factor (c) of section 190.3. Defendant appears to contend that the trial court erroneously failed to instruct the jury with regard to the distinct purposes of the two factors, i.e., that factor (b) evidence shows defendant's propensity for violence, while factor (c) evidence shows defendant's habitual criminality has been undeterred by the community's previous criminal sanctions. (See *People* v. *Melton*, *supra*, 44 Cal.3d at p. 764.) He also contends that when the prosecutor argued the Espinoza evidence, he misled the jury by twice emphasizing the factor (c) purpose of the evidence. Defendant claims that the combination of the trial court's error and the prosecutor's improper argument resulted in the jury's "double-counting" of the Espinoza evidence as demonstrating his propensity for violence. This, he claims, constituted a denial of his state and federal constitutional rights to due process and a reliable sentence. We cannot agree.

To begin with, the trial court did not err in failing to give an instruction amplifying the distinction between factors (b) and (c) of section 190.3. In the absence of a request by the defendant, a trial court is under no duty to give such an instruction sua sponte. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 146 [249 Cal.Rptr. 320, 756 P.2d 1348].) In this case, the possibility of an amplifying instruction was discussed on April 29, 1988, prior to the commencement of jury selection, when the trial court ruled that evidence of defendant's accessory conviction was admissible. At that point, the trial court acknowledged defense counsel's stated concerns that the jury be properly instructed on the evidence, but told counsel they would address the issue when it came time to decide upon instructions. When such time arrived, however, defense counsel failed to renew his concerns or to press for an appropriate instruction, and the issue apparently was never discussed

again.[88] Under these circumstances, the trial court had no duty to give such an instruction sua sponte.

Defendant's claim regarding the prosecutor's argument fares no better. To the extent defendant is claiming that the prosecutor made impermissible and misleading arguments to the jury, his failure to object and to request a curative admonition waives the claim on appeal. (*People* v. *Noguera, supra,* 4 Cal.4th at p. 638.) In any event, the claim is without merit. We have reviewed the record and have determined that the prosecutor's argument clearly distinguished the two factors, and never suggested that the jury could "double-count" the conduct underlying the incident. No violation of defendant's state or federal constitutional rights appears.

### 16. *Instructions Regarding Consideration of Unadjudicated Offenses*

 Defendant contends that, even though the trial court gave a complete version of CALJIC No. 2.90 at the guilt phase, it erred at the penalty phase in refusing to reinstruct as follows: "A defendant in a criminal action is presumed to be innocent until the contrary is proved. In case of a reasonable doubt whether the truth of an allegation is satisfactorily shown, he is entitled to a finding of not guilty. This presumption places upon the state the burden of proving the truth of any allegation beyond a reasonable doubt." (See CALJIC No. 2.90, 1st par.) Defendant claims this error violated California statutory mandates (§ 1096; Evid. Code, §§ 502, 520), and deprived him of his constitutional rights to due process and a reliable penalty determination.

As defendant acknowledges, the trial court had instructed the jurors at the guilt phase on the presumption of innocence and the prosecutor's obligation to prove beyond a reasonable doubt. Although the court chose not to repeat those particular instructions at the penalty phase, it nevertheless told the jurors to consider the guilt phase instructions during their penalty phase deliberations, and furnished written copies of the guilt phase instructions. After listing the 10 unadjudicated offenses introduced by the prosecutor, the court instructed the jurors that "before you may consider any of such criminal acts as an aggravating circumstance in this case you must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts." (See CALJIC No. 8.87 (5th ed. 1988).) The court also repeated the definition of reasonable doubt. (See CALJIC No. 2.90, 2d par.)

We find no basis for reversal. A court has no duty under statutory or constitutional law to instruct sua sponte on the presumption of innocence

---

[88]In his opening appellate brief, defendant suggests that the trial court volunteered or otherwise undertook to assume the duty of drafting an appropriate instruction. This suggestion is not supported by the record.

and the prosecutorial burden at the penalty phase. (*People* v. *Benson, supra*, 52 Cal.3d at pp. 809-810; see *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1020 [30 Cal.Rptr.2d 818, 874 P.2d 248] [no error where court failed to reiterate instructions on presumption of innocence].) It makes no difference that defendant in this case requested such instructions and was refused. When, as here, the jury is effectively instructed that evidence of unadjudicated offenses is subject to the reasonable doubt standard, no more is required. (*People* v. *Benson, supra*, 52 Cal.3d, at p. 810.) In any event, we have reviewed the record and found nothing to contradict the earlier instructions on the presumption of innocence and the prosecutorial burden of proof.[89] Consequently, we conclude a reasonable jury would assume those instructions continued to apply.

### 17. *Instruction on Sentencing Discretion*

The court gave the 1986 version of CALJIC No. 8.84.2, which reflects the changes suggested in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] reversed on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], as follows: "[I]t is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having heard all of the evidence, and after having heard all of the, after having heard and considered the arguments of counsel you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating, and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravation, aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you *simply* determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death each of you must be persuaded that the aggravating evidence is *so substantial* in comparison with the mitigating circumstances that it *warrants* death instead of life without parole. [¶] Now you shall now retire and select one of your number to act as your foreman, who will preside over your deliberations. In

---

[89]The prosecutor's argument correctly told the jury: "One thing you should bear in mind, Judge Shelton will tell you that each of the things that are presented to you as factors in aggravation, and that includes the truth or falsity of prior felony convictions, must be proven beyond a reasonable doubt. That's only fair. . . . [¶] I would indicate to you that in relation to criminal acts involving force or violence, these are also incidents which must be proven to you beyond a reasonable doubt."

order to make a determination as to the penalty all twelve jurors must agree. [¶] Any verdict that you reach must be dated and signed by your foreman on a form that will be provided and then shall be returned, and then you shall return with it to this courtroom." (Italics added.)[90]

Defendant claims that above italicized words rendered the instruction vague, misleading and constitutionally defective. However, if defendant believed the instruction was unclear, he had the obligation to request clarifying language. (See *People* v. *Johnson, supra,* 6 Cal.4th at p. 53.) In any case, we have repeatedly rejected arguments identical to defendant's (*People* v. *Sully, supra,* 53 Cal.3d at pp. 1244-1245; *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 590-591 [286 Cal.Rptr. 628, 817 P.2d 893]; see also *People* v. *Wader, supra,* 5 Cal.4th at pp. 662-663; *People* v. *Breaux* (1991) 1 Cal.4th 281, 315-316 [3 Cal.Rptr.2d 81, 821 P.2d 585]), and decline to reconsider our determinations.

Defendant next claims that the trial court erred in failing to instruct that *even if no evidence in mitigation was found,* or *if the circumstances in aggravation were found to outweigh those in mitigation,* the jury nevertheless had discretion to impose life without parole *if it determined that such a sentence was the appropriate penalty under all of the circumstances.* (See *People* v. *Duncan* (1991) 53 Cal.3d 955, 979 [281 Cal.Rptr. 273, 810 P.2d 131] [jury may determine "even in the absence of mitigating evidence" that the aggravating evidence is insubstantial].) In particular, defendant complains that the instructions given in this case were inadequate and led to a constitutionally flawed result because: (1) their wording required that there be *some* evidence in mitigation as a prerequisite for imposing a sentence less than death; and (2) they presupposed that such evidence was introduced at the penalty phase. We disagree.

Defendant's failure to request such clarifications at trial bars appellate review of the issue. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 52.) In any event, no error appears. We recently concluded that a trial court did not err in failing to give substantially similar clarifications where it instructed the jury pursuant to instructions identical to those given here (former CALJIC No. 8.84.2). Under such instructions, "[n]o reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist." (6 Cal.4th at p. 52; cf. *People* v. *Raley* (1992) 2 Cal.4th 870, 921 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Thus, the trial court in this case adequately informed the jury of its sentencing responsibilities. No more was required.

[90]Former CALJIC No. 8.84.2 was renumbered as CALJIC No. 8.88 in 1989. (See com. to CALJIC No. 8.88 (5th ed. 1993 pocket pt.).)

### 18. *Response to Jury Question*

During the penalty phase deliberations, the jury sent the court a note stating: "Can we please have a clarification on the instructions. [¶] Does the jury have to be unanimous on the penalty no matter which choice is made? And if the jury happens not to be unanimous what would happen then?" The court discussed the matter with both sides outside the presence of the jury, and the prosecutor agreed with defense counsel's suggested responses. Pursuant to the parties' agreement, the court informed the jury that the answer to its first question was "yes," and that the answer to its second question was, "you are not to speculate on that eventuality. That is a matter which must not in any way affect your decision."

 Defendant now contends, despite his counsel's express suggestion to the contrary below, that the trial court's response to the second question violated section 1138[91] and resulted in a deprivation of his federal constitutional rights to due process, a fair trial by jury and a reliable penalty judgment. He claims that the court instead should have advised the jurors truthfully that if they were unable to reach a unanimous verdict the penalty issue would be retried by another jury, but that such matter was not to concern them.

We are not persuaded. Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 847 [281 Cal.Rptr. 90, 809 P.2d 865].) Moreover, the claim is devoid of merit. The trial court "is not required to 'educate the jury on the legal consequences of a possible deadlock.' [Citation.]" (*Ibid.*; *People* v. *Morris, supra,* 53 Cal.3d at p. 227; *People* v. *Belmontes, supra,* 45 Cal.3d at p. 814.) We have previously cautioned that informing the jury of the possibility of subsequent retrials in the event of a deadlock "would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process. Penalty phase juries are presently instructed that their proper task is to decide between a sentence of death and life without the possibility of parole. Any further instruction along the lines suggested herein could well serve to lessen or diminish that obligation in the jurors' eyes. [Citations.]" (*People* v. *Belmontes, supra,* 45 Cal.3d at p. 814, fn. omitted.) Accordingly, defendant was not entitled to have the trial court explain to the jury what

---

[91]Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

would happen in the event of a deadlock, and defense counsel was not ineffective for failing to urge such a response.[92]

Defendant seeks to equate the trial court's failure to advise the jurors that if they were unable to reach a unanimous verdict the penalty issue would be retried by another jury with the situation in *Simmons* v. *South Carolina* (1994) 512 U.S. __ [129 L.Ed.2d 133, 114 S.Ct. 2187], in which the United States Supreme Court reversed a death judgment because of the trial court's refusal to instruct that imposition of a life sentence on the defendant would be life without parole. The situations are not similar. Here, not advising the jury that the case would be retried did not create a "false choice" between impossing the death penalty or sentencing defendant to a limited term of incarceration (*id.* at p. __ [129 L.Ed.2d at p. 141]), or have the effect of allowing defendant to be sentenced to death on the basis of information which he had no opportunity to explain or deny (*id.* at p. __ [129 L.Ed.2d at p. 143]).

### 19. *1978 Capital Sentencing Scheme*

Defendant argues that the sentencing scheme under California's 1978 death penalty law is constitutionally flawed in a number of ways. We have repeatedly rejected identical claims, as follows.

Neither the 1978 law nor the instructions given in this case are defective for failing to make express distinctions between aggravating and mitigating circumstances. (*People* v. *Wash* (1993) 6 Cal.4th 215, 271 [24 Cal.Rptr.2d 421, 861 P.2d 1107]; *People* v. *Clark, supra,* 5 Cal.4th at p. 1040; *People* v. *Montiel, supra,* 5 Cal.4th at p. 943.) The 1978 law is not unconstitutional insofar as it permits a jury which has already decided a defendant's guilt to determine, on the issue of penalty, whether the defendant committed alleged prior criminal acts to be considered in aggravation. (*People* v. *Pride, supra,* 3 Cal.4th at pp. 252-253; *People* v. *Balderas, supra,* 41 Cal.3d at pp. 204-205; see also *People* v. *Hawthorne, supra,* 4 Cal.4th at p. 77.) There is no constitutional requirement that the jury in a capital case must be instructed that it must find unanimously and beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate penalty. (*People* v. *Wash, supra,* 6 Cal.4th at pp. 271-272; *People* v. *Clark, supra,* 5 Cal.4th at p. 1040; *People* v. *Montiel, supra,* 5 Cal.4th at p. 943.) Nor is there a constitutional requirement of jury

---

[92]Defendant speculates that the jurors might have been influenced by incorrect beliefs to change their votes in order to avoid a deadlock and thereby "preempt" an undesired result. Such conjecture provides no basis for relief. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 552-553 [262 Cal.Rptr. 1, 778 P.2d 129].)

findings, either unanimous or separate, on the truth of the allegations of the prior unadjudicated crimes. (*Ibid.*) There is also no constitutional requirement that a record be maintained of the sentencing factors and reasons relied on by the jury in its imposition of the death penalty. (*Ibid.*) Moreover, the 1978 death penalty law does not deprive defendant of the benefits of the Determinate Sentencing Act (see § 1170, subd. (c)) in violation of due process and equal protection. (*People* v. *Medina* (1990) 51 Cal.3d 870, 910 [274 Cal.Rptr. 849, 799 P.2d 1282]; see also *People* v. *Clark, supra,* 5 Cal.4th at p. 1041; *People* v. *Marshall, supra,* 50 Cal.3d at p. 945.) Defendant's arguments fail to persuade us to reconsider any of these issues.

 Defendant also claims that factor (a) of section 190.3 is impermissibly vague under the Eighth Amendment to the federal Constitution or under the reasoning in *Stringer* v. *Black* (1992) 503 U.S. 222 [117 L.Ed.2d 367, 112 S.Ct. 1130]. Not only have we repeatedly found such a contention to be without merit (e.g., *People* v. *Cudjo* (1993) 6 Cal.4th 585, 637 [25 Cal.Rptr.2d 390, 863 P.2d 635], and cases cited therein; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 478-479 [24 Cal.Rptr.2d 808, 862 P.2d 808], and cases cited therein), but now the United States Supreme Court has done so. In *Tuilaepa* v. *California* (1994) 512 U.S. __ [129 L.Ed.2d 750, 114 S.Ct. 2630], decided after briefing was completed in this case, the high court ruled: "our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. [Citation.] We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires. In any event, this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms. The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." (512 U.S. at p. __ [129 L.Ed.2d at p. 762, 114 S.Ct. at p. 2637].) Any dispute over this issue has now been finally resolved.

Additionally, we reject defendant's claim that the inclusion of both "circumstances of the crime" and "the existence of any special circumstances" among the factors which a jury may use to aggravate the sentence creates a bias and presumption in favor of death in violation of his constitutional rights. The jury cannot return a death verdict unless it finds, based on the totality of the aggravating circumstances and the totality of the mitigating circumstances, that the aggravating evidence is *so substantial* in comparison with the mitigating circumstances that it warrants death instead of life without parole. (See *People* v. *Johnson, supra,* 6 Cal.4th at p. 52.) Consequently, mere inclusion of the challenged matters as factors in aggravation for the jury's consideration creates no bias or presumption in favor of death.

Finally, we decline defendant's request to compare his sentence to those of his accomplices, or to those of other defendants in cases involving the killing of a single person during a burglary and attempted robbery. Such review is not required under the federal Constitution, and defendant fails to set forth compelling reasoning or authority in support of such review. (*People* v. *Marshall*, *supra*, 50 Cal.3d at p. 946; see also *People* v. *Mayfield*, *supra*, 5 Cal.4th at p. 196; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297].) In view of the brutal nature of defendant's crimes, and his violent and incorrigible history, we do not perceive his death sentence to be "so disproportionate that it shocks the conscience and offends fundamental notions of human dignity. [Citations.]" (*People* v. *Livaditis*, *supra*, 2 Cal.4th at p. 786.)

### 20. *Automatic Motion for Modification of Death Verdict*

 "Under section 190.4, subdivision (e), a capital defendant is deemed to have automatically applied for a sentence modification. In ruling on the application, the trial judge must independently reweigh the evidence of aggravating and mitigating circumstances and determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict. [Citation.] The judge must also state on the record the reasons for the ruling. [Citation.]" (*People* v. *Mincey*, *supra*, 2 Cal.4th at p. 477.) **(72)** Defendant contends that the trial court, in denying his motion for modification, committed four errors which in turn violated his constitutional rights.

First, defendant claims that the trial court's statement of reasons indicates that it committed error by treating the absence of a particular mitigating factor as an aggravating factor. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861].) In reviewing each of the statutory factors the trial court referred to the absence of evidence of section 190.3, factors (d), (e), (f), (g), (h) and (j), but did not suggest that that absence was itself aggravating. When discussing factor (i), however, the court stated that the age of defendant "is not a mitigating factor and, therefore, is not relevant to the determination of this motion." Defendant asserts that because no similar "finding" of irrelevance was made with regard to the other factors listed above, the court must have implicitly found and considered the absence of such factors to be aggravating. We do not agree.

The court's brief comment does not support defendant's speculative contention. The record makes clear that the court was not urged to treat the absence of any mitigating factor as an aggravating factor. Moreover, defense counsel's failure to make the relevant objection supports our conclusion that

the court's statements, when taken as a whole and reasonably construed, simply reflected its determination that some of the factors were neutral.

Second, defendant claims that in denying his motion, the trial court improperly considered the January 1, 1981, arson incident at Susanville and the November 2, 1984, incident involving threats to Leo Rodriguez because those incidents neither constituted "criminal activity" nor involved "the use or attempted use of force or violence or . . . the express or implied threat to use force or violence" as required under section 190.3, factor (b).

Even assuming the above evidence was improperly considered, the record as a whole demonstrates that defendant was not prejudiced. In denying defendant's motion, the trial court emphasized the heinous nature of the underlying crime: "the circumstances of the murder were particularly savage and brutal and reflected a high degree of cruelty, viciousness and callousness on the part of the defendant." The court determined that "the evidence that the victim was stabbed over 20 times, coupled with the ultimate death by loss of blood, reflects extreme and gratuitous violence, and presents a strong factor in aggravation." The court also reviewed the evidence, evaluated the credibility of the witnesses and found beyond a reasonable doubt that defendant committed each of the other eight criminal offenses introduced by the prosecutor, and that he had been convicted of being an accessory to murder, and of burglary and auto theft. Finally, although the court found some evidence in the record of mitigating factors such as defendant's childhood home life and his relationships with family members and neighborhood peers, it nonetheless concluded that the evidence in aggravation was overwhelming and substantial by comparison. Since the statement of decision makes apparent that the trial court did not deem the issue of penalty to be a close one, no remand is warranted. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 893 [277 Cal.Rptr. 122, 802 P.2d 906].) It is inconceivable that the court would have been moved to grant a modification of the death verdict had evidence of the Rodriguez threat and evidence of the Susanville fire incident been withdrawn from consideration.

Third, defendant claims that the trial court erroneously considered his prior felony conviction for accessory in the Espinoza matter as a conviction for the crime of accessory *to murder*. However, it is extremely doubtful that the trial court, having found beyond a reasonable doubt that defendant was criminally responsible for Espinoza's killing, would have arrived at a different conclusion had the conviction been otherwise characterized.

Fourth, defendant complains that, although the trial court expressly found that accomplice Cynthia Ontiveros's testimony was adequately corroborated

with respect to the guilt verdicts, it made no such finding with respect to the special circumstance allegations. He asserts that the lack of specific evidentiary findings on the special circumstances reflects the court's ignorance of the applicable law and facts, and that due to this ignorance, the court did not adequately determine under section 190.4, subdivision (e) whether the jury's findings on the special circumstance findings were contrary to the law or the evidence presented.

We find nothing in the record that reasonably supports defendant's assignment of error. The trial court explicitly found "the evidence concerning the truth of the special circumstances; to wit, that the defendant committed a murder during the commission of a burglary, and an attempted robbery to be overwhelming. . . ." It further found "that the jury's verdicts, finding the defendant guilty of murder in the commission of burglary and attempted robbery, to be supported by evidence beyond a reasonable doubt, and to be neither contrary to the evidence nor the law." After having reviewed the record, we conclude that the evidence more than adequately supports the jury's verdict that defendant killed Juan Barragan during the commission of a burglary and attempted robbery, and find that the trial court independently and correctly reached the same conclusion in passing on defendant's modification motion.

21. *Effect of Alleged Errors*

Defendant claims that the various asserted statutory and constitutional violations, both singly and in combination, denied him due process and undermined the reliability of the death verdict. Whether or not expressly discussed, we have considered and rejected as being without merit all of these claims. (See *People* v. *Mickle*, *supra*, 54 Cal.3d at p. 197.)

III. Disposition

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed in its entirety.

Lucas, C. J., Kennard, J., Arabian, J., George, J., and Werdegar, J., concurred.

MOSK, J., Concurring and Dissenting.—I concur in the judgment as to guilt, death eligibility, and noncapital sentence. After review, no error or other defect is evident requiring reversal or vacation on any of these issues.

I dissent, however, from the judgment as to the sentence of death. I would set aside that penalty as unreliable under the Eighth Amendment to the

United States Constitution and article I, section 17 of the California Constitution because defendant's counsel introduced none of the available evidence in mitigation.[1] It is the duty of the sentencer to weigh aggravating circumstances and mitigating circumstances. How can it do so when it is presented with the former but not with the latter? In such a situation, which obtains here, the scale is automatically, and arbitrarily, skewed in favor of death.

The petitions of both respondent and appellant for a rehearing were denied February 16, 1995, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petitions should be granted.

---

[1]See *People* v. *Stansbury* (1993) 4 Cal.4th 1017, 1074 [17 Cal.Rptr.2d 174, 846 P.2d 756] (conc. & dis. opn. of Mosk, J.), reversed on other grounds *sub nom. Stansbury* v. *California* (1994) 511 U.S. __ [128 L.Ed.2d 293, 114 S.Ct. 1526]; *People* v. *Diaz* (1992) 3 Cal.4th 495, 577 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (conc. & dis. opn. of Mosk, J.); *People* v. *Howard* (1992) 1 Cal.4th 1132, 1197 [5 Cal.Rptr.2d 268, 824 P.2d 1315] (conc. & dis. opn. of Mosk, J.); *People* v. *Sanders* (1990) 51 Cal.3d 471, 531-533 [273 Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.); *People* v. *Lang* (1989) 49 Cal.3d 991, 1059-1062 [264 Cal.Rptr. 386, 782 P.2d 627] (conc. & dis. opn. of Mosk, J.); see also *People* v. *Williams* (1988) 44 Cal.3d 1127, 1158-1061 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. & dis. opn. of Mosk, J.); *People* v. *Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925].